IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16-CR-265 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN ADAMS |
| -vs- | ) | |
| | ) | |
| ERICK HENDRICKS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT ERICK HENDRICK'S OMNIBUS RESPONSE TO
GOVERNMENT'S REQUESTS FOR PROTECTIVE ORDERS**

Now comes defendant, Erick Hendricks, by and through his undersigned attorneys, and respectfully responds to the Government's requests for protective orders for possible witnesses it may call during trial. In sum, the Government seeks to alter the appearance of a particular witness to protect the identity of that witness, who may be currently involved in investigations not related to Hendricks. As the Supreme Court of the United States has not addressed this issue, Hendricks objects. This response is intended for all of the individual requests for protective orders made by the Government.

However, the Defendant understands that circuits and other district courts have engaged in a weighing of interests when determining the extent to which the Government may alter the appearance of a witness in the name of national security. Although national security is a valid interest to be considered, that interest must be weighed against Hendricks' Constitutional guarantees of an open courtroom and the right of confrontation.

Defendant recognizes that until the Court actually sees the altered identity of the witness, it is impossible to assess the proper weights of the above interests. Nevertheless, Hendricks will address that arguments in the attached memorandum.

This year, on February 15, 2018, District Judge Paul A. Engelmayer of the Southern District of New York addressed many of the same issues facing this Court in <u>United States v. Alimehnti, Dist. Court</u>, No. S1 16-cr-398, SD New York, (2018), in a material support case. Hendricks will not repeat the arguments here, but a copy of Judge Engelmayer's Opinion and Order is attached as Appendix A. A Memorandum in Support follows.

Respectfully submitted,

| | |
|---|---|
| S/ Stephen D. Hartman | S/ David L. Doughten |
| Stephen D. Hartman (OH 0074794) | David L. Doughten (OH 0002847) |
| 320 N. Michigan St., 1st Floor | 4403 St. Clair Ave. |
| Toledo, OH 43604 | Cleveland, OH    44103 |
| (419) 461-6107 | (216) 361-1112 |
| (419) 710-0496 Fax | (216) 881-3928 Fax |
| stevehartmanlaw@gmail.com | ddoughten@yahoo.com |

COUNSEL FOR DEFENDANT ERICK JAMAL HENDRICKS

## MEMORANDUM IN SUPPORT

Presently, the government is requesting a series of "protective measures" that conflict with a defendant's rights which ensure an open and adversarial justice system. One's right to a public trial and one's right to confront the witnesses against him are essential bedrock rights guaranteed by the Constitution and upheld by our highest courts, as discussed below. While, lower courts have permitted "protective measures" to erode those rights, controlling case law steadfastly protects against the measures sought by the government in this case. The two main protections effected here are the open courtroom and the right of confrontation.

I.  **Conflicting Rights In General**

   a.  **Open Courtroom**

The Sixth Amendment protects the accused's right to a public trial. Waller v. Georgia, 467 U.S. 39, 44-47, 104 S.Ct. 2210 (1984). This right helps to ensure "that judge and prosecutor carry out their duties responsibly and encourages witnesses to come forward and discourages perjury." *Id*. at 46, 104 S.Ct. 2210. "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions..." *Id.*, at 46, (quoting In re Oliver, 333 U.S. 257, 270, n. 25, 68 S.Ct. 499, 506, n. 25 (1948), in turn quoting T. Cooley, Constitutional Limitations 647 (8th ed. 1927)).

Although the right to an open trial may give way in certain cases to other rights or interests. Id. at 45, 104 S.Ct. 2210, "[s]uch circumstances will be rare, however, and the balance of interests must be struck with special care." Id. According to the Court:

> The presumption of openness may be overcome *only* by an overriding interest *based on findings* that closure is essential to preserve higher values and is narrowly tailored to serve that interest. *The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.*

Id. (quoting Press-Enterprise Co. v. Superior Ct. of Cal., 464 U.S. 501, 510, 104 S.Ct. 819 (1984)). (Emphasis added).

