IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16-CR-265 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | GOVERNMENT'S RESPONSE IN |
| ERICK JAMAL HENDRICKS, | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTION IN LIMINE TO EXCLUDE |
| Defendant. | ) | GOVERNMENT'S PRESENTATION OF |
| | ) | EVIDENCE |

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney for the Northern District of Ohio, and Matthew W. Shepherd, Mark S. Bennett, Assistant United States Attorneys, and Rebecca A. Magnone, Trial Attorney, Counterterrorism Section, and hereby respectfully moves this Honorable Court to issue an Order denying Defendant's Motion In Limine To Restrict Government's Presentation of Evidence, which sought to preclude the government from presenting any evidence at trial related to the terrorist attack in Garland, Texas on May 3, 2015, including photographs of the crime scene While any evidence against the Defendant is prejudicial, the evidence in this case related to the Garland attack is not unfairly prejudicial, and  is far outweighed by its probative value, as it

relates directly to allegations in the indictment.   this Court should issue an Order denying

Defendant's Motion *in Limine* and allow the Government to present its case in full.

## RELEVANT FACTS

### I.  THE SUPERSEDING INDICTMENT

Defendant Erick Jamal Hendricks is charged in a two-count Superseding Indictment.

Count 1 charges him with conspiracy to provide material support and resources to a designated

terrorist organization, namely the Islamic State of Iraq and the Levant ("ISIL"),[1] and Count 2

charges him with attempting to provide material support and resources to a designated terrorist

organization, also ISIL, both in violation of 18 U.S.C. § 2339B(a)(1).  The conspiracy count

alleges that "[t]he objects of the conspiracy were to: (1) recruit individuals in the United States to

form a cell of ISIL supporters; (2) train individuals recruited for the cell of ISIL supporters to

commit acts of violence in the United States on behalf of ISIL; and (3) commit acts of violence

in the United States on behalf of ISIL."  Count 1 further alleges several manner and means

employed as part of the conspiracy, including: "Defendant directed individuals he had previously

vetted, to vet other potential recruits through communications on social media applications;"

"Defendant suggested that UCE[2] travel to Garland, Texas, to a contest for drawing the Prophet

Mohammad;" "Defendant asked UCE about security measures at the contest for drawing the

Prophet Mohammad in Garland, Texas;" and "Defendant caused a document to be posted online

that claimed 'Islamic State in America' committed the attack at the Garland, Texas contest for

drawing the Prophet Mohammad and warned of future attacks."  (Doc. 25).  Thus, an integral

part of the defendant's role in a conspiracy to provide material support to ISIL by creating a cell

---

[1] ISIL is also frequently referred to as the "Islamic State for Iraq and Syria," "ISIS," or "The Islamic State."
[2] UCE refers to an FBI undercover employee who communicated with Hendricks over social media applications as part of the investigation in this case.

of supporters to commit attack in the United States is conduct that is tied to the Garland, Texas event.

## II.   THE DEFENDANT'S CONNECTION TO THE EVENTS AND ONE OF THE PERPETRATORS OF THE THWARTED TERRORIST ATTACK IN GARLAND, TEXAS ON MAY 3, 2015, ARE BASED ON EXTENSIVE EVIDENCE.

### (a) *The Attack*

On or about May 3, 2015, Elton Simpson (hereinafter referred to as "Simpson") and Nadir Hamid Soofi (hereinafter referred to as "Soofi"), who were inspired by ISIL, arrived together at the Curtis Culwell Center in Garland, Texas for the purpose of conducting a terrorist attack.  The center was hosting an event entitled "The First Annual Muhammad Art Exhibit and Contest."  Also present at the exhibit was the organizer of the event, Pamela Geller, who was scheduled to deliver a speech to those in attendance.

Simpson and Soofi arrived together in a vehicle, equipped with body armor and assault style weapons.  Simpson and Soofi drove their vehicle up to the center, exited, and began shooting towards the entrance.  A nearby security guard suffered minor injuries before the Garland police returned fire and killed both Simpson and Soofi.

In the moments prior to the attack, Simpson posted a Twitter message which read, "#texasattack: 'May Allah accept us as mujahideen.'"  In his message, Simpson also stated that he and Soofi had pledged their allegiance to "Amirul Mu'mineen," which is an alias for ISIS leader Abu Bakr al-Baghdadi.

In the days following the attack, members of ISIS claimed responsibility for the attempted attack.  During a radio address, one ISIS member referred to Simpson and Soofi as "brothers," and provided the following warning:  "We say to the defenders of the cross,

the U.S. that future attacks are going to be harsher and worse.  The Islamic State soldiers will inflict harm on you with the grace of God.  The future is just around the corner."

