UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16CR265 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| -vs- | ) | |
| | ) | ORDER |
| ERICK JAMAL HENDRICKS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Pending before the Court are two motions for protective orders filed by the Government. In its first motion, the Government requests that the Court take certain steps to protect the identity of an undercover employee within the FBI ("UCE"). Doc. 63. In its second motion, the Government requests that the Court similarly take certain steps to protect the identity of a confidential human source ("CHS-4"). Doc. 64. The Defendant, Erick Jamal Hendricks, has responded in opposition in part to the motions. The Court now resolves the motions.

Hendricks is charged with one count of conspiring to provide material support to a designated terrorist organization and one count on attempting to provide material support to a designated terrorist organization. More specifically, the Government asserts that it will prove that Hendricks engaged in efforts in the spring of 2015 to create of cell of the Islamic State of Iraq and

the Levant ("ISIL") supporters in the United States. The superseding indictment in this matter further asserts:

> g. Defendant directed individuals such as A.A., and others known and unknown, to connect Defendant to other like-minded individuals for recruitment by Defendant.
>
> h. Defendant distributed documents to recruits that provided advice on how to avoid law enforcement detection.
>
> i. Defendant provided suggestions to recruits about materials they should read, including lectures by Anwar Al-Awlaki and materials that contained bomb-making instructions and information on law enforcement surveillance methods.
>
> j. Defendant attempted to purchase land to be used for training in military tactics for members of the cell he was recruiting.
>
> k. Defendant met in person with potential recruits to discuss the creation of a cell to conduct attacks in the United States on behalf of ISIL.
>
> l. Defendant claimed that he obtained guidance from "senior brothers" in ISIL.
>
> m. Defendant suggested that UCE travel to Garland, Texas, to a contest for drawing the Prophet Mohammad.
>
> n. Defendant asked UCE about security measures at the contest for drawing the Prophet Mohammad in Garland, Texas.
>
> o. Defendant caused a document to be posted online that claimed "Islamic State in America" committed the attack at the Garland, Texas contest for drawing the Prophet Mohammad and warned of future attacks.

Doc. 25 at 3-4.

The Government requests the Court implement the following measures with respect to the UCE:

1. The UCE may testify under the UCE's undercover pseudonym when testifying at trial, without disclosing publically the true identity of the UCE;

2. The defense shall be prohibited from asking any questions seeking personal identifying information from the UCE;

3. The UCE may testify using a light disguise, such as changing the UCE's facial hair, hairstyle, or dress style;

4. When the UCE testifies, only the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team shall be present in the courtroom. The government shall provide a contemporaneous audio broadcast of the courtroom proceeding while the UCE is testifying for the public in a separate room.

5. No public disclosure of any audio or video recording, or similar reproduction of the voice or visual image of the UCEs while testifying, shall be permitted.

6. The UCE shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom, shall be permitted to enter the courtroom and sit in the witness chair outside the presence of the jury and defendant, and shall be permitted to remain seated when sworn in;

7. All non-official recording devices shall be prohibited from being in the courtroom in which the UCE testifies as well as the room in which the audio feed is broadcast during the UCE's testimony.

8. The Protective Order sought by this motion may only be modified through a written superseding order issued by this Court.

The Government further requests that the Court implement the following measures for CHS-4:

1. CHS-4 may testify at trial using a pseudonym without publically disclosing CHS-4's true identity;

2. The government will disclose CHS-4's true name to defense counsel only. Defense counsel may not disclose CHS-4's true name to the Defendant, a member of Defendant's family, or to any other person, except that defense counsel may disclose CHS-4's true name to an attorney, paralegal, investigator, or other member of defense counsel's firm for the sole purpose of assisting in the cross-examination of CHS-4. Defense counsel shall not make any reference to CHS-4's true name in any public court proceeding or filing.

3. The defense shall be prohibited from asking CHS-4 or any other witness at trial any questions seeking the true name of or other identifying information of CHS-4; and

4. All non-official recording devices shall be prohibited from being in the courtroom in which CHS-4 testifies and no visual depictions, recordings, or photographs shall be made of CHS-4.

While Hendricks has opposed both motions, he has not contested every aspect of the protective orders sought by the Government. For example, Hendricks does not oppose the request that the UCE and CHS-4 be permitted to testify utilizing pseudonyms. Similarly, Hendricks does not

oppose the request that the UCE be permitted to use a non-public entrance to the courtroom. Hendricks, however, has raised arguments in opposition to the substance of the remaining requested protective measures.

1. **Courtroom Closure**

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial." U.S. Const. amend. VI. "The central aim of a criminal proceeding must be to try the accused fairly," and the right to a public trial is "one created for the benefit of the defendant." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). However, "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id*. at 45. Courtroom closures are "rare" and "the balance of interests must be struck with special care." *Id*.

