IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16CR265 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | GOVERNMENT'S RESPONSE IN |
| ERICK JAMAL HENDRICKS, | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTION FOR JUDGMENT OF |
| Defendant. | ) | ACQUITTAL, AND CONDITIONALLY, |
| | ) | A NEW TRIAL |

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney for the Northern District of Ohio, and Matthew W. Shepherd and Mark S. Bennett, Assistant United States Attorneys, and Rebecca A. Magnone, Trial Attorney, National Security Division, and hereby responds in opposition to Defendant Erick Jamal Hendricks' Motion for Judgment of Acquittal and New Trial. (R. 137: Motion, PageID 3247). For the reasons stated herein, the United States respectfully asserts that the Motion for Judgment of Acquittal should be denied without a hearing. In the event this Court grants the Defendant's Motion for Judgment of Acquittal, the Government submits that this Court should also enter a conditional ruling denying the Motion for a New Trial, pursuant to Fed. R. Crim. P. 29(d)(1).

I.      **INTRODUCTION**

On December 13, 2016, a federal grand jury in the Northern District of Ohio returned a two-count Superseding Indictment charging Erick Jamal Hendricks ("Hendricks") with conspiracy to provide material support and resources to a foreign terrorist organization, namely

the Islamic State of Iraq and the Levant ("ISIL"),[1] and attempting to provide material support and resources to a foreign terrorist organization, also ISIL, both in violation of 18 U.S.C. § 2339B(a)(1).  (R. 25: Superseding Indictment, PageID 118).

Trial commenced on March 8, 2018.  The government presented testimony from 18 witnesses, and approximately 136 exhibits were admitted.  The parties also entered into five stipulations.  The following is a brief summary of the witness testimony.  The jury first heard from Special Agent ("SA") Ryan Presley who testified to how the Cleveland FBI started its investigation of Hendricks after the arrest of another defendant, Amir Al-Ghazi, in June 2015, which led to Al-Ghazi's admission that he had been in communication on Twitter with someone known as "Abu Harb."  SA Presley also explained how IP address information connected "Abu Harb's" Twitter account to Hendricks' two wives.  (R. 95: Trial Tr. 03/08/18, Page ID 2147-75).

Next Amir Al-Ghazi testified pursuant to a plea agreement with the government.  Al-Ghazi described his communications online with "Abu Harb," who he described as a recruiter for what he believed to be ISIS.  He explained how "Abu Harb" asked him if he was able to travel, could engage in military training in Texas, had experience with weapons, and was ready to wage jihad on the kuffar. (R. 95: Trial Tr. 03/08/18, PageID 2178-2243).

Janet Miller, a government informant, testified and identified Hendricks as someone she met with in Baltimore at the home of a friend in March 2015.  She testified that during this meeting Hendricks expressed his support for ISIS, talked about having land for training, and discussed recruiting others. (R. 95: Trial Tr. 03/08/18, PageID 2243-66).

Jeffrey Reese and Michael Gill then testified to communications they had with Hendricks regarding Hendricks' efforts to purchase land they had for sale in isolated locations in California

---

[1] ISIL is also frequently referred to as the "Islamic State for Iraq and Syria," "ISIS," or "The Islamic State," and will be referred to as ISIS throughout this brief as that was the term most commonly used at trial.

and New Mexico in late 2014.  Notably, Gill testified that Hendricks asked about shooting firearms at night on the land.  (R. 95: Trial Tr. 03/08/18, PageID 2266-92, 2293-2303).

Special Agent ("SA") Steven Jane, an undercover FBI agent, testified at length over two days about communications he had with Hendricks on social media applications.  SA Jane explained that he started communicating with Hendricks as a result of another investigation, and that their communications took place over several months and utilized multiple social media applications and user names.  SA Jane testified that Hendricks described creating a team of individuals who would act as the "limbs" for the "brain," but that the ultimate brain was the "khilafa," a reference to ISIS.  SA Jane also testified to the counter-surveillance methods Hendricks advised him to use, to the documents Hendricks recommended or distributed to him, and to how Hendricks referred others to SA Jane to be vetted for inclusion in the team Hendricks was building.  SA Jane testified that Hendricks referred him to communicate with Elton Simpson, and that he engaged Simpson in communications on social media.  SA Jane further explained how Hendricks directed him to travel to Garland, Texas on May 3, 2015, to an event hosting a contest for drawing cartoons of the Prophet Mohammad.  From there, SA Jane was quizzed by Hendricks about security measures at the event and was told to get closer to the event's organizer.  SA Jane testified that as he drove past the venue, two individuals pulled up in a car, exited, and began firing on security and police.  After a short exchange of fire, both attackers were killed.  One of the attackers was Elton Simpson, who Hendricks had earlier referred to SA Jane.  Finally, SA Jane testified to his communications with Hendricks after the attack in Garland.  (R. 92: Trial Tr. 03/09/18, PageID 1422-1630; R. 93: Trial Tr. 03/12/18, PageID 1641-78).

Dr. Lorenzo Vidino, Director of the George Washington University Program on Extremism, testified as an expert witness regarding ISIS and their methodology. He provided information about ISIS, their beliefs, history, and leaders. He explained how ISIS had declared itself to be the true Islamic Caliphate and controlled territory in Iraq and Syria. He also explained how ISIS opposed the United States, desired to spread its control to new territory, used propaganda, and recruited members. He described how ISIS used a less formal structure to attract new members and supporters to join ISIS. He testified to the number of attacks ISIS and its supporters had committed in the United States and elsewhere. He also testified that Hendricks' communications with SA Jane were consistent with ISIS ideology and methodology. (R. 93: Trial Tr. 03/12/18, PageID 1682-1735).

SA Brian Marlow and SA Jason Saitta testified regarding cellular telephones belonging to Elton Simpson, one of the shooters at the event in Garland, that were recovered from the scene of the shooting and Simpson's apartment, respectively. (R. 93: Trial Tr. 03/12/18, PageID 1743-49, 1750-59).

