IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16-CR-265 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| ERICK JAMAL HENDRICKS, | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney for the Northern District of Ohio, and Matthew W. Shepherd and Mark S. Bennett, Assistant United States Attorneys, and Rebecca A. Magnone, Trial Attorney, National Security Division, Department of Justice, and hereby submits this sentencing memorandum.  For the reasons described below, the government recommends that the Court sentence the Defendant, Erick Jamal Hendricks, to 30 years in prison and a lifetime period of supervised release.

## I.    INTRODUCTION

Defendant Erick Hendricks was convicted after a jury trial of conspiring to provide and attempting to provide material support to the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization.  The evidence proved that Hendricks sought to create a cell of ISIS supporters in the United States to conduct attacks and attempt to expand ISIS to the United States of America.  The evidence showed that Hendricks attempted to recruit members for his cell online and in-person; traveled to Baltimore to meet a recruit in-person; took pains to vet the suitability of potential recruits; created and distributed a document providing advice on

how to avoid law enforcement detection; took extensive precautions himself to avoid law enforcement detection; attempted to purchase isolated plots of land on which to train the cell he was building; communicated with one of the perpetrators of the terrorist attack in Garland, Texas; sent an FBI undercover agent he believed was a member of his cell to the scene of the Garland, Texas terrorist attack to report back to him; and later caused to be published online a document claiming credit for the attacks and threatening additional attacks.

This evidence proved that Hendricks was not merely an unsophisticated, online ISIS supporter who never attempted to put his beliefs into action.  Instead, took specific steps to put his plans into action.  He was, as Dr. Lorenzo Vidino, the government's expert witness, described him, someone who showed "a high degree of understanding of ISIS ideology" and was "quite sophisticated in comparative terms."  (R.93: Trial Tr. 3/12/18, PageID 1712).  Hendricks' efforts to create a cell of ISIS supporters in the United States also set him apart from those who only sympathized with ISIS, who remained isolated ISIS supporters, or who sought to travel to Syria join ISIS as a foot soldier.  As Dr. Vidino explained, Hendricks was "significantly more active in the sense of seeing himself as a recruiter." (Id., at PageID 1714). Hendricks' efforts to create a group of like-minded ISIS supporters in the United States not only set him apart from other online ISIS supporters, they show how dangerous he truly is and why he is deserving of the maximum sentence in this case.  As explained below, the government requests that the Court sentence Hendricks to 30 years in prison and a lifetime period of supervised release.

## II.    PSR OBJECTIONS

The government has no pending objections to the Presentence Investigation Report ("PSR").  Hendricks objects to the application of the enhancement for committing a crime of terrorism provided at U.S.S.G. § 3A1.4.  Hendricks' objection should be overruled because the

enhancement properly applies to his conduct in this case.

### a.) *The terrorism enhancement properly applies to the defendant's offenses.*

U.S.S.G. § 3A1.4 provides a 12-level increase in the offense level, with a minimum offense level floor of 32, and an increase of the criminal history category (CHC) to level VI if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism. U.S.S.G. § 3A1.4.  "Federal crime of terrorism" is defined for purposes of this enhancement by reference to 18 U.S.C. § 2332b(g)(5).  U.S.S.G. § 3A1.4, App. Note 1.  18 U.S.C. § 2332b(g)(5) defines "federal crime of terrorism" to be an offense that meets two requirements:  (1) the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and (2) the offense must be one of the enumerated offenses at 18 U.S.C. § 2332b(g)(5)(B).  Thus, a "federal crime of terrorism" must be both a listed offense and include the required intent. See United States v. Graham, 275 F.3d 490, 514 (6th Cir. 2001). This intent can be proven through circumstantial evidence, and need not be based on an explicit admission of intent by the defendant.  United States v. Dye, 538 F.App'x. 654, 666 (6th Cir. 2013). Further, the terrorism enhancement is not limited to acts of international or transnational terrorism, as it has been properly applied in domestic terrorism cases.  See United States v. Stafford, 782 F.3d 786, 791–92 (6th Cir. 2015).  The burden on the government is to show by a preponderance of the evidence that the terrorism enhancement applies.  United States v. Wright, 747 F.3d 399, 407 (6th Cir. 2014).  The enhancement can also be applied to offenses such as conspiracy or attempt.  Id.