The Waller Court identified four requirements, important though not particularly onerous, that must be met before public access to a criminal proceeding may be denied:

1. The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced;

2. The closure must be no broader than necessary to protect that interest;

3. The trial court must consider reasonable alternatives to closing the proceeding; and,

4. it must make findings adequate to support the closure.

Id. at 48, 104 S.Ct. at 2216.

In relation to the fourth requirement, Waller makes clear that both partial and total closures burden the defendant's constitutional rights, and before either is undertaken, a court must hold a hearing and articulate on the record specific findings. See also, Douglas v. Wainwright, 739 F.2d 531, 532 (11th Cir. 1984). To that extent, this Court must make its finding after it has seen the alteration of witness by the Government.

3

**b.     Confrontation Clause**

The Sixth Amendment guarantees the criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. Amend. VI. At the core of the Confrontation Clause is the right of every defendant to test the credibility of witnesses through cross-examination. *See* Smith v. Illinois, 390 U.S. 129, 129-31 (1968), Davis v. Alaska, 415 U.S. 308, 315-16 (1974); Mayes v. Sowders, 621 F.2d 850, 855 (6th Cir.1980). The Supreme Court has emphasized that cross-examination is more than a desirable rule of trial procedure; rather, it is the "principal means by which the believability of a witness and the truth of his testimony are tested." Davis, 415 U.S. at 316; *see also* Chambers v. Mississippi, 410 U.S. 284, 295 (1973); Pointer v. Texas, 380 U.S. 400, 404 (1965).

A defendant's right to confrontation is violated when a trial court "unfairly" limits his cross-examination of a government witness. Coy v. Iowa, 487 U.S. 1012, 1020 (1988) (noting that the Confrontation Clause implies the right to cross-examine witnesses). *See also*, Delaware v. Van Arsdell, 475 U.S. 673, 679 (1986) (acknowledging right but explaining that trial judges have discretion in limiting the extent of cross-examination to curb concerns such as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.") (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)); Crawford v. Washington, 124 S.Ct. 1354, 1359 (2004).

The basic purpose of the Confrontation Clause is "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact," Maryland v. Craig, 497 U.S. 836, 845 (1990), and by giving

4

a defendant the "opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Mattox v. United States, 156 U.S. 237, 242-43 (1895).

That right, however, is not absolute. "[T]he Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." United States v. Owens, 484 U.S. 554, 559 (1988) (*quoting* Kentucky v. Stincer, 482 U.S. 730, 739 (1987)) (alteration in original) (emphasis in original). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." United States v. Crowley, 318 F.3d 401, 417 (2d Cir. 2003) (quoting Delaware v. Van Arsdall, 475 U.S. at 679.

## II.     The Specifics of the Prosecutors' Request.

In its Motion for Protective Order to Protect the Identity of Confidential Human Source at Trial and Motion for Protective Order Pertaining to Testimony of Undercover Agent at Trial, the government has asked for a number of separate encroachments on Hendrick's confrontation rights. Those requests include; 1) UCE be able to testify using a psuedonym, 2) Defense counsel be prohibited from using UCE's true name or disclosing it to defendant, 3) Cross examination be restricted to prohibit any identifying information, 4) Prohibition of non-official recordings, depictions, or photographs, 5) UCE be permitted to wear a disguise, 6) closure of the court to

non-essential personnel permitting audio listening only in a separate room, 7) UCE be permitted to use a non-public entrance, 8) UCE be permitted to enter courtroom outside the presence of the jury, the defendant, and the public, 9) UCE be permitted to remain seated while being sworn in, and 10) Modification of the order only be made through a superseding written court order.

The government asserts that these measures are needed to prevent the public disclosure of the true identity and physical description of the UCE. The government argues in its brief that these "reasonable" measures are "an appropriate balance of the defendant's rights to a public trial and confrontation, and the interest in the FBI in not jeopardizing the UCE's continuing work and safety."