(b) *Hendricks' Connections to Simpson*

There is extensive evidence connecting Hendricks to Simpson prior to the attack in Garland.  Investigation revealed that Hendricks communicated with Simpson, and then directed the UCE to communicate with Simpson and vet him.   Hendricks first communicated with Simpson using Twitter, then moved to Surespot, directed the UCE to communicate with Simpson, and then followed up with the UCE afterwards.[3]

On or about April 23, 2015, Simpson communicated with Hendricks via Twitter. Evidence obtained from one of the cellular telephones recovered at the scene of the Garland attack includes evidence of tweets between Simpson's Twitter account, "@atawaakul," and Twitter account "@UmmahOneLove."  Twitter account @UmmahOneLove is one of the accounts used by Hendricks.[4]  A search warrant executed on the "@atawaakul" Twitter account revealed direct communications with "@UmmahOneLove" on or about April 23, 2015.  During these communications, Simpson provided "@UmmahOneLove" with his Surespot account, "Juba8021."  Later, another cellular telephone was recovered during a

---

[3] Hendricks followed a similar pattern with others in this case: first communicating on Twitter, then moving to a more secure social media application such as Surespot, and then requesting someone else he trusted to vet the new person.

[4] "@UmmahOneLove" is connected to Hendricks through strong circumstantial evidence.  First, there is commonality of IP addresses used to log into "@UmmahOneLove" with another Twitter account used by Hendricks, "@abucommander."  Second, the timing and context of the communications between Hendricks and the UCE described here and below show that these communications were part of the same series of connected events— Hendricks communicates with Simpson on Twitter, then Surespot, and then directs the UCE to Simpson on Surespot, where Simpson admits he has been communicating already for a short time with Hendricks.  These events only make sense if Hendricks is the user of "@UmmahOneLove."  Finally, as explained later, after the Garland attack, Amanda Amaro communicated to a different undercover agent that she had been communicating with someone on Twitter using "one ummah love" as his Twitter account, who then used Surespot account "itsmehere" to direct her to post "The New Era" online.  As is explained below, "itsmehere" was an account used by Hendricks.

search of Elton Simpson's apartment in Phoenix, Arizona. That cellular telephone contained a photo of the screen of another cellular telephone. The photo was of an exchange over Surespot between accounts "Juba8021" and "UmmahOne." This same day, Simpson had used his Twitter account to post a link to the "Draw the Prophet Muhammad Contest" being held in Garland, Texas on May 3, 2015.

Also on or about April 23, 2015, Hendricks, using Wickr account "accepted,"[5] directed UCE to contact Simpson, "a good brother," because he wanted them to be introduced to each other. Hendricks added, "I vouch for this brother. He is good and clean . . . Just validate who I am and what we have been connecting brothers etc." Hendricks gave further instruction to UCE, stating, "Don't ask him about details though." Hendricks next provided UCE with Surespot account "juba1911" (which was owned and operated by Simpson), for UCE to contact this "brother." While still communicating with Hendricks on Wickr, UCE sent an invite on Surespot to Surespot account "juba1911." Hendricks told UCE that "juba1911" was simultaneously contacting him (Hendricks) via Surespot to verify UCE's account.[6]

UCE then communicated with Simpson's Surespot account "juba1911" throughout April 23 and 24, 2015. During the conversation, "juba1911" claimed to have recently met the brother who introduced him to the UCE online (meaning Hendricks) and to have

---

[5] Hendricks is confirmed to be the user of Wickr account "accepted." On May 2, 2015, a confidential human source ("CHS-4") met with an individual in Baltimore, Maryland, that CHS-4 had been communicating with on Wickr who used the account "accepted." The individual CHS-4 met with was Hendricks, which was confirmed through surveillance. Hendricks also traveled to the meeting in a vehicle registered to his wife, Tyrinda Hendricks. Thus, "accepted" is Hendricks.

[6] The FBI conducted a forensic examination of Simpson's cellular phone that was found on scene immediately after the Garland, Texas attack. This examination revealed that he purchased Surespot and downloaded it onto his phone on or about March 22, 2015.

communicated with him a "few times" on Twitter and Surespot.  "Juba1911" disclosed to UCE

that he had been a Muslim for "11 yrs," to which UCE responded that he had been a Muslim

for "2 years."  UCE told "juba1911," "We've got a good mutual brother and its worth keeping

in touch . . ." "Juba1911" asked UCE, "Who sent you to me akhi?," to which UCE responded,

"A good brother.  Talk to him on Wickr.  We talk about organizing."  UCE added that

Hendricks was "really good at putting brothers in touch . . . I'm not sure why he paired us up

lol . . . Are you looking for like minded brothers?" "Juba1911" responded, "He didn't tell you

why? . . . What did he say to you then?" UCE then stated, "I'm sure he had a purpose . . . I

don't know anything more than your name." Thereafter, "Juba1911" stated, "Well u mentioned

something earlier about organizing."

On or about April 24, 2015, the conversation continued between the UCE and

"Juba1911."  "Juba1911" and the UCE discussed the need to be careful when

communicating with others online.  "Juba1911" made multiple references to the presence of

spies online. "Juba1911" also briefly discussed their shared experiences when communicating

with Hendricks, which focused on the length of time they were each in contact with

Hendricks and similarities with Hendricks' assurances when facilitating their introduction

(*e.g.,* Hendricks stated to "Juba1911" that UCE was" "a good brother, pretty much the same

things he told u about me, he said about u.").