*Waller* established the test for determining whether a courtroom closure violates the Sixth Amendment:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id*. (quoting *Press–Enter. Co. v. Super. Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510, (1984)).

*Waller* also set forth the details of a four-factor analysis:

> [(1)] the party seeking to close a public hearing must advance an overriding interest that is likely to be prejudiced, [(2)] the closure must be no broader than necessary to protect that interest, [ (3) ] the trial court must consider reasonable alternatives to closing the proceeding, and [ (4) ] it must make findings adequate to support the closure.

*Id*. at 48, 104 S.Ct. 2210;

Most federal courts of appeals have drawn a meaningful distinction between full courtroom closures and partial courtroom closures. *Garcia v. Bertsch*, 470 F.3d 748, 752 (8th Cir. 2006) ("Many courts ... have distinguished the complete closure in Waller from partial closures."). "Whether a closure is total or partial ... depends not on how long a trial is closed, but rather who is excluded during the period of time in question." *United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013). In other words, a total closure involves excluding all persons from the courtroom for some period while a partial closure involves excluding one or more, but not all, individuals for some period. *Judd v. Haley*, 250 F.3d 1308, 1316 (11th Cir. 2001).

"Both partial and total closures burden the defendant's constitutional rights," but "the impact of [a partial] closure is not as great, and not as deserving of such a rigorous level of constitutional scrutiny." *Id*. at 1315. "Partial closure of a courtroom has a reduced impact on a defendant's rights." *United States v. Yazzie*, 743 F.3d 1278, 1288 n. 4 (9th Cir. 2014); *see also Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) (noting that courts have "reasoned that a less stringent standard was justified because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does").

All federal courts of appeals that have distinguished between partial closures and total closures modify the Waller test so that the "overriding interest" requirement is replaced by requiring a showing of a "substantial reason" for a partial closure, but the other three factors remain the same. *See, e.g., Bucci v. United States*, 662 F.3d 18, 23 (1st Cir. 2011) (explaining that the First Circuit and other circuits only require a "substantial" interest rather than a "compelling" one in partial closure cases); *United States v. Osborne,* 68 F.3d 94, 98–99 & n. 12 (5th Cir. 1995) (adopting the "substantial reason" test for partial closures and noting that the Second, Eighth, Ninth, Tenth, and Eleventh Circuits have done the same). Accordingly, "under the modified *Waller*

test applied by those courts, (1) a party seeking a partial closure of the courtroom during proceedings must show a "substantial reason" for doing so that is likely to be prejudiced if no closure occurs; (2) the closure must be no broader than necessary or must be "narrowly tailored"; (3) the trial court must consider reasonable alternatives to closing the proceeding; and (4) the trial court must make findings adequate to support the closure." *United States v. Simmons*, 797 F.3d 409, 412–14 (6th Cir. 2015).

> "[T]he gravity of the interest that must be asserted by the state depends on the extent of the closure requested." *Bobb v. Senkowski*, 196 F.3d 350, 353 (2d Cir. 1999).
>
> The extent of the permissible closure turns on factors including "the importance of the testimony rendered during closure, the duration of closure, ... the relationship of those excluded to the complaining defendant," *id*., and "whether the public can learn (through transcripts, for example) what transpired while the trial was closed," *Bowden*, 237 F.3d at 129 (citing *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) (en banc); and *Herring v. Meachum*, 11 F.3d 374, 379–80 (2d Cir. 1993)). "Special concerns may apply when the spectators selectively barred from the courtroom are the defendant's family members." *Id*. at 132.

*United States v. Alimehmeti*, No. S1 16-CR-398 (PAE), 2018 WL 922150, at *5 (S.D.N.Y. Feb. 15, 2018).

With respect to the UCE, the Government seeks a partial closure of the courtroom, including the removal of the family of the defendant. In that respect, "[the] safety of a police officer working undercover surely constitutes an overriding interest." *Brown v. Artuz*, 283 F.3d 492, 501 (2d Cir. 2002). Moreover, "[t]here is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity." *Ayala*, 131 F.3d at 72. Herein, the Government has demonstrated to the Court that disclosure of the identity of the UCE to the public or press would place the UCE and possibly other investigations in peril. However, courts have recognized "a special concern for assuring the attendance of family members of the accused." *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir.1994) (holding that a trial court

is not permitted to deny a defendant's family access to his trial simply because the family lives in the same borough in which the undercover officer seeking closure works).  In the instant matter, it is not entirely clear which family members of the Defendant may attend trial and their relationship to the Defendant.  Accordingly, the Court will hold in abeyance a final ruling on the attendance of family members during the testimony of the UCE.