SA Todd Shelton testified about surveillance of Hendricks on May 2, 2015, in Baltimore, Maryland, when Hendricks was meeting with a confidential informant. (R. 93: Trial Tr. 03/12/18, PageID 1760-87).

Hamza al-Ansari, a government confidential informant, testified about his communications with Hendricks over social media and then in person, at a meeting on May 2, 2015, in Baltimore. During that meeting, which was recorded, Hendricks discussed with al-Ansari his plans to recruit followers, obtain land for military training, and commit attacks, including what al-Ansari described as raids on targets such as military recruitment centers. Hendricks' wife was present at this meeting. Hendricks also admitted to writing a document

called "GPS for the Ghuraba," which provided guidance on how to conduct counter-surveillance of law enforcement.  (R. 93: Trial Tr. 03/12/18, PageID 1789-1864; R. 96: Trial Tr. 03/13/18, PageID 2316-64).

Jasmine Bevany, Hendricks' stepdaughter, testified to communications she had over email with al-Ansari after Hendricks set her up with al-Ansari as a possible husband.  (R. 96: Trial Tr. 03/13/18, PageID 2364-74).

Retired Georgia State Trooper Stanley Kent testified regarding a traffic stop of Hendricks and his wife, Tyrinda, at the end of May 2015.  During this stop, Kent took a photo of an email address written in a notebook that was the same email address provided by Hendricks to al-Ansari.  (R. 96: Trial Tr. 03/13/18, PageID 2374-84).

Amanda Amaro testified to communications she had with Hendricks in which Hendricks directed her to post a document called "The New Era" online after the Garland, Texas attack. The document claimed responsibility for the attack, pledged loyalty to the head of ISIS, and threatened additional attacks, among other things.   (R. 96: Trial Tr. 03/13/18, PageID 2385-2466).

Another government confidential informant, Matthew Palmer, testified about his communications over social media with Hendricks. He described a series of communications that were very similar in style and content to those between Hendricks and SA Jane and al-Ansari. (R. 96: Trial Tr. 03/13/18, PageID 2466-2518).

FBI Intelligence Analyst Amy Vaughan testified as an expert witness on social media and provided testimony about various relevant social media accounts related to Hendricks.  Her testimony explained the results of her analysis of records obtained for these accounts, which provided circumstantial evidence that Hendricks was the user of all of these accounts.  She also

testified regarding communications between Hendricks and Elton Simpson found on the two cellular telephones belonging to Simpson described above and on Simpson's Twitter account. (R. 97: Trial Tr. 03/14/18, PageID 2534-2607).

Finally, Detective Steven Conley testified regarding his interactions with Hendricks when Hendricks worked as a source for the FBI prior to the conduct charged in this case. Det. Conley testified that Hendricks' employment as a source for the FBI occurred prior to the conduct involved in this case, and that he was not working as an informant for the FBI when committing the conduct in this case. Despite Det. Conley giving Hendricks the opportunity to do so, Hendricks never reported any of his conduct in this case to Det. Conley. (R. 97: Trial Tr. 03/14/18, PageID 2611-22).

The government's exhibits included numerous screenshots of communications involving Hendricks, subscriber records and IP address records for social media accounts, surveillance video, footage, and audio from Hendricks' meeting with al-Ansari on May 2, 2015, Simpson's cellular telephones, documents such as "The New Era" and "GPS for the Ghuraba" created and distributed by Hendricks, materials distributed by Hendricks such as <u>How to Survive in the West: A Mujahid Guide</u> (2015), and Twitter communications between Hendricks and Al-Ghazi and Simpson, among other exhibits.

After the government presented its case, Hendricks made an oral motion for judgment of acquittal pursuant to Rule 29 on both Counts 1 and 2. (R. 97: Trial Tr. 03/14/2018, PageID 2637). This Court denied the motion. (<u>Id.</u>, PageID 2640). Hendricks did not present any witnesses or evidence. (<u>Id.</u>, PageID 2631). On March 20, 2018, the jury found Hendricks guilty on both charges. (R. 101: Trial Tr. 03/20/2018, PageID 2772-73). Hendricks now files the instant motion, seeking a judgment notwithstanding the verdict, and conditionally a new trial

under Rule 29(d)(1).  (R. 137, PageID 3247).  The Motion claims that the government failed to present sufficient evidence to prove beyond a reasonable doubt that Hendricks conspired or attempted to provide material support to ISIS, as opposed to conspiring and attempting to take independent actions inspired by ISIS, (Id., PageID 3251-55), and that the evidence was insufficient to prove beyond a reasonable doubt that he conspired with a non-governmental agent to provide material support to ISIS.  (Id., PageID 3255).  However, a careful review of Hendricks' arguments prove them meritless under a proper application of the Rule 29 standard.

## II.    LEGAL STANDARD

Defendant moves for acquittal under Fed. R. Crim. P. 29, and conditionally a new trial under Fed. R. Crim. P. 29(d)(1) and 33.  While Rules 29 and 33 "deal with similar issues, the two rules are governed by different standards of review."  United States v. Dimora, 879 F. Supp. 2d 718, 724 (N.D. Ohio 2012).

### A.    LEGAL STANDARD FOR DECIDING A MOTION FOR JUDGMENT OF ACQUITTAL

In determining whether to grant a Rule 29 motion for judgment of acquittal, the relevant question is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Woods, 877 F.2d 477, 479 (6th Cir. 1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  This is especially so where, as here, the defendant's Rule 29 motion proceeds under a theory of insufficient evidence.  "A defendant claiming insufficiency of the evidence bears a heavy burden."  United States v. Johnson, 71 F.3d 539, 542 (6th Cir. 1995).  When ruling on a Rule 29 motion, a court must draw all inferences from the evidence in favor of the prosecution.  United States v. Sherlin, 67 F.3d 1208, 1214 (6th Cir. 1995).  Under a Rule 29 challenge seeking acquittal, the court does not weigh the evidence, consider the

credibility of the witnesses, or substitute its judgment for that of the jury.  United States v. Walls, 293 F.3d 959, 967 (6th Cir. 2002).  Indeed, to do so would "allow the trial judge to invade the province of the jury as the sole finder of fact in a jury trial."  United States v. Adamo, 742 F.2d 927, 935 (6th Cir. 1984).