Hendricks does not dispute that he was convicted of an enumerated crime in 18 U.S.C. § 2332b(g)(5), as he was convicted of violating 18 U.S.C. § 2339B, which is a listed offense.  See

18 U.S.C. § 2332b(g)(5).  Instead he argues that the enhancement should not apply because "[t]he evidence did not show that Mr. Hendricks's motive was to influence, affect, or retaliate against government conduct."  (R.147: Defendant's Sentencing Memorandum, PageID 3342). Hendricks focuses on the Garland, Texas attack, claiming that because it was directed at the organizers of a "Draw the Prophet Muhammad" event, Hendricks could not have had the requisite intent to influence, affect, or retaliate against government conduct. (Id.).  However, as the Sixth Circuit has recognized, the terrorism enhancement can still apply even though the immediate object of a plot was not specifically directed at a government when all of the evidence shows that the defendant had the requisite intent to influence, affect, or retaliate against the government.  See Wright, 747 F.3d at 407-10 (upholding application of terrorism enhancement against defendants who had plotted to bomb a civilian bridge and did not target the government directly).  Further, the intent to influence, affect, or retaliate against the government need not be the defendant's "ultimate or sole aim."  Id., at 408.  Hendricks' argument fails when considering all of the evidence admitted at trial in this case and the broader context of Hendricks' actions.

First, the Garland attack itself was directed not just at a cartoon contest but also at the governmental law enforcement agencies that provided security for the event.  The attackers themselves initiated their attack against officers at a police checkpoint outside the event.  (R.92: Trial Tr. 3/9/18, PageID 1609).  And Hendricks himself asked the FBI undercover agent he sent to the event about the presence of law enforcement, specifically asking whether any "feds" were present. (Id., at PageID 1598).  Then, in "The New Era" document that Hendricks caused to be posted online, he included a warning of future attacks "[t]o those who protect" the event's organizer.  He further announced that "[e]veryone who houses her events" or "gives her a platform to spill her filth" were "legitimate targets."  (Trial Ex. 53).  Hendricks knew that law

4

enforcement provided security at the event.  It is also a reasonable inference that Hendricks would know that because of the attack in Garland, there would be even more law enforcement required to provide security to host future events.  His threats against those who would protect the event's organizer or host future events are threats against the law enforcement personnel who would provide that security at future events.  These threats were intended to dissuade governments and law enforcement from providing security required to host future events.  These threats are a clear example of how Hendricks sought to influence the actions of government through coercion or intimidation.

More broadly, Hendricks was convicted of conspiring to provide and attempting to provide material support to ISIS, a designated foreign terrorist organization.  As the government's expert witness Dr. Lorenzo Vidino explained at trial, ISIS is more than just a terrorist organization dedicated to committing acts of violence with no purpose.  Instead, ISIS sought to establish governmental control over large swaths of territory by declaring a new caliphate.  Dr. Vidino explained:  "ISIS claimed in June, 2014, it basically claimed to have reestablished the caliphate.  The last caliphate was that was universally accepted was basically existed until 1924.  Since there, there has been no caliphate.  What ISIS did what it basically occupied that land in Syria and Iraq, it claimed a bedland was the new caliphate and its leader was the new caliph."  (R.93: Trial Tr. 3/12/18, PageID 1691).  In addition to seeking to establish itself in the Middle East, ISIS also sought to expand through the creation of provinces, or "willayah."  Dr. Vidino described this ambition:  "Wilayah means province basically.  The way ISIS has been operating is, as we discussed, ISIS had created sort of a central state in Syria and Iraq, but it was the caliphate, but it had global ambitions of establishing or spreading

throughout the world and create provinces, which it called Willaya in Arabic." (Id., at PageID 1716).