The defense disagrees. In whole, the measures requested are not the least restrictive measures to achieve the government's purpose. However, without waiving objection to these procedures in their entirety, some of the prosecutors' requested measures will not be challenged by the defense simply because they do not meaningfully impose on the defendant's rights. For example, the defense does not oppose allowing the UCE to use a non-public entrance/exit to the courthouse and courtroom, provided that the jury is not made aware of those circumstances.

Additionally, defense counsel does not object to permitting the UCE to testify under a pseudonym so long as his true identity and information regarding his background and experiences are disclosed to counsel. Counsel does not concede the need for such a measure but does not principally oppose the measure.

So long as it is not known to the jury and not conspicuous, defense counsel does not have an issue with the UCE using a light disguise. As described in the motion, a light disguise is a

changing facial hair, hairstyle, or dress style, so long as it does not prevent the jury from observing the UCE's demeanor nor prevent a reading of the UCE's facial expressions during testimony. Note that counsel reserve the right to object to any excessive or conspicuous disguise that would conceal the UCE's demeanor from the jury, prevent the jury from making its necessary credibility determinations, or impinge upon Defendant's confrontation rights.

Further, the defense does not object to additional measures sought by or that may be sought by the prosecutors such as measures concerning barring of the public disclosure of audio recordings of the UCE's voice or visual image while testifying and prohibiting all nonofficial recording devices from the courtroom while the UCE testifies as these do not substantially infringe upon Hendricks Sixth Amendment protections discussed above.

**B.    The Prosecutors' Request to Remove the Public from the Courtroom During the UCE's Testimony Violates the Constitutional Guarantee to a Fair and Public Trial.**

The defense would object to removal of the public or any other courtroom closure. Closure of the courtroom to the public is not the least restrictive means for achieving the government's purpose. For the reasons described in more detail below, that extreme step would not only undermine the Constitutional fair and public trial guarantees, but would also have real, tangible and irremediable prejudice to Defendant in front of the jury. The long-standing law on this issue establishes a strong presumption in favor of public trials. Indeed, in <u>United States v. Osmakac,</u>(12 CR 45 (M.D. Fla.), relied upon by the government, when faced with a similar motion to close the courtroom, the district court held: "The courtroom shall remain open during the testimony of the UCE."

7

As the Supreme Court has emphasized, "[t]he central aim of a criminal proceeding must be to try the accused fairly." Waller v. Georgia, 467 U.S. at 46; United States v. Simmons, 797 F.3d 409 (6th Cir. 2015). The public-trial guarantee, enshrined in both the First and Sixth Amendments, exists to protect the right to a fair trial. Id.

A public trial allows for essential public scrutiny over judicial proceedings. This scrutiny serves important policy concerns, including the following:

> ·allowing for contemporaneous review of testimony in an open forum to safeguard against the abuse of power by the government or the court;
>
> ·discouraging perjury;
>
> ·requiring the parties to fulfill their duties and responsibilities conscientiously;
>
> ·encouraging unknown witness to come forward to be heard;
>
> ·guarding against favoritism;
>
> ·exposing substantial allegations of police misconduct; and
>
> ·increasing confidence in the judicial system.

See, e.g., Simmons, 797 F.3d at 415; Waller, 467 U.S. at 46-47; In re Associated Press, 162 F.3d 503, 506 (7th Cir. 1998); In re Oliver, 333 U.S. at 270 ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."); Press-Enterprise Co. v. Superior Court, 104 S. Ct. 819, 823 (1984) ("Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system"); Globe Newspaper Co. v. Superior Court for Norfolk County, 457 U.S. 596, 606 (1982) ("Public scrutiny of a criminal trial

8

enhances the quality and safeguards the integrity of the fact-finding process, with benefits to both the defendant and to society as a whole.")

Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. In the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government. Wayne LaFave, et al., 6 Criminal Procedure §24.1 (3d ed. 2007); Akhil Reed Amar, Sixth Amendment First Principles, 84 GEO. L.J. 641, 677-81 (1996). *See also* Fed. R. Crim. P. 26 (emphasis added) ("In every trial the testimony of witnesses *must* be taken in open court, unless otherwise provided by a statute or by rules adopted under 28 U.S. §§1071-2077). The public-trial right is so fundamental that a violation is deemed a structural trial error that is not subject to the harmless error analysis. Waller, 467 U.S. at 49-50, n.9.