"Juba1911" also shared limited details about his criminal history, stating "I've been

arrested b4 akh . . . That's all I will say . . ."  UCE later asked "Juba1911" how much time he

spent in prison to which Simpson responded, "Not much, got bailed out . . . 1 charge dropped, 1

stayed, 3 yrs probation."  "Juba1911" also made references to the upcoming "drawing" contest in

Garland, Texas, asking the UCE, "Did u see that link I posted?  About texas?  Prob not."  In response, the UCE stated that he did not have "Juba1911's" Twitter account.  Later, "Juba1911" sent the UCE a link to the "Draw Prophet Muhammad Contest" in Garland, Texas.  The UCE and "Juba1911" then further discussed the upcoming contest.  Towards the end of the conversation, Simpson expressed concern that Hendricks might be working for law enforcement.

 "Juba1911's" description of his personal and criminal history matched the history of Simpson, who had a prior federal conviction for making false statements to the FBI, which had resulted in a sentence of 3 years probation.  From this, along with the cellular telephone later found in Simpson's residence with the image of a communication using a variation of "Juba" as the user name, it is clear that Juba1911 was Simpson.

After the UCE's conversation with "Juba1911" ended, the UCE reported back to Hendricks on their conversation, including discussing "Juba1911's" concerns about Hendricks.

### (c) *Hendricks Directs the UCE to travel to Garland, Texas*

On or about May 1, 2015, Hendricks, while using Wickr account "accepted," communicated with UCE regarding the upcoming drawing the Prophet Mohammad contest in Garland, Texas.  UCE reminded Hendricks that "Juba," meaning Simpson, had told UCE about it.  After further discussion about the event and "Juba," Hendricks stated in reference to "Juba," "The AZ [Arizona] brother?"  UCE replied, "He told me that he tweeted an article about the drawing contest and then u hit him up about it."  At the time, Simpson was residing in Arizona.  Hendricks claimed to have just learned about the drawing contest that evening.  UCE commented that he could link up with "Juba," Hendricks replied, "You can

link with him brother.  That's your call."

The next day, on or about May 2, 2015, Hendricks, while using Wickr "accepted," again communicated with UCE about the contest in Garland, Texas.  Hendricks wrote, "I wish someone could go to tx and harass them during the night;" "a good solid protest;" and "Unique one man protest."  Hendricks also told UCE why he [Hendricks] could not go to Texas, "too much driving for us.  And I don't fly." At the time, Hendricks was in Baltimore, having just met CHS-4.[7]  UCE responded, "Ok.  Just me or any other brothers?" "See what you and bro Juda[8] can do;" and "At least be heard."  UCE asked if Hendricks was still in contact with "Juba" (Simpson).  Hendricks told UCE, "He has another brother he knows," and stated that he was not in contact with him. However, Hendricks then provided Twitter account "tawwakil" to UCE to use to contact "Juba" [Simpson], a misspelling of Simpson's actual Twitter account, "@atawaakul" or "@tawaakul."

The UCE subsequently traveled to Garland, Texas and was present on or about May 3, 2015, at the event.[9]  The UCE notified Hendricks that he was in the vicinity of the "Draw the Prophet Muhammad Contest" event in Garland, Texas.  Hendricks stated "If you see that pig [meaning Pamela Geller, the organizer of the event] make your 'voice' heard against her."  Hendricks asked UCE a series of questions related to the security posture to include:  "How is security?;" How big is gathering?;" "How many ppl?;" "How many police/agents/?;" "How

---

[7] On May 2, 2015, Hendricks had a face-to-face meeting with CHS-4. During that meeting Hendricks brought up Pam Geller, the organizer of the Muhammad cartoon contest in Garland, TX, and Hendricks told CHS-4 he wanted to be in a position to attack that type of scenario.

[8] "Bro Juda" is believed to be "bro Juba," meaning Simpson.

[9] The UCE did not travel to the Garland, Texas event with Simpson or Soofi.  He traveled there as a result of his communications with Hendricks.  He also did not communicate with Simpson prior to traveling to Garland, despite the suggestion by Hendricks that he do so.  The UCE did not know that Simpson and Soofi would be at the event or attack it.

big is building?;" "Is it wood?;" "Do u see feds there?;" "Do you see snipers?;" and "How many media?"

During this conversation, Hendricks also asked UCE several questions regarding whether he [UCE] was armed with weapons.  After UCE provided Hendricks with a series of general observations, Hendricks asked, "What u got with u?"  UCE responded, "Tools of the trade," and "not a small hand tool."  Hendricks responded,  "Lol," and "The ppl doing the drawing and hosting and observing are the ones needed to protest against."  UCE next explained that there was not a lot of activity outside of the center, to which Hendricks responded,  "Yea they are there but you can voice your concerns to the hosts after their detail is gone...They will be outside yapping their mouths and thanking the pigs."  UCE responded,  "OK let me let u go n see how close I can get."  Lastly, just prior to the attack, Hendricks stated to UCE, "You may see her get into a car to go to airport or catch a flight etc," referring to Pamela Geller, the organizer of the event.  Shortly thereafter, Simpson and Soofi committed the attack on the cartoon drawing contest venue described above.

### III.    HENDRICKS' ACTIONS IMMEDIATELY FOLLOWING THE THWARTED TERRORST ATTACK IN GARLAND, TEXAS CONNECT HIM TO THE ATTACK AND THE PERPETRATOR.