With respect to the closure to the remaining public, the Court finds that the Government has shown a substantial reason to justify the closure.  First, "[t]he state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest."  *Ayala*, 131 F.3d at 72.  Herein, the Government has shown that both the Defendant (allegedly) and others utilizing the same social media platforms and allegedly sharing the same ideologies have engaged in extensive counter-surveillance measures to detect undercover law enforcement officers.  Given the nature of the work performed by the UCE, counterterrorism, and the evidence adduced by the Government, the Government has shown a substantial reason for a limited closure.

Furthermore, the Government has provided for other methods of access to the public and press.  A live audio feed of the UCE's testimony will be live-streamed to another room in this courthouse.  Along with that live-stream, the evidence presented by the Government through the testimony of the UCE will also be made available in the other room of the courthouse.  Finally, should there be inquiry and a demonstration of need, the Court may provide access to transcripts of the UCE's testimony to those excluded from the courtroom.  As such, the Court finds that the limited closure is narrowly tailed to serve the Government's substantial interest in protecting the identity of the UCE.

2. **Remaining Protective Measures**

The remaining protective measures sought by the Government are less intrusive upon the rights of the Defendant. For example, limiting cross-examination of the UCE and the CHS-4 to ensure that real identities are not revealed does not unlawfully infringe upon the right of cross-examination or confrontation. The Fourth Circuit has noted:

> In general, the Confrontation Clause guarantees a defendant the right to question an adverse witness about identifying information, including his full name and address. *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) ("[T]he very starting point in exposing falsehood and bringing out the truth through cross-examination must necessarily be to ask the witness who he is and where he lives." (footnote omitted)). We have recognized that this right is not absolute, however, and that "a trial court may limit cross-examination if the information sought could endanger the witness." *Chavis v. North Carolina*, 637 F.2d 213, 226 (4th Cir. 1980). When the government seeks to withhold a witness's true name, address, or place of employment, it bears the burden of demonstrating that "the threat to the witness [is] actual and not a result of conjecture." *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969). If the government makes a showing of an actual threat, the district court still has discretion to review relevant information and determine whether disclosure of the witness's identifying information is necessary to allow effective cross-examination. *Id.*

*United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012). Herein, while the Government has not identified an existing threat, it has outlined the significant risks that both the UCE and the CHS-4 would face if their true identities were revealed in court proceedings. Moreover, such information would provide minimal, if any, support in defense of this matter. As such, Defendant's right of Confrontation will not be unconstitutionally infringed upon by the limitations proposed by the Government.

**CONCLUSION**

The Court hereby orders that the following protective measures will be taken during the course of the trial in this matter.

1. The UCE may testify under the UCE's undercover pseudonym when testifying at trial, without disclosing publically the true identity of the UCE;

2. The defense shall be prohibited from asking any questions seeking personal identifying information from the UCE;

3. The UCE may testify using a light disguise, such as changing the UCE's facial hair, hairstyle, or dress style;[1]

4. When the UCE testifies, only the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team shall be present in the courtroom. The government shall provide a contemporaneous audio broadcast of the courtroom proceeding while the UCE is testifying for the public in a separate room.[2]

5. No public disclosure of any audio or video recording, or similar reproduction of the voice or visual image of the UCEs while testifying, shall be permitted.

6. The UCE shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom, shall be permitted to enter the courtroom and sit in the witness chair outside the presence of the jury and defendant, and shall be permitted to remain seated when sworn in;

7. All non-official recording devices shall be prohibited from being in the courtroom in which the UCE testifies as well as the room in which the audio feed is broadcast during the UCE's testimony.

8. CHS-4 may testify at trial using a pseudonym without publically disclosing CHS-4's true identity;

9. The government will disclose CHS-4's true name to defense counsel only. Defense counsel may not disclose CHS-4's true name to the Defendant, a member of Defendant's family, or to any other person, except that defense counsel may disclose CHS-4's true name to an attorney, paralegal, investigator, or other member of defense counsel's firm for the sole purpose of assisting in the cross-examination of CHS-4. Defense counsel shall not make any reference to CHS-4's true name in any public court proceeding or filing.

10. The defense shall be prohibited from asking CHS-4 or any other witness at trial any questions seeking the true name of or other identifying information of CHS-4; and

11. All non-official recording devices shall be prohibited from being in the courtroom in which CHS-4 testifies and no visual depictions, recordings, or photographs shall be made of CHS-4.

---

[1] The Court will make a final determination regarding the "light disguise" issue upon viewing the witness and following an *ex parte* discussion with the Government if necessary.

[2] As noted above, the Court will make a final determination regarding the ability of Defendant's close family to remain in the courtroom closer to the time of the testimony.

12. This Protective Order may only be modified through a written or oral superseding order issued by this Court.

IT IS SO ORDERED.

Dated:  February 28, 2018                     */s/ John R. Adams*_____
                                              JOHN R. ADAMS
                                              UNITED STATES DISTRICT JUDGE