When viewing the evidence by this standard of review, a court may not make independent determinations regarding the weight that should be accorded to the evidence. United States v. Abdullah, 162 F.3d 897, 902-903 (6th Cir. 1998).  Instead, the Court must assume the truth of the evidence offered by the prosecution and give the government the benefit of all inferences that can be reasonably drawn therefrom.  United States v. Overmyer, 867 F.2d 937, 939 (6th Cir. 1989) ("the court assumes the truth of the evidence offered by the prosecution") (quoting United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985)); Abdullah, 162 F.3d at 903 (courts must give "the government the benefit of all inferences that could be reasonably drawn from the testimony").  Moreover, "substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt."  United States v. Lee, 359 F.3d 412, 418 (6th Cir. 2004) (internal quotation and citation omitted).  Finally, it should be noted that the Sixth Circuit recognizes that granting a motion of acquittal "will be confined to cases where the prosecution's failure is clear."  United States v. Keeton, 101 F.3d 48, 52 (6th Cir. 1996) (quoting Burks v. United States, 437 U.S. 1 (1978)).

B.      LEGAL STANDARD FOR DECIDING A MOTION FOR NEW TRIAL

When a court grants a judgment of acquittal, it must also "conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."  Fed. R. Crim. P. 29(d)(1).  In doing so, it "must specify the reasons" for granting

or denying the new trial.  United States v. Paulus, No. 17-5410, 2018 WL 3097952, at *7 (6th Cir. June 25, 2018).

A motion for a new trial is governed by Rule 33 of the Federal Rules of Criminal Procedure, which provides that the court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A jury verdict should be vacated "only in the extraordinary circumstance[] where the evidence preponderates heavily against the verdict."  United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988).  Indeed, "[t]he paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence.'"  United States v. Munoz, 605 F.3d 359, 373 (6th Cir. 2010) (quoting United States v. Crumb, 187 Fed. Appx. 532, 536 (6th Cir. 2006)).  Because a jury verdict is presumptively valid, Hendricks has the burden of showing that the jury's verdict is against the weight of the evidence.  United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007).

Although a court's authority to grant a new trial is discretionary, such discretion should be exercised only in the limited and "extraordinary circumstance where the evidence preponderates heavily against the verdict."  Ashworth, 836 F.2d at 266 (internal quotations and citations omitted); see also Hughes, 505 F.3d at 592.  In evaluating a Rule 33 motion, the trial judge may consider the credibility of the witnesses and the weight of the evidence in order to guarantee there is not a miscarriage of justice.  Ashworth, 836 F.2d at 266.  Indeed, a court may sit as a theoretical "thirteenth juror," but "the court may not wholly usurp the jury's role."  United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000).

As discussed, for Hendricks to prevail on his motion for acquittal he must overcome a heavy burden of demonstrating that the evidence offered at trial, when viewed in a manner most favorable to the prosecution, was insufficient to convince a rational juror to find him guilty

beyond a reasonable doubt.  This he cannot do.  Accordingly, Hendricks' motion for judgment of acquittal should be denied.  Moreover, Hendricks has failed to meet the burden of showing that the jury's verdict was against the manifest weight of the evidence as contemplated by Fed. R. Crim. P. 33, and his conditional motion for a new trial should similarly be denied.

## III.  ARGUMENT

### A.  DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL SHOULD BE DENIED BECAUSE THERE WAS MORE THAN SUFFICIENT EVIDENCE OF THE DEFENDANT'S GUILT

#### 1.  The evidence at trial proved Hendricks conspired and attempted to provide material support to ISIS and did not engage solely in independent advocacy or action.

Hendricks first challenges his convictions for conspiracy and attempt to provide material support to ISIS by arguing that the government failed to prove that he was conspiring or attempting to provide material support to ISIS, but rather sought to create his own independent terrorist organization.  Hendricks claims that the trial evidence was insufficient to prove beyond a reasonable doubt that he "conspired or attempted to provide personnel or services to ISIS, as opposed to personnel or services inspired by ISIS or to promote ISIS's goals."  (R. 137: Motion, PageID 3252).[2]  He argues that there was no evidence presented that showed his intention in recruiting individuals to join his terrorist cell was for those members to work under the direction and control of ISIS.  Contrary to Hendricks' argument, the government presented substantial evidence that Hendricks sought to create a terror cell in the United States that would be under the direction and control of ISIS, and not just an independent terrorist organization.

---

[2] Hendricks does not argue that the evidence was insufficient to prove his identity.

18 U.S.C. § 2339B(a)(1) makes it unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization" or to "attempt[] or conspire[] to do so."  For purposes of this statute, "material support" is defined at 18 U.S.C. § 2339A(b)(1):

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The Superseding Indictment in this case specifically alleged that the material support Hendricks conspired and attempted to provide included personnel and services.  (R: 25: Superseding Indictment, PageID 119, 122).  18 U.S.C. § 2339B provides specific guidance regarding the meaning of personnel as a means of material support:

> No person may be prosecuted under this section in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.  Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B(h).    There is no statutory definition or guidance specific to the meaning of "services" in this context.