In addition to controlling territory, central to ISIS' existence is the perception of being at war with numerous enemies, including the United States.  Dr. Vidino explained, "The idea was that they were creating a new society, a new state, which obviously was in a state of war with a variety of enemies."  (Id., at PageID 1694).  Dr. Vidino also explained how ISIS viewed the United States as its enemy:

> Of course, the United States is perceived as one of the biggest enemies, not just of ISIS, but in Islam in general.  The obvious is that the United States is an infidel country.  Of course, it's not ruled under Islamic law so, therefore, it's per se a regime that should be destroyed, but also it interferes unfairly in the Middle East.  It has attacked ISIS.  Of course, since September 2014 the U.S. led coalition has been attacking ISIS and that, of course, has made ISIS propaganda against the United States even more sacred and more vitriolic and patriotic.  There's different angles in which attack America from almost like a social moral point of view, characterizing America as a decadent, immoral society, and then from a moral like a foreign policy military point of view.  So sort of a 360-degree critique by then leads, of course, to calling for attacks against the United States.  So it's not just a critique in itself.  It's a critique followed by the order to carry out attacks, the exhortation, at least, to carry out attacks against the United States, against United States' interests abroad.

(Id., at PageID 1701-02).

As Dr. Vidino explained, ISIS sought to control territory in the Middle East, sought to expand to other parts of the world, and encouraged attacks against the United States because the United States had attacked it and failed to follow Muslim law.  Thus, ISIS' goals were to influence and affect the conduct of governments such as the United States and to retaliate against its enemies who had attacked it, including the United States.  Hendricks is convicted of conspiring to and attempting to support ISIS, which necessarily includes those same goals.  It can be reasonably inferred that a defendant such as Hendricks who attempts to provide or conspires to provide material support to a terrorist group such as ISIS shares and intends to

further the goals of the terrorist group.  See United States v. Chandia, 675 F.3d 329, 340 (4th Cir. 2012) ("Hence, the court did not repeat the mistake of relying solely on Chandia's knowledge of LET's terrorist purpose; it reasonably inferred by a preponderance of the evidence that Chandia intended to advance that purpose in providing material support to Khan.").  It would be a rare case indeed where a defendant knowingly provided material support to a terrorist group yet did not intend to support the goals of the terrorist group.  This is not that rare case.   Specific evidence introduced at trial further supports the determination that Hendricks planned to advance the broader goals of ISIS in influencing, affecting, and retaliating against the United States government.

The evidence at trial showed that Hendricks intended to create an extension of ISIS in America, which would necessarily bring Hendricks into conflict with the United States government, and is a means of trying to influence or affect government action.  See United States v. Jayyousi, 657 F.3d 1085, 1115 (11th Cir. 2011) (finding that intent requirement for terrorism enhancement satisfied where evidence at trial demonstrated that "defendants' support activities were intended to displace 'infidel' governments that opposed radical Islamist goals").  For example, after the attack in Garland, Hendricks caused Amanda Amaro to distribute "The New Era" document, which claimed responsibility for the attack and threatened more attacks.  In this document, Hendricks referred to the attack as one by "the Islamic State in America," a reference to an expansion of the ISIS to the United States.  He threatened further attacks in multiple states in the United States and also threatened further attacks against those who would host future events such as the one in Garland. (Trial Ex. 53).

Amaro also testified about Hendricks' goals.  She explained, "There was a time he suggested that he wanted to build within America a group.  And he said—and I seemed, from

my assumption, I meant—I got that he meant mujahideen fighters."  She further explained, "No, I mean, he had talked a lot about ISIS, of course, because he had mentioned the leader. But from what I got, that he just wanted to build like an extension of it in America."  When asked if she meant an extension of ISIS in America, Amaro answered in the affirmative.  (R.96: Trial Tr. 3/13/18, PageID 2401).