While the public-trial guarantee is not absolute, the Supreme Court has held that trial closures are to be "rare and only for cause shown that outweighs the value of openness." Press-Enterprise, 464 U.S. at 509. Overcoming the Constitutional presumption of access to trial proceedings is a "formidable task." In re Associated Press, 162 F.3d at 506.

Specifically, the four-part test is as follows: "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." Waller, 467 U.S. At 48. In Simmons, the Sixth Circuit adopted a modified test, replacing the showing of an

9

"overriding interest" with a requirement to show a "substantial reason." Simmons at 414.

Here, the prosecutors must show a substantial interest "that is likely to be prejudiced" absent closure, and that closure of the courtroom is "no broader than necessary to protect that interest." Moreover, reasonable alternatives, including those proposed by the prosecutors that the defense accepts, as well as the enforcement of the Court's local rules, are more than adequate to protect any interests that may exist.

### 1. The Prosecutors Have Not Identified an "Substantial Reason" Sufficient to Justify Closure of the Courtroom for the UCE's Testimony.

At present, it appears that removing spectators from the courtroom is no longer being requested. Hendricks will nonetheless address the matter to establish why removing spectators cannot be an option.

To justify the extreme measure of closing the courtroom to the public during the UCE's the government relies on the second circuit cases Ayala v. Speckard and Rodriguez v. Miller. The Second Circuit authority cited by the prosecutors is of limited value. (*See* Motion, p. 9 citing Ayala v. Speckard, 131 F.3d 62, 72 (2d Cir. 1997); Rodriguez v. Miller, 537 F.3d 102, 110 (2d Cir. 2008)). These cases each involved the same, specific factual scenario—"buy and bust" narcotics transactions involving undercover police officers purchasing narcotics from individuals who are later arrested by other officers outside of the presence of the undercover officer.

Significantly, in each of these cases it appears that the trial courts closed the courtrooms for the undercover officer's testimony only *after* the officers testified in a closed hearing

10

pursuant to New York state law and provided detailed facts regarding their history of working in an undercover capacity, specific threats and risks that they faced, and also precise information regarding when and where the officers planned to return working in an undercover capacity. *See Ayala*, 131 F.3d at 64-65 (describing testimony of undercover officers prior to courts ordering closure of courtrooms for undercover officers' testimony); Rodriguez, 537 F.3d at 104 (describing testimony of undercover officer at hearing pursuant to *People v. Hinton*, 31 N.Y.2d 71 (1972) prior to court ordering closure of courtroom for undercover officer's testimony).

    This overall procedure, and particularly the ability to cross-examine the undercover officer, militates against rather than for closure of the courtroom. It simply goes too far to argue that "protecting other investigations and ensuring a law enforcement officer's safety" will universally satisfy the first Waller factor. This is especially so when, unlike the New York "buy and bust" cases, there is no similar fact-sensitive record that would justify a closed hearing.

    Understanding that the government must protect the witness's safety, the government concedes that there have been no threats made against the UCE. The government relies on an argument that Hendricks was attempting to identify law enforcement. Absent a threat, one's interest in identifying law enforcement is just as likely to be in an effort to evade detection or punishment. If a defendant's interest in detecting law enforcement was sufficient reasoning to close a courtroom, nearly every criminal case would result in a closed court. Inherent in criminal conduct is an interest in avoiding detection. Identifying the presence of law enforcement is an essential part of avoiding detection. As an example, countless motorists purchase radar detectors to identify the presence of law enforcement and evade detection and punishment for the violation

11

of speeding. It would be patently unreasonable to assume that the officer who issued a speeding citation to such a motorist would be in danger simply because that motorist engaged in overt acts to identify law enforcement.