On or about May 4, 2015, one day after the terrorist attack in Garland, Texas, Hendricks, while using Surespot account "itsmehere," contacted CHS-4 and instructed him to clean up his Twitter page and take all "pro sguff off."  Hendricks then told CHS-4 to "Keep looking fir  me on here akh I may need you to help online soon."   Hendricks  also stated that he intended to obtain another cellular telephone.  Lastly, Hendricks asked if CHS-

4 was familiar with the website, justpaste.it.[10]

On or about May 5, 2015, Hendricks, while using Surespot account "itsmehere,"[11] directed CHS-4 to an identified Twitter account that contained a link to a document ['New Era' Justpaste.it/Anonymous90]. Pertinent portions of the document stated:

> 'The New Era' To our brothers and sisters fighting for the Sake of Allah, we make dua for you and ask Allah to guide your bullets, terrify your enemies, and establish you in the Land. As our noble brother in the Philippines said in his bayah, 'This is the Golden Era, everyone who believes ... is running for Shaheed.' The attack by the Islamic State in America is only the beginning of our efforts to establish a wiliyah in the heart of our enemy. Our aim was the khanzeer [the organizer of the Garland, TX event] and to show her that we don't care what land she hides in or what sky shields her; we will send all our Lions to achieve her slaughter. This will heal the hearts of our brothers and disperse the ones behind her. To those who protect her: this will be your only warning of housing this woman and her circus show. Everyone who houses her events, gives her a platform to spill her filth are legitimate targets. We have been watching closely who was present at this event and the shooter of our brothers. We knew that the target was protected. Our intention was to show how easy we give our lives for the Sake of Allah. We have 71 trained soldiers in 15 states ready at our word to attack any target we desire. Out of the 71 trained soldiers 23 have signed up for operations like Sunday. We are increasing in number bithnillah. Of the 15 states, 5 we will name ...Virginia, Maryland, Illinois, California, and Michigan. The disbelievers who shot our brothers think that you killed someone untrained, nay, they gave you their bodies in plain view because we were watching. The next six months will be interesting. Look for us on Mondays and Fridays. To our Amir Al Mu'mineen,[12] make dua for us and continue your reign, May Allah enable your face. May Allah send His peace and blessings upon our Prophet Muhummad and all those who follow until the last Day. Abu Ibrahim Al Ameriki.

A variation of this document was also located online at the URL of www.justpaste.it/Anonymous 13. This document was substantially the same, but

---

[10] Justpaste.it is a website that allows users to post text online.

[11] Surespot account "itsmehere" was used by Hendricks. "itsmehere" contacted CHS-4 after their in-person meeting on May 2, 2015. Based on the context of the conversation, CHS-4 believed "itsmehere" to be Hendricks. Further, at that time, only CHS-4 had only provided his Surespot account to one other person, and the communications from "itsmehere" were not from that individual. The communications between "itsmehere" and CHS-4 then transitioned to Surespot account "terwatch." "terwatch" attempted to introduce his daughter to CHS-4 online and sent a picture of her and her email address to CHS-4. The picture and email address have been confirmed to belong to Hendricks' stepdaughter. Thus, "itsmehere" was used by Hendricks.

[12] Amir Al Mu'mineen translates to the "leader of the faithful," and as previously stated, was a known alias for ISIS leader Abu Bakr al-Baghdadi.

provided a description of the background of the attackers that was not included in the other version: "The disbelievers who shot our brothers **from Arizona, a new Muslim of 2 years and another of 11 years**, you think that you killed someone untrained, nay, they gave you their bodies in plain view because we were watching." (emphasis added).

The importance of this variation is the reference to "a new Muslim of 2 years." The reference to "another of 11 years" is consistent with Simpson's history, as he informed UCE that he had been a Muslim for 11 years during their communications. Additionally, UCE had informed Hendricks that he [UCE] had been a Muslim for 2 years. Soofi, Simpson's actual partner in the attack, was raised a Muslim. When combined with Hendricks' statement to UCE described below that he initially thought UCE was killed in the attack, the reference to "a new Muslim of 2 years" in this "New Era" document is likely a reference to UCE (because Hendricks mistakenly believed UCE assisted with the attack, and was killed along with Simpson).

The "New Era" document was posted onto justpaste.it by Amanda Amaro (hereinafter referred to as "Amaro") at the direction of Hendricks. Hendricks and Amaro had been communicating on Twitter and then Surespot prior to the attack. Hendricks communicated with Amaro using the same Surespot account he used to communicate with CHS-4, "itsmehere."[13] On or about May 4, 2015, Hendricks communicated with Amaro about the attack. He stated that he was friends with the shooters, and that one of the brothers was a close friend who had left a letter that he wanted published after the attack. At which point,

---

[13] After posting this document, Amaro complained about having been directed to post "The New Era" online in a communication with an undercover law enforcement agent (not the UCE referred to above). Amaro stated that she had first communicated with the person on his Twitter account, "one ummah love," a variation of the actual account "@UmmahOneLove." Amaro further identified the Surespot account as "itsmehere," which was the same account used by Hendricks to communicate with CHS-4.

he began sending paragraphs of text to Amaro to publish on justpaste.it.  He also asked Amaro to send the document to fighters in Syria, giving her specific Twitter user names to tag.  He had Amaro do this because he believed she had more contacts overseas than he did. It became clear to Amaro over the next few days that the author of the letter was not the deceased shooter, but rather Hendricks himself.  The differences in the two versions of the document were based on edits to the original version directed by Hendricks.