The Supreme Court has also provided guidance on the issue raised by defense counsel.  In Holder v. Humanitarian Law Project, 561 U.S. 1 (2010), the Supreme Court considered the constitutionality of Section 2339B's prohibition against providing material support to designated terrorist organizations.  Regarding the prohibition on providing personnel, the Court explained:

As for "personnel," Congress enacted a limiting definition in IRTPA that answers plaintiffs' vagueness concerns. Providing material support that constitutes "personnel" is defined as knowingly providing a person "to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization." § 2339B(h). The statue makes clear that "personnel" does not cover *independent* advocacy: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." Ibid.

Holder, 561 U.S. at 23 (emphasis in original). Regarding the meaning of "services," the Court

further explained:

"[S]ervice" similarly refers to concerted activity, not independent advocacy. See Webster's Third New International Dictionary 2017 (1993) (defining "service" to mean "the performance of work commanded or paid for by another: a servant's duty: attendance on a superior"; or "an act done for the benefit or at the command of another"). Context confirms that ordinary meaning here. The statute prohibits providing a service "*to* a foreign terrorist organization." § 2339B(a)(1) (emphasis added). The use of the word "to" indicates a connection between the service and the foreign group. We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause.

Moreover, if independent activity in support of a terrorist group could be characterized as a "service," the statute's specific exclusion of independent activity in the definition of "personnel" would not make sense. Congress would not have prohibited under "service" what it specifically exempted from prohibition under "personnel." The other types of material support listed in the statute, including "lodging," "weapons," "explosives," and "transportation," § 2339A(b)(1), are not forms of support that could be provided independently of a foreign terrorist organization. We interpret "service" along the same lines. Thus, any independent advocacy in which plaintiffs wish to engage is not prohibited by §2339B. On the other hand, a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization.

Holder, 561 U.S. at 23-24.

Here, Hendricks was charged with conspiracy and attempt to provide material support, and not with the completed crime of providing material support to ISIS. Thus, the government did not need to prove that Hendricks successfully provided material support to ISIS. See United

States v. Kaziu, 559 F.App'x. 32, 37 (2nd Cir. 2014) (noting that "it was not necessary for Kaziu to succeed in assisting al-Shabaab in its war against the Somali government for him to be convicted of attempting to do so."). To prove attempt or conspiracy, the government need not prove that Hendricks had actual contact with ISIS in Syria, but had to prove his intent. See United States v. Suarez, __ F.3d __, 2018 WL 3134545 at *3 (11th Cir. 2018) (explaining that "it is irrelevant that he did not make contact with ISIS, because the law requires only that Suarez directed (or attempted to direct) his services to ISIS").

The evidence at trial proved that Hendricks intended to do more than act and recruit others to act independently in support of ISIS's goals. Instead, the evidence showed that Hendricks sought to provide himself and those he recruited to act under ISIS's control, and to provide services in coordination with ISIS. The strongest evidence of this intent came from Hendricks' own communications. Hendricks explained in communications with SA Jane, the undercover FBI agent, that his intent in creating a cell was to act under the guidance and control of ISIS. Hendricks used the analogy of a brain and its limbs to describe the relationship between the cell he was recruiting for in the United States and ISIS. He explained that a body has limbs and a brain that controls those limbs. He described himself as the brain that would control the limbs in the cell he was creating. Hendricks, using username "hereafter, explained to SA Jane:

> EH (Erick Hendricks):     I will give you an analogy.
>
> SJ (Special Agent Jane):     Ok
>
> EH:     Every body has a brain in order to operate the limbs
>
> SJ:     Right
>
> SJ:     So are we the limbs?
>
> EH:     In order for the body to be functional we need a strong brain

SJ:     Right

EH:     We are constructing the brain

EH:     Eye to eye?

SJ:     So are we the limbs?  And the khi La Fa Is our brain?

EH:     In this land my dear brother a brain is needed

EH:     Then the limbs grow

(Trial Ex. 5, p. 56-59).[3]  Hendricks then explained that the ultimate brain controlling them was

ISIS, which he referred to as the "khilafa:"  "But all of the um m ah is one body so in a way it

doesn't fit bc ultimately the brain is the kh l a f a."[4]  (Id., p. 59).   Hendricks went on to compare

the situation to a corporate structure:  "Every business needs a headquarters and outposts."  (Id.,

p. 60).  When asked by SA Jane if "we are making our own brain" or were "[c]onnected to the

ultimate brain," Hendricks replied, "Ulti m ate brain brother lol."  (Id., p. 60-62).  Hendricks then

advised SA Jane to "[s]tudy the fi qh[5] of WI la yah."  (Id., p. 62); (see also R. 92: Trial Tr.

03/09/18, PageID 1515-18, 1520-23).  As Dr. Vidino explained, "wilayah" means province, and

in the context of ISIS, is a reference to their efforts to expand the caliphate to control provinces

in lands beyond Syria and Iraq.  (R.93: Trial Tr. 03/12/18, PageID 1716-17).

---

[3] All of the Trial Exhibits referenced in this motion response were admitted at trial and are therefore already part of the record in this case. Specifically, this motion response references Exhibits 5, 8, 12, 28, 51, 52, 53, 62D, 62G, 62H, 65, and 66.  Because these exhibits are already part of the record and several are audio files or lengthy, copies of these exhibits are not attached to this response.  However, copies will be provided to the Court or defense counsel upon request.

[4] In order to avoid detection by law enforcement, Hendricks commonly deleted letters or put random spaces into the spelling of words he considered to be possibly incriminating, or that would draw law enforcement attention. (R.92: Trial Tr. 03/09/18, PageID 1491). For example, here, he spelled the word, "khilafa," which means caliphate, as "kh l a f a."  "Khilafa" is also a common reference to ISIS, as it was at that time the only terrorist group that had declared the existence of an Islamic Caliphate. (Id., at PageID 1516-17, 1523)

[5] "Fiqh" is translated as Islamic jurisprudence.  (R.92: Trial Tri. 03/09/18, PageID 1521-22).