In his communications with FBI undercover agent Steven Jane, Hendricks explained that he was working to create an extension of ISIS in America using the analogy of a brain and its limbs to describe the relationship between the cell he was recruiting for in the United States and ISIS.  He explained that a body has limbs and a brain that controls those limbs.  He described himself as the brain that would control the limbs in the cell he was creating.  (Trial Ex. 5, p. 56-59).  Hendricks then explained that the ultimate brain controlling them was ISIS, which he referred to as the "khilafa:"  "But all of the um m ah is one body so in a way it doesn't fit bc ultimately the brain is the kh l a f a."[1]  (Id., p. 59).   Hendricks went on to compare the situation to a corporate structure:  "Every business needs a headquarters and outposts."  (Id., p. 60).  When asked by SA Jane if "we are making our own brain" or were "[c]onnected to the ultimate brain," Hendricks replied, "Ulti m ate brain brother lol."  (Id., p. 60-62).  Hendricks then advised SA Jane to "[s]tudy the fi qh[2] of WI la yah."  (Id., p. 62); (see also R. 92: Trial Tr. 03/09/18, PageID 1515-18, 1520-23).  These communications show that Hendricks was seeking to extend ISIS to America, consistent with the goals of ISIS to expand to new provinces.

---

[1] In order to avoid detection by law enforcement, Hendricks commonly deleted letters or put random spaces into the spelling of words he considered to be possibly incriminating, or that would draw law enforcement attention. (R.92: Trial Tr. 03/09/18, PageID 1491). For example, here, he spelled the word, "khilafa," which means caliphate, as "kh l a f a."  "Khilafa" is also a common reference to ISIS, as it was at that time the only terrorist group that had declared the existence of an Islamic Caliphate. (Id., at PageID 1516-17, 1523)

[2] "Fiqh" is translated as Islamic jurisprudence.  (R.92: Trial Tr. 03/09/18, PageID 1521-22).

In addition to evidence of Hendricks' goal of expanding ISIS to the United States, the evidence from trial also shows that Hendricks intended violence against law enforcement and the military.  For example, in the document that Hendricks authored with his wife and distributed online to those he was recruiting, "GPS for the Ghuraba in America (The West)," Hendricks advised violence not against civilians, but against law enforcement who might investigate his followers, advising them, "Stop going to jail brothers.  Boobie trap your homes, lay in wait for them, never leave your home without your AK-47 or M16.  If you're in deep, don't allow them to even get you at a traffic stop."  (Trial Ex. 51, p. 18).

Also, the government informant ("CHS") Hendricks met in person in Baltimore, Maryland testified that Hendricks discussed with him his plans to commit attacks against military targets in the United States:  "For example, we discussed a possible target for night raiding, and that target would consist of military recruitment centers."  (R.96, Trial Tr. 3/13/18, PageID 2319).  Hendricks and the CHS further discussed the purpose of land that Hendricks was planning to obtain for the group he was recruiting.  The CHS explained that the "main use of the land would be as a headquarters for the group" for the purpose of "[p]hysical training, military training, weapons training."  (Id.) Hendricks then discussed with the CHS a list of United States military members with their addresses that had been published. (Id., at PageID 2319-20).

Finally, Hendricks made clear in his communications with SA Jane that his purpose was not just the wanton killing of civilians for no reason, as he criticized someone else for advocating attacks on purely civilian targets instead of on military or government targets: "These are the same cowards who will pass up 1 million soil ders and bases to go bomb six flags and a hospital or a mall or a college."  (Trial Ex. 14, p. 115); and, "Yeah.  These type of people will pass by 50 police, arm y, and legis lat ion place and go to a six flags."  (Id., at p.

124).  This criticism shows that Hendricks intended retaliatory attacks on governmental

institutions and the military, consistent with ISIS ideology, and not merely advocating attacks

on civilians.