The defense is not minimizing the reality that the allegations in the present case are significantly more serious than a traffic violation. However, the factors in Waller require a substantial reason, and the government's burden in that regard should not be lowered merely because the seriousness of the allegations are heightened. Indeed, where liberty and freedom are at stake, it is essential to maintain the standards set forth in Waller and Simmons. Here the government states that, "although there are no specific threats against the UCE, the defendant's conduct and communications make clear that the defendant or fellow members of his cell are actively seeking to identify law enforcement officers and share that information with others." That does not establish a threat to the witness's safety.

Additionally, the government argues that the UCE's identity should be protected for the purpose of protecting the integrity of other investigations. In this case, the entirety of the UCE's involvement with the defendant and other members of his alleged cell was through online and social media communication. The government argues that "the UCE in question did not actually meet the defendant in person."

The entirety of his undercover operation was through a series of online identities and social media handles. The identification of those handles will necessarily be revealed in the course of this trial. Accordingly, the "cover" of those accounts, and thus the value of those covers, which the government is seeking to protect, will already be lost. This instance can be

12

differentiated from the traditional "undercover" case in which the UCE has a physical presence.

Where a UCE has a physical presence, protecting his physical appearance is paramount in protecting the value of his operation. However, where the UCE has a virtual presence, as in this case, his ability to maintain or recreate a virtual presence is not compromised by having appeared in court. The harm is further minimized where he has appeared in a disguise, un-recorded, un-photographed, under pseudonym, with court security.

Finally, the partial closure of the courtroom during the UCE's testimony would cause Hendricks unfair and irremediable prejudice. Excluding the entire public—including his own family—when the UCE takes the stand would send the clear message that Hendricks is dangerous. No limiting instruction could cure this prejudice—indeed, counsel submit that a limiting instruction would only exacerbate the problem. This certain prejudice resulting from closure of the courtroom must be avoided, particularly given that the public trial guarantee is "one created for the benefit of the defendant." Gannett Co. v. DePasquale, 443 U.S. 368, 380 (1979); In re Oliver, 333 U.S. at 270 n.25 ("The requirement of a public trial is for the benefit of the accused").

> 2.  **Expelling the Public from the UCE's Testimony is Not Narrowly Tailored to the Prosecutor's Interest to Protect the Identity of the UCE, Which Can Be Addressed Through Other Narrower Measures.**

Waller requires that closure of the courtroom "must be no broader than necessary to protect" the stated interest. Waller also requires the Court consider reasonable alternatives to closing the courtroom. The government argues that the purpose of closing the courtroom is to ensure the safety of the UCE. The prosecutors have not shown how measures narrower than

13

removing the public and press from the courtroom and forcing them to *listen*—not watch—the proceedings is no broader than necessary to protecting the UCE's image and real name.

The government argues that because the defendant and the UCE did not meet in person, "there is no legitimate public interest in the UCE's physical appearance." This argument ignores the reasoning of Waller in its entirety. The prosecutors' proposal to allow the public and press to hear the trial testimony but not see it does not cure the prejudice to the truth-seeking function of a public trial. Both the public and the press would be prevented from observing the gestures, facial expressions, and demeanor of the litigants as well. Further, witness perjury could very well be facilitated by knowledge that the witness is not subject to immediate public scrutiny.

### III. Conclusion.

Closure of the courtroom to the public is not narrowly tailored. The government has not cited a substantial reason for the Constitutional intrusion. Thus, the government has not met their burden and offer no explanation why a light disguise, pseudonym, and enforcement of existing court security measures would not be sufficient to meet the stated interests.

             Respectfully submitted,

             S/ David L. Doughten
             David L. Doughten

             S/ Stephen D.Hartman
             Stephen D. Hartman

             Counsel for Mr. Hendricks

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of February, 2018, a copy of the foregoing was filed electronically. Parties may access this filing through the Court's system. Notice of this filing will be sent by operation of the Court's electronic filing system

S/ Stephen D Hartman<br>
Attorney for Defendant Hendricks