On or about May 5, 2015, Hendricks, while using Wickr account "mesecretl7," communicated with UCE.  Prior to discussing details of the Garland, Texas attack, Hendricks verified UCE's identity through the use of a code they had previously arranged. UCE and Hendricks then discussed the Garland, Texas attack.  UCE claimed to have been the "eyes" of Hendricks, to have seen Simpson and Soofi killed, and stated that "Cops almost shot me."  Hendricks then directed UCE to deactivate his Twitter account, and asked UCE, "Have you seen the just pas.te?"   Hendricks stated he believed that UCE had been killed at first, "Up until last night I thought that u."  He then learned that UCE was not killed in the attack, stating, "Bc after I added up the facts I knew it wasn't u."  After UCE continued to express concern that he was nearly killed in the attack and sorrow for Simpson and Soofi, Hendricks stated, "I thought the same thing bro.  And I know that will always be a concern you will have. But listen bro, AL LA h showed you that in order to prepare you.  Next time you will be twice as better iA . . . Don't worry.  This is a example Al la h granted you.  Don't let this real time lesson be in vain."  Lastly, Hendricks  stated to UCE, "Bro.  Keep in touch with me.  If you need a sa fe house, let me know.  This is why I'm here."

On or about May 9, 2015, through on or about May 10, 2015, Hendricks, using Wickr

accounts "terrorwatch17" and "itsme17," communicated with UCE. These communications were brief, but focused on UCE's presence in Garland, Texas on or about May 3, 2015. Hendricks and UCE required each other to provide "the code" to which the response was "17." During these conversations, Hendricks expressed concern as to whether UCE displayed his Wickr account online. Hendricks also expressed concern about the possibility of UCE having used his cellular phone on the date of the attack (asking if it pinged off a "tower locally") and further directed UCE to consider changing his cellular phone.

## IV. EVIDENCE THE GOVERNMENT SEEKS TO INTRODUCE AT TRIAL

The government seeks to introduce the following categories of relevant evidence related to the Garland attack: (1) communications between Hendricks and Simpson[14] and between the UCE and Simpson in April 2015, prior to the actual Garland event; (2) statements and communications between Hendricks and the UCE and CHS-4 in early May 2015 about the Garland event, including communications related to the UCE traveling to the event; (3) evidence related to the presence of the UCE at the event, including photos taken by the UCE of the event and communications between Hendricks and the UCE, while the UCE was present at the event; (4) evidence describing the actual attack and its immediate aftermath, consisting of the testimony of one of the responding officers, testimony describing the crime scene by the leader of the FBI Evidence Response Team, and photographs depicting the crime scene; and (5) evidence related to Hendricks' actions in the days after the Garland attack, including communications with the UCE about the attack and his communications regarding posting "The New Era" document online claiming credit for the attack and threatening additional attacks. All of this evidence should be admissible, as it is related to the allegations in the indictment and its

---

[14] This includes evidence obtained from a cellular telephone collected at the scene of the attack and a cellular telephone collected during a search at Simpson's residence the following day.

probative value is not substantially outweighed by the danger of unfair prejudice.

## LAW AND ARGUMENT

## V.  <u>APPLICABLE LAW.</u>

Hendricks seeks to exclude from trial any reference to the events in Garland, Texas, including communications related to the event, and any photographs of the aftermath of the attack.  Contrary to Hendricks' argument, the communications between Hendricks and the UCE leading up to the Garland, Texas shooting and the photographs that memorialize the acts of violence there will not prejudice the defendant in such a way that it will outweigh the probative value of the evidence.  The evidence is relevant and probative of Hendricks' guilt by helping to establish that he was in fact the individual communicating with UCE, and supporting acts of violence in the United States on behalf of ISIL, as charged in the superseding indictment.  Further, this evidence relates directly to the manner and means of the conspiracy charged in the Supeseding Indictment.  Therefore, Hendricks' motion in limine to exclude "any and all references" to the Garland event should be denied, and the Unites States should be allowed to present its evidence at trial.

The initial inquiry is whether the evidence is relevant.  Under Rule 401, evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence," and if "the fact is of consequence in determining the action." Fed. R. Evid. 401.  The standard for relevancy is "extremely liberal." *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir.2006), quoting *Douglass v. Eaton Corp*., 956 F.2d 1339, 1344 (6th Cir.1992).  " '[E]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth.' " *Id*., quoting

*DXS, Inc. v. Siemens Med. Sys., Inc*., 100 F.3d 462, 475 (6th Cir. 1996) (quoting *Douglass*, 956 F.2d at 1344).

"The court may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of …unfair prejudice …" Fed. R. Evid. 403. (emphasis added). "Both rules [401 and 403] strongly favor admissibility – the only problematic evidence is that which evokes unfair prejudice that substantially outweighs any material, probative value. *United States v. Lang*, case no. 15-5997, 2017 WL 4924680, *11 (6th Cir., October 31, 2017). A party "is entitled to hit as hard as he can above, but not below, the belt." *Id*, quoting *People v. Vasher*, 449 Mich, 494, 537 N.W.2d 168, 172 (1995).