This exchange between Hendricks and SA Jane provided the jury with Hendricks' own words as evidence of his intent in recruiting members to join his cell—to create an extension of ISIS in the United States, under ISIS control. As Hendricks explained, using both analogies, ISIS was the ultimate brain controlling the brain and limbs he was creating in the United States, and was the headquarters controlling the outposts in the United States. Hendricks' reference to "wilayah" reinforced this expression of intent—the goal was to create a province under ISIS control. The jury was free to credit these statements of Hendricks' intent made by Hendricks.

Other evidence also supports the conclusion that Hendricks was not recruiting an independent team or cell of terrorists. Hendricks claimed to be in contact with "senior brothers" who were advising him to stay in the United States, and not to make "hijrah,"[6] or travel to Syria to join ISIS there. When asked by SA Jane about making hijrah, Hendricks responded: "Hi j rah is a great deed. If that's what your heart desires then I ask A ll ah to make all your intentions noble. I've spoken to senior brothers and the Na see hah[7] is to remain here." (Trial Ex. 5, p. 99-101; R. 92: Trial Tr. 03/09/18, PageID 1529). In a later conversation, Hendricks again stated, "Hij rah is not what senior people requested me." (Trial Ex. 12, p. 16; R. 92: Trial Tr. 03/09/18, PageID 1552). When pressed by SA Jane whether the guidance on staying in the United States was really what the senior people wanted, Hendricks responded that it was "advice my brother, not an order." (Trial Ex. 12, p. 18). He further explained that, "The conditions for a wili ya h have to be in place. Only advice," and that, "The only provide advice to wol ves. And connect ppl to form gro ups." (Trial Ex. 12, p. 20; 92: Trial Tr. 03/09/18, PageID 1552-53). Hendricks made a similar statement to Matthew Palmer in a chat on social media when discussing the

---

[6] "Hijrah" is a term used to describe migration to an Islamic land. In the context of ISIS, it refers to traveling to join ISIS in ISIS-controlled territory. (R. 92: Trial Tr. 03/09/18, PageID 1485).
[7] "Naseehah" means advice. (R. 92: Trial Tr. 03/09/18, PageID 1529).

possibility of making "hijrah:" "Plus all the real brothers I know are wanting us to stay here," (Trial Ex. 28, p. 13).

In context, the clear inference is that Hendricks' references to "senior brothers," "senior people," or "real brothers" are references to ISIS leaders. When discussing "hijrah" and whether to travel to ISIS-controlled territory, references to senior people giving advice about staying in the United States would logically be about ISIS leaders. As Dr. Vidino explained, the advice to stay in the United States that Hendricks described was consistent with the actual messaging from ISIS leadership. (R. 93: Trial Tr. 03/12/18, PageID 1694-96). Further, the explanation about how these senior brothers only give advice to wolves to help them connect to form groups because the conditions are not in place yet for a wiliyah or province again expresses Hendricks' ultimate goal in recruiting his cell—to create a branch of ISIS in the United States.

These communications from Hendricks explaining his overall purpose and connection to ISIS were sufficient for the jury to conclude that Hendricks' intent was to create a cell to act under the direction and control of ISIS, in effect as an extension of ISIS in the United States, and that he was already taking guidance from their leadership. Other evidence confirmed Hendricks' intent to act under ISIS direction and control. The jury heard evidence and testimony that Hendricks caused to be created and posted online two versions of a document called, "The New Era," which claimed credit for the May 3, 2015, attack by Elton Simpson and Nadir Soofi at the contest to draw the Prophet Mohammad in Garland, Texas and promised new attacks. This document confirms Hendricks' intent to provide support to ISIS and act under their control. First, the document asserts, "The attack by the Islamic State in America is only the beginning of our efforts to establish a wiliyah in the heart of our enemy." (Trial Ex. 52, 53). In the context of Hendricks' previous discussions with SA Jane about the goal of creating a province of ISIS in

the United States, and the explicit reference to establishing a "wiliyah," the reference to the "attack by the Islamic State in America" is most reasonably read as meaning an attack by the "Islamic State," another term for ISIS, in the location of America, and not as an attack by an independent group calling itself the "Islamic State in America." And even if the reference was to a group calling itself "The Islamic State in America," when read in conjunction with Hendricks' discussions about creating an extension of ISIS in the United States, the meaning would most likely be that of a group affiliated with ISIS, and not an independent organization.

Second, the document pledges allegiance to the leader of ISIS: "To our Amir Al Mu'mineen, make dua for us and continue your reign, May Allah enoble your face." (Id.). As explained by Dr. Vidino, "Amir Al Mu'mineen" is a reference to the leader of ISIS, the so-called Caliph of the Islamic State. (R. 93: Trial Tr. 03/12/18, PageID 1692). This declaration of support for the ISIS leader, including calling him "Amir," confirms that Hendricks' intent was to be a part of ISIS, not to act independently. The second version of "The New Era" provided even more confirmation of the connection to ISIS by including the flag typically used by and associated with ISIS. (Trial Ex. 53; R. 93: Trial Tr. 03/12/18, PageID1730-31).

By causing this document to be posted online, Hendricks was also attempting to provide a service to ISIS. The distribution of propaganda on behalf of a terrorist organization can be a form of material support. See United States v. Mustafa, 406 F.App'x 526, 530 (2nd Cir. 2011) (upholding conviction for providing material support to terrorist organization that was based in part on using website to post training manuals and propaganda). In providing this service, Hendricks attempted to act in coordination with ISIS. Hendricks directed Amanda Amaro to share this document with members of the Islamic State in Syria. She testified that she was directed to send the document to Twitter accounts belonging to Junaid Hussein and Sally Jones.