These examples of evidence introduced at trial show that Hendricks sought to act in

concert with ISIS' plans to expand by creating an extension of ISIS in America and attacking the

United States military and law enforcement.  As at least one court has recognized, "coercion and

intimidation are inherent in the concept of terrorism." United States v. Haften, No. 15-cr-37-jdp,

2017WL32336 at *1 (W.D.Wis. Feb. 9, 2017) (unpublished).   Here, Hendricks' threats against

the hosts and security personnel of future events such as the event in Garland, his plan to create a

cell to commit attacks on behalf of ISIS in the United States against targets including the

military, and to create an extension of ISIS necessarily involved actions to coerce and intimidate

government and to retaliate against it.  The extension of ISIS to the United States envisioned by

Hendricks could not exist without using violence to force the government of the United States

permit to it.  For all of the above reasons, the evidence introduced at trial more than meets the

government's burden of proving by a preponderance of the evidence that the terrorism

enhancement applies to this case.

## III.    ADVISORY SENTENCING GUIDELINES CALCULATION

The Presentence Investigation Report ("PSR") correctly calculates the advisory

sentencing guidelines range.  First, the report calculates a total offense level of 38.  This results

from a base offense level of 26 pursuant to U.S.S.G. §2M5.3, and the application of a 12 level

enhancement for committing a crime of terrorism pursuant to U.S.S.G. §3A1.4(a).  The result is

a total offense level of 38. (PSR, ¶ 25-33).  Hendricks went to trial and has not in any way

demonstrated an acceptance of responsibility, so no such reduction is appropriate.

Hendricks' criminal history category is properly determined to be VI. Because of the application of the terrorism enhancement at U.S.S.G. § 3A1.4(b), Hendricks' criminal history category automatically is adjusted to VI. (PSR, ¶ 38).

With a total offense level of 38 and criminal history category of VI, Hendricks' range calculates to 360 months to Life in prison. However, the maximum punishment for the convictions for each of Count 1 and Count 2 is 180 months, resulting in a total maximum punishment of 360 months. Thus, the advisory sentencing guidelines range is greater than the statutory maximum punishment, which makes the advisory sentencing guidelines range equal to the statutory maximum of 360 months. (PSR, ¶ 63).

## IV. SENTENCE RECOMMENDATION AND ANALYSIS OF THE SECTION 3553(a) FACTORS

The government recommends that the Court impose the maximum sentence of 30 years in prison and a lifetime period of supervised release. This is the sentence of imprisonment called for by the advisory sentencing guidelines, and is the appropriate sentence after consideration of all of the factors at 18 U.S.C. § 3553(a).

### a.) *The Court should impose consecutive sentences for Count 1 and Count 2.*

Consecutive sentences are permissible, are consistent with the guidelines, and contrary to Hendricks' claim that his sentence would result simply from a charging decision, are appropriate because of the severity of Hendricks' conduct. First, the Court is authorized to impose consecutive sentences. Convictions for conspiracy to commit an offense and the corresponding substantive offense that was the object of the conspiracy are convictions for separate offenses, and consecutive sentences are not precluded by the double jeopardy clause. "A substantive crime and conspiracy to commit that crime are not the same offense for

purposes of double jeopardy … ." United States v. Farrad, 76 F.App'x. 42, 44 (6th Cir. 2003).

It is "established doctrine that a conspiracy to commit a crime is a separate offense from the

crime itself."  United States v. Felix, 503 U.S. 378, 391 (1992).  A defendant may be sentenced

to consecutive sentences for a conspiracy conviction and the substantive offense that was the

object of the conspiracy.  See United States v. Mainville, 9 F.App'x. 431, 435 (6th Cir. 2001)

("In any event, Mainville's contention that he can not be sentenced to consecutive sentences for

a substantive offense and conspiracy to commit that substantive offense is just plain wrong.");

see also Callanan v. United States, 364 U.S. 587 (1961) (upholding the imposition of

consecutive sentences for convictions for conspiracy to commit Hobbs Act extortion and

committing substantive Hobbs Act offense).

      Consecutive sentences are consistent with the United States Sentencing Guidelines.