Unfair prejudice has nothing to do with whether it makes it more difficult for a party to prove its case or raise a defense. All evidence introduced by the prosecution carries with it a degree of prejudice inasmuch as it is offered to prove a point disputed by the defendant. *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993). On the contrary, the Supreme Court held that "[t]he term 'unfair prejudice' [. . .] speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," such as on the basis of emotion. *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

Stated another way, "unfair prejudice" within the context of Rule 403 "means an undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403 Advisory Committee Note; *see also United States v. Bermudez*, 529 F.3d 158, 170 (2d Cir. 2008) ("The term 'unfair prejudice,' as to the criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged") (internal quotation marks omitted).

"Because all probative evidence is to some extent prejudicial, [courts have] consistently emphasized that Rule 403 balancing turns on whether the prejudice is *unfair*." *United States v. Eads*, 729 F.3d 769, 777 (7th Cir. 2013) (citation omitted) (emphasis in original). The fact that the evidence described above tends to prove the defendant's guilt does not render it unfairly prejudicial under Rule 403. *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.")

In *Old Chief*, the Supreme Court recognized that the government is "entitled to prove its case by evidence of its own choice…" 519 U.S. at 186. The Supreme Court went on to discuss the government's right to introduce a picture into evidence, as opposed to agreeing to defendant's proposed stipulation, and stated, "Evidence thus has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Id*. at 187. "Thus, the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." *Id*. citing *United States v. Gilliam*, 994 F.2d 97, 100-102 (2nd Cir. 1993), cert. denied, 510 U.S. 927 (1993).

Because both Rules 401 and 403 favor the admissibility of evidence, "[a] district court is granted 'very broad' discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence." *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004), quoting *United States v. Vance*, 871 F.3d 572, 576 (6th Cir. 1989). " 'If judicial self-restraint is ever desirable, it is when a Rule 403 [prejudicial effect] analysis of a trial court is reviewed by an

appellant tribunal.' " *Id.*, quoting *United States v. Zipkin*, 729 F.2d 384, 390 (6th Cir. 1984) (citations omitted).  "In conducting review of a rejected 'undue prejudice' objection, the Sixth Circuit 'look[s] at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.' " *Id.*

VI.  **ARGUMENT**

In this case, each category of evidence related to the Garland attack that the government seeks to introduce is directly relevant to the charged offenses.  First, the communications between the UCE and Hendricks and between Simpson and the UCE in April 2015 show how Hendricks made contact with potential recruits through social media and then sought to vet them, often directing others to also vet the potential recruits, as is alleged in the indictment as a manner and means of the conspiracy.  The communications with Simpson illustrate this conduct. Hendricks first communicates with Simpson on Twitter; then he communicates over a more secure social media application, Surespot; then he directs the UCE to communicate with Simpson over Surespot; and finally he discusses Simpson's suitability with the UCE afterwards. This is directly relevant to the conduct alleged in the indictment and there is nothing unfairly prejudicial about evidence that merely proves the conduct alleged.

Second, Hendricks' conversations with the UCE and with CHS-4 are also admissible. The statements to CHS-4 about the event in Garland and its organizer and his desire to commit attacks against events like it are directly relevant to the charges.  Hendricks is alleged to have conspired and attempted to support ISIL by attempting to create a cell of ISIL supporters to commit attacks in the United States.  Evidence showing his desire to attack an event like the one in Garland are directly relevant to his intent in recruiting individuals to join his cell.

The communications between Hendricks and the UCE about the event in Garland relate to Hendricks efforts to create a cell to commit attacks on events such as the one in Garland. Hendricks has recruited the UCE, whom he believes is a fellow ISIL supporter, to join his cell, and then sends him to the event.  In the context of Hendricks' statements to CHS-4 about wanting to be able to attack an event such as the contest in Garland, the communications with the UCE can only have two possible meanings:  either he is directing the UCE to commit an attack at the event, or he is sending the UCE to the event to conduct a reconnaissance for a future attack at a similar event.[15]  Either interpretation is relevant to the charges and incriminating.  Further, the instructions to the UCE connect back to the earlier communications with Simpson because Hendricks suggests to the UCE that he go with Simpson to the event.  Thus, Hendricks suggests that the UCE go to the event with the same person he earlier asked the UCE to vet, which is relevant to the allegation in the indictment that Hendricks sought to vet potential recruits.

Third, the evidence of the UCE's communications with Hendricks at the event are similarly relevant, as they provide clear proof of Hendricks seeking out intelligence about the event that can only be relevant to a possible attack, either on this specific event, or a future, similar event.  There is no other reasonable explanation for the series of questions Hendricks asks about security at the event, about what the UCE is carrying, and how close the UCE can get to Geller, the event's organizer.  Again, in the context of a conspiracy to support ISIL by creating a cell to commit attacks in the United States, this is directly relevant evidence.