(R. 96: Trial Tr. 03/13/18, PageID 2418-19). As Dr. Vidino testified, Hussein and Jones were prominent members of ISIS in Syria. (R. 93: Trial Tr. 03/12/18, PageID 1710-11). Amaro did as she was instructed. She even communicated directly with Jones about the document and testified that Jones "seemed pleased with the message itself." (R. 96: Trial Tr. 03/13/18, PageID 2419-20). This shows Hendricks sought to coordinate the release of "The New Era" with ISIS, and runs contrary to his assertion that the evidence showed he sought only to act independently of ISIS.

In addition, the jury heard other evidence which showed that Hendricks' intent was to provide material support to ISIS, and not to engage in independent advocacy. Dr. Vidino provided the jury with expert testimony about ISIS' ideology and methodology. He further testified that based on his review, the communications Hendricks had with SA Jane were consistent with that ideology and methodology. (R. 93: Trial Tr. 03/12/18, PageID 1711-13). In fact, Dr. Vidino testified that Hendricks' communications "show[ed] a high degree of understanding of ISIS ideology," and that Hendricks was "clearly someone who is quite sophisticated in comparative terms." (Id., PageID 1712). The jury heard testimony that Hendricks shared with and encouraged others to read and follow the guidance in How to Survive in the West: A Mujahid Guide (2015), an online manual for ISIS supporters in the West that gives instructions on topics such as counter-surveillance and bomb-making. (Trial Ex. 65; Trial Ex. 66; R. 92: Trial Tr. 03/09/18, PageID 1485-88; R.93: Trial Tr. 03/12/18, PageID 1722-23, 1853-54). Janet Miller told the jury that during a conversation with Hendricks about ISIS, Hendricks expressed support for ISIS, talked about having land for training, and asked to be connected to an overseas contact he believed Miller had. (R. 95: Trial Tr. 03/08/18, PageID 2251-54). Al-Ansari also testified that in addition to discussing land to be used for military and

weapons training and potentially conducting raids against targets such as military recruitment centers, Hendricks also discussed with him a list of military members with their addresses that had been leaked online.  (R. 96: Trial Tr. 03/13/18, PageID 2319-20).  This was consistent with Dr. Vidino's testimony in which he explained that ISIS had disseminated lists of U.S. service members with their personal information to supporters in the United States.  (R. 93: Trial Tr. 03/12/18, PageID 1702-03).

All of this evidence admitted at trial proved that Hendricks' activities went well beyond mere "independent actions inspired by ISIS or supporting its goals," and that his intent was to provide personnel to act under ISIS' control and services in coordination with ISIS.  Viewing all of this evidence in the light most favorable to the government, the jury had more than sufficient evidence to conclude that Hendricks' was conspiring or attempting to provide material support to ISIS, and not just engaging in independent advocacy or action.  Therefore, Hendricks' motion on this basis should be denied.

2.    The evidence at trial was more than sufficient to show Hendricks conspired with others to provide material support and resources to ISIS.

Hendricks claims that the evidence presented at trial was insufficient to establish that he conspired to provide material support to ISIS with anyone other than a government agent.  (R. 137: Motion, PageID 3255).  He argues that the government failed to demonstrate an agreement with anyone else to provide personnel or services to ISIS.  (Id.).  As with his first argument, this claim too fails.

The essence of a conspiracy is the agreement between the defendant and at least one other person to commit a crime.  However, proof of a formal agreement is not necessary, and "the existence of a conspiracy may be inferred from acts done with a common purpose."  United States v. Hughes, 891 F.2d 597, 601 (6th Cir. 1989).  "[A] tacit or mutual understanding among

the parties is sufficient to show a conspiratorial agreement." Id.  It is well settled that "[t]he existence of a criminal conspiracy, need not be proven by direct evidence, a common plan may be inferred from circumstantial evidence."  United States v. Gresser, 935 F.2d 96, 101 (6th Cir. 1991) (quoting United States v. Poulos, 895 F.2d 1113, 1117 (6th Cir. 1990).  Although, as Hendricks points out a defendant may not be convicted of conspiring with a government agent, see United States v. Barger, 931 F.2d 359, 369 (6th Cir. 1991), if the indictment alleges, as it does here,[8] that the conspiracy involved unknown or unnamed conspirators, a defendant may be convicted of conspiring with unidentified or unknown individuals.  See United States v. Crayton, 357 F.3d 560, 567 (6th Cir. 2004).

Viewing the evidence in the light most favorable to the government, there was sufficient evidence to support the jury verdict that Hendricks conspired with at least one other person who was not a government agent.  First, there was evidence that Hendricks conspired with his wife, Tyrinda Hendricks.  In furtherance of the conspiracy, Hendricks distributed a document called "GPS for the Ghuraba."  This document provided advice to individuals in the United States on how to conduct counter-surveillance of government agents, how to build a team, and how to respond to law enforcement with violence, among other topics.  (Trial Ex. 51). This guidance was a part of Hendricks' efforts to build a team of ISIS supporters on behalf of ISIS in the United States.  During his meeting with Hamza al-Ansari in Baltimore, in a recorded conversation, Hendricks admitted that he wrote this document with his wife:

|   |   |
|---|---|
| EH (Erick Hendricks): | So I gave you that.  I gave you my writing.  Actually me and my wife, we wrote that. |
| HA (Hamza al-Ansari): | Mashallah. |

---

[8] See R.25: Superseding Indictment, PageID 119.

| EH: | Alhamdullilah. GPS of the ghuraba. I ask Allah to accept that from us. Hopefully you will spread that as well, inshallah. |
|---|---|

(Trial Ex. 62G; R. 96: Trial Tr. 03/13/18, PageID 2351)

It was reasonable for the jury to infer that a jointly written document such as GPS for the Ghuraba could only have come from a common agreement to support ISIS. Corroborating Tyrinda's role as co-conspirator was her presence at Hendricks' meeting with al-Ansari. (R. 93: Trial Tr. 03/12/18, PageID 1844-45, 1859, 1863; R. 96: Trial Tr. 03/13/18, PageID 2350). If she were not a co-conspirator, Hendricks would be unlikely to bring her to a meeting at which he sought to recruit in person someone to join a terrorist cell.