Because the sentence called for under the sentencing guidelines exceeds the maximum

punishment of one of the offenses of convictions, the sentencing guidelines call for the offenses

to be "stacked," or run consecutively in order to reach the advisory guidelines sentence.  See

U.S.S.G. § 5G1.2(d);[3] United States v. Colbert, 977 F.2d 203, 206-07 (6th Cir. 1992); Jenkins

v. United States, 394 F.3d 407, 411-12 (6th Cir. 2005).  Here the properly calculated advisory

guidelines sentence is 360.  The maximum punishment for each of Counts 1 and 2 is 180

months, well below the advisory guidelines range.  U.S.S.G. §5G1.2(d) then provides for

stacking the sentences for both counts to reach a total of 360 months, which becomes the

advisory guidelines sentence.  Thus, consecutive sentences are consistent with the sentencing

guidelines.

---

[3] U.S.S.G. § 5G1.2(d) provides in relevant part:  "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."

Although the sentencing guidelines call for consecutive sentences, they are advisory in nature. In determining whether to impose consecutive or concurrent sentences, the Court must consider the factors at 18 U.S.C. § 3553(a), as it would for any sentence. See 18 U.S.C. § 3584(b) ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a).") Based on the analysis of the section 3553(a) factors below, consecutive sentences are appropriate in this case because of the seriousness of Hendricks' conduct.

Further, contrary to Hendricks' argument, it would not be unfair to impose consecutive sentences in this case as a result of a charging decision. (R.147: Defendant's Sentencing Memorandum, PageID 3344-45.) Hendricks' exposure to consecutive sentences is not simply the result of the government's charging decision, it is the result of his conduct in this case and the recognition that a criminal conspiracy is a distinct crime that presents a distinct threat to the public. Courts have long recognized the additional dangers caused by criminal agreements and partnerships. As the Supreme Court has explained:

> [C]ollective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.

Callanan, 364 U.S. at 593-94. The dangers of conspiracy are even more apparent in the context of conspiring to support a terrorist group such as ISIS, where the dangers of a lone supporter

can be quickly magnified through a conspiracy to create a network of ISIS supporters across the country.  Hendricks faces the possibility of consecutive because of his *conduct*, which exposed the public the greater danger caused by engaging in a conspiracy, in addition to the substantive offense.

**b.)  A 30 year sentence is appropriate after consideration of the relevant Section 3553(a) factors.**

After calculating the advisory guidelines range, the Court must consider the factors listed at 18 U.S.C. § 3553(a).  Title 18, United States Code, Section 3553(a) states, in pertinent part:

> (a) Factors to be Considered in Imposing a Sentence.   The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.   The court, in determining the particular sentence to be imposed, shall consider:
>> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>> (2) the need for the sentence imposed;
>>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>> (B) to afford adequate deterrence to criminal conduct;
>>> (C) to protect the public from further crimes of the defendant; and
>>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>> (3) the kinds of sentences available;
>> (4) the kinds of sentences and the sentencing range established [by the Sentencing Guidelines];
>> (5) any pertinent policy statement [from the Sentencing Commission];
>> (6) the need to avoid unwarranted sentencing disparities among defendants with similar conduct; and
>> (7) the need to provide restitution to any victims of the offense.

18 U.S.C.  § 3553(a).

Although the Court must consider all of these factors, in this case, the most pertinent are the nature and circumstances of the offense, the history and characteristics of the defendant, the

need to protect the public, and the sentencing range established by the sentencing guidelines.

### 1.) <u>The Nature and Circumstances of the Offense.</u>

The PSR provides a thorough and detailed description of the relevant conduct in this case that need not be repeated in full here.  The Court also heard extensive evidence at trial detailing Hendricks' offenses that also need not be repeated.  However, certain aspects of this case deserve special consideration by the Court when fashioning an appropriate sentence.

First, it is important for the Court to consider that at the heart of this case is Hendricks' role as a recruiter.  Hendricks was attempting to build a cell of ISIS supporters to commit attacks within the United States.  He was trying to bring together otherwise isolated and separated ISIS supporters.  The result would have been to magnify the ability of those ISIS supporters to cause violence and destruction.  Bringing other, like-minded supporters together would have allowed Hendricks to direct a longer-term campaign of violence and increased its effectiveness.  Also, by acting as the recruiter, the one bringing these recruits together, Hendricks set himself out as more important and more vital to the ISIS cause.  This role as recruiter marks Hendricks as deserving of a greater sentence than one who is just a recruit.