Fourth, the evidence of the attack itself is also probative and not substantially outweighed by the danger of unfair prejudice, including the photographs the government seeks to introduce. The government does not intend to dwell on the specifics of the attack itself, intending to present

---

[15] It is worth noting that in his discussion about the Garland event with CHS-4, Hendricks stated that the Garland contest was expected to be an annual event.

only one eyewitness, the responding police officer who witnessed and then stopped the attack, one crime scene investigator to testify to the attack's immediate aftermath, and an investigating agent to provide essential background on the two attackers. A description of the attack itself is necessary for the jury to understand that Hendricks' efforts to create a cell was not merely an exercise in online fantasy, but related to real-world events. Further, explaining to the jury what happened during the attack is also necessary to put into context the later communications between Hendricks and the UCE about the attack and Hendricks' efforts to post online a document taking credit for the attack and threatening additional attacks. Without evidence of the attack itself, the jury will be lacking in necessary context.

Courts routinely admit photographs in death cases that are graphic and likely to arouse emotion in the jury. *See, e.g.*, *United States v. McVeigh*, 153 F.3d 1166, 1203 (10th Cir. 1998) ("even 'graphic depictions' of murder are relevant to support 'other evidence about how the crime occurred, even when the element is uncontested – indeed, even when the defendant offers to admit to the element'") (quoting *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997)); *United States v. Fields*, 483 F.3d 313, 355-56 (5th Cir. 2007) (despite the fact that some of the points made by photos were not in dispute, the government needed the photos to demonstrate that the body had decomposed too much for much physical evidence to be found, a point made more effectively with images rather than vague generalizations). These pictures allow the United States to present to the jury a more complete, visual picture of events as opposed to relatively vague testimony, enabling their deliberative process. The jury will expect to see photos of the aftermath of the Garland attacks, and may hold the failure to produce such photos against the government. *Gonzalez*, 127 F.3d at 621 (two photos of dead men on the sidewalk riddled by bullets were admissible because "limiting the proofs to clinically abstract propositions may

prevent the jurors from acquiring an accurate picture of events, and that disappointing their expectations about what evidence would normally be available to establish a proposition may lead them to draw inaccurate inference about what actually happened (based on conjectures about why evidence is being hidden from their view)").  Further, the photos are not so graphic or revolting as to cause the jury to convict on that basis alone.  The photos the government seeks to introduce, while showing the bodies of the attackers, do not include close-ups of the bodies, but instead show the scene and the general aftermath of the attack.  (The photos the government seeks to introduce will be filed separately under seal as Exhibit 1 to this response.)

While conducting a Rule 404(b) and Rule 403 analysis, the Sixth Circuit has recognized the concern that gaps in the government's evidence may inappropriately lead to the jury feeling uncomfortable in reaching a verdict. *United States v. Davis*, 683 Fed.Appx. 480 (6th Cir. 2017), citing *Old Chief*, 519 U.S. at 188 – 189 (government is entitled to present relevant evidence regardless of stipulation because "there lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be [. . .] A prosecutor who fails to produce [such expected evidence], or some good reason for his failure, has something to be concerned about" because "triers of fact may penalize the party who disappoints them by drawing a negative inference against that party").

In *Davis*, the Sixth Circuit affirmed the district court's ruling that allowed the government to introduce evidence that the defendant sexually assaulted a witness in order to avoid having gaps in the time table of the witness' testimony and a surveillance video, as well as to help substantiate the witness' positive identification of the defendant as the individual who committed a robbery. *Id*. at 484 - 86. The defendant argued that evidence of his sexual assault of the witness did not help prove any of the elements of the robbery and, therefore, should be

excluded either under a Rule 404(b) analysis, or pursuant to Rule 403 because the probative value was substantially outweighed by the unfair prejudice. *Id.*

The Sixth Circuit disagreed and, relying on *Old Chief*, stated, "As the Supreme Court has recognized, jurors 'who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters,' and may feel uncomfortable reaching a verdict when they know 'that more could be said than they have heard.' " *Id.*, quoting *Old Chief*, 519 U.S. at 189.  The Sixth Circuit went on to state, "For that reason, the prosecution may introduce evidence of other crimes if the evidence 'forms an integral part of a witness's testimony' or 'completes the story of the charged offense.' " *Id.*, quoting *United States v. Gibbs*, 797 F.3d 416, 423 (6th Cir. 2015).  Specifically, with regard to the defendant's Rule 403 argument, the Sixth Circuit stated,

> As explained above, however, the evidence was compelling proof that Green had correctly identified Davis.  And the robber's identity was the central issue in the case, given Davis's defense.  Moreover, the evidence had probative value beyond its tendency to prove identity because it filled what otherwise would have been a sizable hole in the prosecution's story of the case. *Old Chief*, 519 U.S. at 186-89, 117 S.Ct. 644.  Given the probative value, the evidence of sexual assault was admissible under Rule 403. *Id*.

The same reasoning applies in the present case.  The Garland attack plays an important role in much of Hendricks's conduct in this case and failing to present evidence of the attack itself would create just such a "sizable hole in the prosecution's story of the case."