Amaro also testified that Hendricks directed her to speak to his wife, and that his wife referred her to listen to lectures at a website called "kalamullah." (R. 96: Trial Tr. 03/13/18, PageID 2404-05). Dr. Vidino testified that this website was a "fairly popular website" with "books, writings, tapes" by "fairly conservative Muslim clerics," including "ISIS or al-Qaeda sympathizers." He explained, "If you're an ISIS sympathizer, it's a popular website." (R. 93: Trial Tr. 03/12/18, PageID 1717). As part of his recruitment efforts, Hendricks referred others he was recruiting to this same website, including SA Steven Jane (R. 92: Trial Tr. 03/09/18, PageID 1530) and Hamza al-Ansari (R. 93: Trial Tr. 03/12/18, PageID 1853; Trial Ex. 65). Hendricks' wife also specifically recommended Amaro listen to the lectures of Anwar Al-Awlaki. (Id., PageID 2405). Awlaki was a prominent Islamic cleric who preached support for violent jihad against the United States and the West before he was killed in Yemen in 2014. His lectures remain very influential among supporters of violent jihad and terrorist groups such as ISIS. Dr. Vidino testified, "He was—still is, I would say, the main reference for people who embrace al-Qaeda's or ISIS's ideology in the West." (R. 93: Trial Tr. 03/12/18, Page ID 1718-19). By

referring Amaro to his wife, so that she could then direct Amaro to consume the ideology of Awlaki posted on the "kalamullah," website as Hendricks himself had directed other recruits, the jury could conclude that Hendricks and his wife were acting in concert to recruit Amaro as part of a conspiracy.

Hendricks also conspired with Amir Al-Ghazi. Although Al-Ghazi testified on behalf of the government pursuant to a plea agreement, he was not a government agent at the time that he interacted with Hendricks in the spring of 2015. Al-Ghazi testified that someone he knew online as "Abu Harb" sought him out on Twitter. (R. 95: Trial Tr. 03/08/18, PageID 2187). They later transferred their conversation to a more secure social media application, Chat Secure. (Id., PageID 2199). While on that application, "Abu Harb," identified through the evidence presented at trial as Hendricks, asked Al-Ghazi if he was willing to travel and to receive military training in Texas. "Abu Harb" claimed to be a recruiter. He also asked Al-Ghazi if he knew how to use weapons. (Id., PageID 2201-02). Al-Ghazi testified that he was asked, "Am I willing to wage jihad on the Kuffar." (Id., PageID 2201). Al-Ghazi testified that he believed "Abu Harb" was recruiting for ISIS because that was the primary terrorist group out there at the time and Al-Ghazi's social media presence was very pro-ISIS, making it only logical that he would be recruited for ISIS, not another group. (Id., PageID 22014). Al-Ghazi testified that "Abu Harb" asked him for contact information for others to recruit as well, and that he provided him with the information of a like-minded person he was communicating with online. (Id., PageID 2204). Al-Ghazi believed that Hendricks was recruiting for ISIS and provided him with the contact information for a potential recruit. By agreeing to provide this information, Al-Ghazi joined the conspiracy. His agreement can be inferred from his actions.[9]

---

[9] Whether or not Al-Ghazi was a co-conspirator is determined by all of the evidence of his interactions with Hendricks and not by whether he believed himself to be a part of a conspiracy. See United States v. Welch, 97 F.3d

Another co-conspirator was Amanda Amaro. Amaro agreed to help Hendricks by putting together "The New Era" document and posting it online on two occasions. Amaro took the words provided by Hendricks, created the text of the document, and posted it online. (R. 96: Trial Tr. 03/13/18, PageID 2407-09). Amaro chose the title, "The New Era." (Id., PageID 2413). Later, at Hendricks' request, Amaro edited the document and posted a new version. (Id.). Amaro posted the document twice—once in the original version, and later, the edited version. (Id., PageID 2416-17). As explained above, "The New Era" document took credit for the attack in Garland, Texas on May 3, 2015, expressed loyalty to the leader of ISIS, and threatened additional attacks. It was an important part of Hendricks' efforts to support ISIS. Amaro collaborated with Hendricks in the creation of the document, gave it a title, edited it, and posted it online twice. From these actions, a rational jury could have inferred that Amaro was engaged in a conspiracy with Hendricks.

The jury could also infer from the evidence that Hendricks was engaged in a conspiracy with other unknown individuals. Hendricks made several references to "senior brothers" he was communicating with. The jury could infer that these senior brothers providing guidance did so in the context of the conspiracy to provide material support to ISIS. Hendricks also made multiple statements in which he referenced working with a team or group of individuals, including references to "we," which would indicate he was not working alone. Examples of these references to unknown individuals include the following:

a. In "The New Era," Hendricks referred to multiple members of his team and used the pronoun "we," evidence of a joint effort: "We have 71 trained soldiers in 15 different states ready at our word to attack any target we desire. Out of the 71 trained soldiers 23 have signed up for operations like yesterday." (Trial Ex. 52)

---

142, 149 (6th Cir. 1996) (explaining that testimony by an accomplice that there was no agreement did not preclude jury from finding that he was part of a conspiracy with the defendant).

b. When asked by Al-Ghazi if he was by himself, Hendricks replied "that there were more of us in Texas." (R. 95: Trial Tr. 03/08/18, PageID 2202).

c. During a meeting with al-Ansari in Baltimore, Maryland on May 2, 2015, Hendricks made several references to his involvement with others, including:

    i. "I mean, alhamdulillah, we have weapons, uh, we have a little weapons, we have a little money, but we need uh.. I mean I'm not, we have one or two brothers." (Trial Ex. 62D).