Second, the Court should consider where Hendricks intended his actions to occur.  Hendricks did not seek to organize a group to travel to Syria to fight for ISIS there.  He sought to create a group to commit attacks within the United States.  Had he succeeded in his plans, the end result would likely have been a series of attacks against targets in Hendricks' own homeland.

Third, the Court should consider that Hendricks advised recruits to kill law

enforcement rather than be arrested.  In the GPS for the Ghuraba document that Hendricks created and distributed, he made clear that law enforcement should be resisted and met with violence if they attempted to arrest his followers, advising followers to "keep your AK-47 loaded, waiting for a no-knock entry."  (Trial Ex. 51, p. 8).   This disregard for law enforcement shows how the danger posed by Hendricks.

Fourth, Hendricks' efforts to avoid law enforcement exposure shows the degree of sophistication Hendricks exhibited.  Hendricks used multiple online user names and applications to create a web of communications that took extraordinary effort for law enforcement to untangle and ultimately identify Hendricks.  He used advanced counter-surveillance techniques when meeting with the CHS in Baltimore, such as meeting the CHS at one location, telling him to take the battery out of his cell phone, giving him a radio, and then directing him to a new location using the radio.  Those are techniques that are only used by a person dedicated to avoiding law enforcement coverage and to his cause.  They are the steps taken by a criminal who is committed to his crime—in this case, committed to supporting ISIS.

Finally, the Court should take note that Hendricks was connected to an actual terrorist attack on American soil, the Garland, Texas shooting in May 2015, which was stopped only by the quick reactions of a lone police officer who stood his ground and killed both attackers.  The evidence at trial showed that less than two weeks before the attack Hendricks was in communication with one of the attackers, Elton Simpson.  The evidence also showed that Hendricks connected an undercover FBI agent to communicate with Simpson.  The evidence showed that he directed the undercover agent to travel to Garland to the event, and then asked a series of questions about topics such as security at

16

the event.  After the attack, the evidence showed that Hendricks thought the undercover

agent had been killed in the commission of the attack.  Hendricks then caused a document

claiming responsibility for the attack to be posted online.  Hendricks' actions were not

merely notional, but were related to a real attempt to cause carnage in the United States in

which a security guard was wounded and two attackers were killed. His connections to

the Garland attack prove that he was serious in his intentions to create a cell of ISIS

terrorists in the United States.

These facts show just how dangerous Hendricks' conduct was, the danger he

continues to pose, and the reason why a long sentence is well-deserved.

### 2.) <u>The History and Characteristics of the Defendant</u>

The Court should also consider Hendricks' personal history and characteristics.

Hendricks has no prior adult criminal history. (PSR, ¶ 35).  He has his G.E.D. and

attended community college. (PSR, ¶ 55-56).  He has a history of being employed and of

owning his own business.  (Id., ¶ 57-58).  He reported a positive childhood.  (Id., ¶ 43).

He has been involved in multiple relationships and marriages, and has fathered two

children.  (Id., ¶ 45-49).  He is currently 38 years old. (<u>Id.</u>, ¶ 43).

The Sixth Circuit has previously noted that these types of personal characteristics

are discouraged from being overly relied upon at sentencing.  See <u>United States v.</u>

<u>Robinson</u>, 669 F.3d 767, 775 (6th Cir. 2012).  However, to the extent that the Court

decides to give them weight, these facts are arguably just as supportive of a significant

sentence as a lenient one.  The reason is that Hendricks had many of the advantages here

that other defendants do not, and yet he still committed these offenses.  He had a good

upbringing, he had the opportunity to attend community college, he is capable of running

his own business, and he is not burdened by a past criminal history.  Despite taking advantage of many of the opportunities afforded him, he still sought to attack the country that provided those opportunities. His commitment to his ideology trumped all of these other personal factors that should have dissuaded him from following this path.