Fifth, the evidence related to Hendricks' conduct after the attack is also relevant.  Having directed the UCE to go the Garland event, his communications with him afterwards are clearly relevant to what his intentions were in sending him there in the first place.  And his expressed belief that the UCE had been killed in the attack is evidence that Hendricks intended and expected that the UCE would attack the event when he directed him to go there.  The indictment also specifically alleges that Hendricks caused a document to be posted online after the attack

claiming credit for the attack.  Posting a document online that pledges support for the leader of ISIL, claims credit for a terrorist attack, and threatens more attacks on behalf of the Islamic State in America is a means of providing material support to a terrorist organization.  Denying the government the ability to present this evidence would prevent the government from proving one of the means by which Hendricks allegedly committed this crime.

Although the evidence the government seeks to introduce related to the Garland attack can be broken down into these five categories, these categories all fit together to provide the broader context of Hendricks' actions in this case.  All of it is required to avoid holes in the evidence and to present the full picture of events to the jury.  Further, it goes to prove that the defendant's actions were not innocent in this case.  *See United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013) (noting that "'[e]vidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial'") (quoting *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011).

The evidence from the Garland attack is also not cumulative of the government's other evidence establishing the fact that Hendricks was the individual communicating over the various social media application using the multiple user IDs.  Instead, the Garland evidence constitutes valuable probative instances of additional similar instances helping to establish the identity of the user of the social media applications in question in this case. *Carney*, 387 F.3d at 451.  Simply because the Garland-related communications with UCE are similar to Hendricks' communications with other UCEs, does not make it "cumulative" and, therefore, inadmissible.  Each communication relates to a separate event and represents valuable building blocks in the government's case, whose probative value outweighs any prejudice to Hendricks.  As the First Circuit has noted, "The point at which relevant and admissible evidence lapses into relevant but

cumulative (and therefore inadmissible) evidence is murky." *Mehanna*, 735 F.3d at 63.  Here however, where there is no other evidence to present to prove allegations specifically contained in the indictment, that point has clearly not been crossed.

The government must be able to prove its case in the way it sees fit.  The defendant should not be able to dictate the manner in which the government proves its case.  Although the defendant claims now that the other evidence is more than sufficient for the government to prove its case, it is unlikely that the defendant will make such a concession at trial if the Garland-related evidence is excluded.  Further, the evidence is not cumulative as to the specific manner and means related to the Garland events alleged in the Superseding Indictment.  Exclusion of the Garland-related evidence would prevent the government from presenting any evidence related to these specific accusations in Count 1.

Hendricks' motion should be denied in all respects.  The evidence is not cumulative and the defendant has not shown that the probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence, as required by Rule 403.

The government further requests that it not be prevented from explaining these events to the jury during its opening statement.  "The purpose of the opening statement of the prosecution is to outline broadly the facts of the case so that the jury will understand the evidence as it unfolds." *United States v. Signer*, 482 F.2d 394, 398 (6th Cir. 1973).  Prohibiting mention of evidence related to Garland will prevent the government from providing the jury with that necessary outline of the facts of the case, inhibiting their ability to understand the evidence as it is presented.  Without any mention of evidence related to the Garland attack, the outline the government can provide to the jury will be woefully incomplete.   For the reasons stated above,

the government requests that the defendant's motion be denied and that the government not be prohibited from mentioning the evidence related to the Garland attack in its opening statement.

## CONCLUSION

The defendant understandably seeks to exclude all evidence related to the Garland attack because that evidence could have a prejudicial, although not unfairly so, impact on his defense. However, in a case of this kind, impactful evidence such as that related to the Garland attack is due to the nature of the offense.  The First Circuit has rightly observed:

> But much of this emotional overlay is directly related to the nature of the crimes that the defendant has set out to commit. It should not surprise a defendant that proof of his participation in conspiracies to provide material support to terrorist organizations and to kill Americans here and abroad will engender the presentation of evidence offensive to the sensibilities of civilized people.

*Mehanna*, 734 F.3d at 64.  That is the case here.  Based on the facts and arguments above, the United States respectfully requests this Court issue an Order denying Hendricks' Motion in Limine to Restrict Government's Presentation of Evidence (R. 65: Motion in Limine, PageID 388 – 398), and that the Court permit the government to introduce all of the evidence related to the Garland attack into evidence in this case.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:    /s/ Matthew W. Shepherd
Matthew W. Shepherd (OH: 0074056)
Assistant United States Attorney
801 W. Superior Ave., Suite 400
Cleveland, OH 44113
(216) 622-3589
(216) 522-2403 (facsimile)
Matthew.Shepherd@usdoj.gov

/s/ Mark S. Bennett

Mark S. Bennett (OH: 0069823)
Assistant United States Attorney
Federal Building
2 South Main Street, Room 208
Akron, OH 44308
(330) 761-0523
(330) 375-5492 (facsimile)
Mark.Bennett2@usdoj.gov

/s/ Rebecca A. Magnone

Rebecca A. Magnone (MA: 672299)
Trial Attorney
Department of Justice
National Security Division
Counterterrorism Section
950 Pennsylvania Avenue NW, Room 7641
Washington, DC 20530
(202) 353-9472
Rebecca.magnone@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of February 2018, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Matthew W. Shepherd
Matthew W. Shepherd
Assistant U.S. Attorney