    ii. "Nobody is prepared except you and I and a couple of brothers." (Trial Ex. 62H).

    iii. "Right now what we're working on is getting you trained, that's what we need UI. Uh, so UI about thirty people or so. Um, but we have some UI we need an extra person to, maybe, look out when we go in, uh, it's during the night it's not during the day." (Trial Ex. 62H).

d. Hendricks made numerous references to senior brothers, a team, and other members during his communications with SA Jane, including the following:

    i. "We have a team but we are scattered. And nobody likes to trust each other. Therefore someone must travel and meet each other a verify each other." (Trial Ex. 5, p. 7; R. 92: Trial Tr. 03/09/18, PageID 1499).

    ii. "You are the third brother out that way that I must meet." (Trial Ex. 5, p. 21; R. 92: Trial Tr. 03/09/18, PageID 1501).

    iii. "A solid team is between 7 to 12 in a 100 mile radius." (Trial Ex. 5, p. 22; R. 92, Trial Tr. 03/09/18, PageID 1501).

    iv. "But. We are very weak." (Trial Ex. 5, p. 22; R. 92, Trial Tr. 03/09/18, PageID 1502).

    v. "So even a 3 out of zero is a whole ummah :-)" (Trial Ex. 5, p. 22; R. 92, Trial Tr. 03/09/18, PageID 1502).

    vi. "There are well over 4 of us on our team. We just need sab r and persistence." (Trial Ex. 5, p. 25: R. 92: Trial Tr. 03/09/18, PageID 1502).

    vii. "A team pulls together for greater good." (Trial Ex. 5, p. 84) (R. 92, Trial Tr. 03/09/18, PageID 1526).

    viii. "I've spoken to senior brothers and the Na see hah is to remain here." (Trial Ex. 5, p. 99-101; R. 92, Trial Tr. 03/09/18, PageID 1529).

ix. "Every team has a recruiter brother." (Trial Ex. 8, p. 59; R. 92, Trial Tr. 03/09/18, PageID 1549)

x. "Hij rah is not what senior people requested me." (Trial Ex. 12, p. 16; R. 92, Trial Tr. 03/09/18, PageID 1552).

e. Hendricks made a similar plural reference during communications with Hamza al-Ansari: "We are few but we are making moves bithnillah." (Trial Ex. 34, p. 3)

The jury could credit these references to communications with senior brothers, to a "team," and use of the plural pronoun "we," and reasonably conclude that Hendricks was conspiring with other, unknown individuals. See Mustafa, 406 F.App'x. at 529 (finding sufficient evidence to support finding of conspiracy to provide material support to terrorist organization through website based on evidence that the website was updated when the defendant was in custody without Internet access and that authors of documents posted on the site expressed gratitude to defendant for assistance). Conspiracy requires agreement with only one other person, so the size of the team described by Hendricks is irrelevant. Hendricks clearly fails to meet the heavy burden of establishing insufficiency of the evidence. Examining the evidence in the light most favorable to the government, and considering the inferences to be drawn in the government's favor, it is clear that a rational trier of fact could have found that Hendricks conspired with at least one other person to provide material support to ISIS.

B.     DEFENDANT'S CONDITIONAL MOTION FOR NEW TRIAL SHOULD BE DENIED BECAUSE THERE WAS MORE THAN SUFFICIENT EVIDENCE OF THE DEFENDANT'S GUILT

As outlined above, there was more than sufficient evidence of Hendricks' guilt. Hendricks' argument that the verdict is against the manifest weight of the evidence is premised on his claim that the evidence was insufficient for a rational jury to convict him. As reflected in the trial record and for the reasons summarized above, that claim fails. The government presented an abundance of evidence demonstrating Hendricks' efforts to recruit a cell of ISIS

supporters in support of and in order to extend ISIS to the United States. Hendricks' conviction is supported by this evidence, and for the reasons stated above is not against the manifest weight of the evidence. The evidence does not preponderate - let alone *heavily* preponderate - against his guilt; to the contrary, it overwhelmingly proves it.

## IV.    <u>CONCLUSION</u>

As stated above, the granting of a motion of acquittal "will be confined to cases where the prosecution's failure is clear." <u>Keeton</u>, 101 F.3d at 52. There is no such failure in this case. The Defendant has failed to meet the heavy burden of demonstrating that no rational trier of fact, when viewing the evidence in the light most favorable to the government, could have found the Defendant guilty. The jury weighed the evidence and reached its verdict, and this Court should not be persuaded by Hendricks' meritless arguments into substituting its own judgment for that of the jury. Accordingly, Hendricks' Motion for Judgment of Acquittal should be denied without

a hearing. Moreover, Hendricks has failed to meet the burden of showing that the jury's verdict was against the manifest weight of the evidence as contemplated by Fed. R. Crim. P. 33, and his conditional Motion for a New Trial should similarly be denied.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By: /s/ Matthew W. Shepherd
Matthew W. Shepherd (OH: 0074056)
Assistant United States Attorney
801 W. Superior Ave., Suite 400
Cleveland, OH 44113
(216) 622-3589
(216) 522-2403 (facsimile)
Matthew.Shepherd@usdoj.gov

/s/ Mark S. Bennett
Mark S. Bennett (OH: 0069823)
Assistant United States Attorney
Federal Building
2 South Main Street, Room 208
Akron, OH 44308
(330) 761-0523
(330) 375-5492 (facsimile)
Mark.Bennet2@usdoj.gov

/s/ Rebecca A. Magnone
Rebecca A. Magnone (MA: 672299)
Trial Attorney
Department of Justice
National Security Division
Counterterrorism Section
950 Pennsylvania Avenue NW, Room 764
Washington, DC 20530
(202) 353-9472
Rebecca.magnone@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of July, 2018, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Matthew W. Shepherd
Matthew W. Shepherd
Assistant U.S. Attorney