Hendricks is not just a teenager who became infatuated with ultra-violent videos he saw on the Internet, or an impressionable youth who followed a charismatic religious leader down the wrong path.  He is a grown, educated man who appears to have deeply considered and then knowingly adopted the ideology of ISIS.  That adherence to ISIS' ideology and the sophistication he showed in committing these offenses makes Hendricks a dangerous man.

### 3.) <u>The Need to Protect the Public</u>

A long sentence is also needed to protect the public from Hendricks.  His crime was inspired by the ideology of ISIS. There is no indication that Hendricks has renounced this ideology or showed any remorse or regret for his actions.  As noted above, Dr. Vidino described Hendricks as someone with "a high degree of understanding of ISIS ideology." (R.93: Trial Tr. 3/12/18, PageID 1712).  Hendricks' conduct shows him to be a true believer in ISIS.  Such a true believer in a terrorist organization can be expected to remain a threat to the public for as long as he maintains these beliefs.

Hendricks cites to a United States Sentencing Commission study on recidivism that suggests that defendants with zero criminal history points have a significantly lower recidivism rate.  (R.147: Defendant's Sentencing Memorandum, PageID 3344).  While this correlation may generally be true, terrorism offenses are unique because they are motivated by belief in an ideology, and in Hendricks' case he has not renounced that ideology.  As at least one court has recognized, "even terrorists with no prior criminal behavior are unique among criminals in the

18

likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."
United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003). Because there is no reason to believe that Hendricks has renounced these beliefs, and every reason to fear that he remains a sophisticated, committed supporter of ISIS, who exhibited a significant capability to use techniques to evade law enforcement, there will be a need to protect the public from Hendricks for the foreseeable future. In Hendricks' case, the combination of ideology and capability makes him an ongoing danger to the public. Only the incapacitation that results from a long prison sentence followed by a lifetime of supervised release can adequately protect the public.

### 4.) <u>The Applicable Sentencing Guidelines Range</u>

The Court must consider—indeed, must start with—the advisory sentencing range determined by the application of the United States Sentencing Guidelines. 18 U.S.C. § 3553(a)(4); <u>Gall v. United States</u>, 552 U.S. 38, 49-50 (2007). As outlined in the PSR, the sentencing guidelines call for a sentence of 360 months or 30 years. There is no reason for the Court to vary downward from the guidelines sentence. Hendricks has shown no remorse. There are no mitigating factors that would support a variance. The Court should follow the guidelines in this case and impose the appropriately substantial sentence of 30 years.

## V.     CONCLUSION

Based on consideration of the advisory sentencing guidelines range and the Section 3553(a) factors identified above, the appropriate sentence for this defendant is the maximum sentence on each count to run consecutively, for a total of 30 years, and a lifetime period of supervised release.

<div style="margin-left: 40%;">

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   /s/ Matthew W. Shepherd
    Matthew W. Shepherd (OH: 0074056)
    Assistant United States Attorney
    801 W. Superior Ave., Suite 400
    Cleveland, OH 44113
    (216) 622-3589
    (216) 522-2403 (facsimile)
    Matthew.Shepherd@usdoj.gov

    /s/ Mark S. Bennett
    Mark S. Bennett (OH: 0069823)
    Assistant United States Attorney
    Federal Building
    2 South Main Street, Room 208
    Akron, OH 44308
    (330) 761-0523
    (330) 375-5492 (facsimile)
    Mark.Bennett2@usdoj.gov

    /s/ Rebecca A. Magnone
    Rebecca A. Magnone (MA: 672299)
    Trial Attorney
    Department of Justice
    National Security Division
    Counterterrorism Section
    950 Pennsylvania Avenue NW, Room 764
    Washington, DC 20530
    (202) 353-9472
    Rebecca.magnone@usdoj.gov

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of January, 2019, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Matthew W. Shepherd
Matthew W. Shepherd
Assistant U.S. Attorney