UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,        Case No. 1:16cr265
                                 Akron, Ohio
          Plaintiff,             February 4, 2019

     vs.

ERICK HENDRICKS,

          Defendant.


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE


SENTENCING HEARING


APPEARANCES:

For the Government:        Matthew W. Shepherd
                           Mark S. Bennett
                           Assistant United States Attorneys
                           Suite 400
                           801 Superior Avenue, West
                           Cleveland, Ohio  44113
                           (216) 622-3859


For the Defendant:         Edward G. Bryan, Esq.
                           Office of the Federal Public
                           Defender – Cleveland
                           Northern District of Ohio
                           750 Skylight Office Tower
                           1660 West Second Street
                           Cleveland, Ohio  44113
                           (216) 522-4856

1

2

3    Court Reporter:           Lori Ann Callahan, RMR-CRR

4                           United States District Courthouse
                           Room 568

5                           2 South Main Street
                           Akron, Ohio  44308

6                           (330) 819-8676

7

8

9

10   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                         -  -  -

 3              THE COURT:  Please be seated, ladies and

 4     gentlemen.

 5              For the record, the court has before it today Case

 6     Number 1:16cr265.  The case is United States of America

 7     versus Erick Jamal Hendricks.

 8              We're here today for sentencing.

 9              Counsel the for government, are you ready to

10     proceed?

11              MR. SHEPHERD:  We are, Your Honor.

12              THE COURT:  On behalf of the defendant?

13              MR. BRYAN:  We are ready, Your Honor.

14              THE COURT:  Thank you.  Mr. Hendricks, did you go

15     over the presentence report and discuss it with your

16     attorney?

17              THE DEFENDANT:  Yes, sir.

18              THE COURT:  Counsel, did you review the report

19     with your client?

20              MR. BRYAN:  We have, Your Honor.

21              THE COURT:  The report indicates that there's one

22     unresolved objection and that objection has been set forth

23     in the presentence report, as well as the sentencing

24     memoranda submitted by the defendant.  It's at paragraphs

25     27, 38 and 62.
```

1          Defendant objects to the so-called terrorism

2     enhancement under Guideline 3A1.4.

3          Counsel for the defendant, do you wish to be heard

4     further regarding your argument regarding that matter?

13:01:51   5          MR. BRYAN:  Your Honor, inasmuch the government

6     has filed its sentencing memorandum after we filed ours, I

7     do think there are a couple of things I need to say with

8     regard to that enhancement.

9          In essence -- and I am responding mostly to the

13:02:07   10     government's sentencing memorandum on this issue in these

11     comments now.  In essence, the government's argument would

12     turn every material support case into one in which the

13     terrorism enhancement would have to be applied.  Under that

14     notion, I don't understand why we even have a separate

13:02:27   15     guideline provision for material support in terrorism or for

16     the terrorism enhancement.

17          So this is a very fact specific determination that

18     has to be made, and it's kind of hard to be made in a case

19     where there is no underlying specific event, but we're

13:02:44   20     alleging an attempt or a conspiracy.  As the court knows,

21     both of those are inchoate offenses, and the government's

22     not required to prove anything specific.  They're not

23     required to prove anything was going to happen.  They just

24     have to prove, in essence, a conspiracy to provide material

13:03:00   25     support as that's defined under the law.

Lori A. Callahan, RMR-CRR       (330) 252-6022

1          And sitting here today, knowing that Mr. Hendricks

2     has been convicted of the material support conspiracy to

3     provide material support, as well as attempting to provide

4     material support, the only thing we can go on are the facts

13:03:15     5     in the case.

6          And so we mention in our sentencing memorandum the

7     only specific event that was even discussed, although

8     Mr. Hendricks was never charged with or made a defendant in

9     that case, was the Garland attacks where the two individuals

13:03:32    10     went to the Drawing the Prophet Muhammad contest and as

11     before -- as they began to open fire, they were killed by

12     law enforcement officers.

13          Clearly the motivation wasn't to attack the

14     government or to retaliate against the government because of

13:03:50    15     its policies, but in that instance, was to retaliate against

16     a civilian who in the eyes of the persons who attacked the

17     event or attempted to attack the event, had blasphemed the

18     Prophet Muhammad and it wasn't being done for law

19     enforcement purposes.

13:04:08    20          Specifically, the enhancement requires not only

21     that there be a conviction for the underlying offense which

22     we concede exists, but that Mr. Hendricks' motive was to

23     retaliate or influence the government, but what the

24     government does is they say "But because law enforcement

13:04:25    25     officers were there in the Garland event, that they

1    potentially would become targets, as well."

2         Again, it has to be related to the person's

3    purpose to retaliate against or influence the government.

4         So they're saying, "Well, if they have to shoot

13:04:42  5    law enforcement while they're there or to avoid being

6    captured or to not be arrested alive, you know, to kill law

7    enforcement during that, that's not a purpose to retaliate

8    against or influence the government."  It's not being done

9    in an effort to try to change government policy or try to

13:04:59  10    punish government for the policy that it's taken in the

11    past, say, a policy that says the Islamic state would think

12    was harmful to the Islamic state or to Muslims generally so

13    there's an attack that's planned or that's done.

14         Specifically, when it comes to maybe law

13:05:21  15    enforcement officers being injured during an attack, say as

16    in the Garland case, or when there's discussion about not

17    being arrested peacefully and fighting back and things of

18    that nature, "Don't let them take you alive so that they can

19    display you," that's not a purpose to retaliate against or

13:05:39  20    influence the government.

21         That's a purpose not to be arrested peacefully, or

22    a purpose to not be arrested during the commission of the

23    offense that the purpose was for to retaliate against the

24    civilian.

13:05:55  25         So the general purpose of creating sort of this

1    off-the-grid terrorism training center or some facility or

2    something like that is too remote.  It's not specific enough

3    to have the 12-level enhancement apply.  Again, allowing it

4    to apply in this case would suggest that there is no

13:06:18    5    material support case where that 12-level enhancement, when

6    it applied, if because ISIS generally has -- has as one of

7    its stated goals, to retaliate against the United States or

8    the west or whatever, some sort of purpose or some desire to

9    provide material support to that entity in some instance

13:06:45    10   means that you are engaging in a terrorism act when there

11   isn't a specific act that's been alleged or proven in the

12   case, which the government obviously didn't have to do in

13   this case because of the way that Mr. Hendricks was --

14             THE COURT:  Well, they really don't have to do

13:06:58    15   that, do they?  The enhancement could be applied to offenses

16   such as attempt and conspiracy, right?

17             MR. BRYAN:  It could -- it could be applied to

18   those offenses if there were facts in the case that showed

19   that the motive of Mr. Hendricks or the defendant was to

13:07:13    20   retaliate against United States government.  That's, in

21   essence, the definition of terrorism.

22             So to retaliate against or influence, the only

23   specificity in this case dealt with a discussion about the

24   Garland, Texas attack which clearly the motive in that case

13:07:33    25   was against the event organizers and not against the

1    government, because of the belief that the event --

2          THE COURT:  What about the discussion that was in

3    Baltimore that was filmed by the government, the discussion

4    that Mr. Hendricks had with the confidential informant?

13:07:47  5          MR. BRYAN:  And that dealt more with the

6    generalities of training and seeing what he was willing to

7    do, what the informant was willing to do, and since I wasn't

8    part of the trial, Your Honor, I am asking for a little bit

9    more guidance.

13:08:06  10          THE COURT:  Well, I know it's difficult.  I

11    apologize since you weren't part of the trial, but that

12    perhaps -- without commenting further, that's probably the

13    most compelling part of the evidence against Mr. Hendricks,

14    the video/audio recording that was made with the undercover

13:08:20  15    and the discussion about what the undercover may be asked to

16    do.

17          I know that's a bit challenging for you, but

18    that's probably the most compelling part of the evidence

19    that I believe was certainly considered by the jury.

13:08:34  20          MR. BRYAN:  Again, to support the material support

21    conviction, but if I -- if I recall the record well enough,

22    based upon my review of the record, again, there weren't

23    any -- there was sort of a feeling out what he was willing

24    to do, but there was no specificity.  There was no actual

13:08:52  25    plan.  There was nothing that was ever discussed like, for

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    instance, go to Garland, Texas and do something or something

2    like that.

3              THE COURT:  Wasn't it in the nature of recruiting,

4    though?  Wasn't he recruiting the undercover to engage in

13:09:07  5    future acts perhaps?

6              MR. BRYAN:  Right.  But in this instance, in this

7    case, there was no future -- nothing future happened

8    basically, and so the talk is one thing and an event, I

9    think -- if there were a case where there was -- they were

13:09:22  10   planning say an attack on military barracks or something

11   like that, and I think that was one of the things that was

12   discussed, but there was some specificity with trying to

13   carry out something, but since he was working with an

14   undercover, it wasn't going to be able to be carried out,

13:09:38  15   that would be a material support case where the terrorism

16   enhancement would be applicable because the motive is clear

17   in that instance that there's an intent to carry out a

18   specific event that would be in retaliation against the

19   government.

13:09:55  20            THE COURT:  I think the case, at least the Wright

21   case, talks about intended to promote under 3A1.4(a), which

22   extends the enhancement to felonies, I am quoting from that

23   decision, that involved or were intended to promote federal

24   crimes of terrorism, rather than limit its application to

13:10:15  25   only those substantial offenses listed under the statute,

1    and that's the language from Wright.

2            MR. BRYAN:  Right.  And I think it's important to

3    note also that Mr. Hendricks -- first of all, there wasn't a

4    substantive act of terrorism that was committed in this

13:10:34    5    case, nor was there one that was even specifically planned

6    with an undercover or with anyone else.

7            And, again, if Mr. Hendricks could have been

8    charged in the Garland attack, I think he would have been

9    charged in the Garland attack, but I don't think there's any

13:10:50    10    sufficient evidence, although there may be evidence that

11    there was communication with one of the Garland attackers,

12    that's the same for the undercover FBI agent that had

13    communication with that person, as well, but there's no

14    specific evidence in the record that Mr. Hendricks knew that

13:11:05    15    was going to take place or somehow planned in that regard.

16            So I think the problem is the nature of this

17    conviction.  There are lots of terrorism cases where the

18    government even creates an event where then the person, they

19    take them down the path to just before they -- the bridge

13:11:23    20    bombing case that was tried in Judge Dowd's courtroom where

21    they take them down the path to where they're actually --

22    they believe they're exploding a bridge in Brecksville,

23    Ohio.  When they press the button, but in reality, obviously

24    because the government was in on it, nothing happened.

13:11:39    25            Nothing in Mr. Hendricks' case came close to

1    anything like that.  In fact, the facts in Mr. Hendricks'

2    case reflect the communication with an undercover agent for

3    a period of about three months, and admittedly those

4    communications were in support of the ISIS ideology,

13:11:59    5    creating a training facility off the grid in the United

6    States, recruiting members, but there wasn't anything

7    specific that was planned in that three months.  And then

8    after that, there was another year and a half before the

9    government itself even shows to arrest Mr. Hendricks based

13:12:14   10    upon the communications that he had with the undercover a

11    year and a half before.

12            So there is no evidence that Mr. Hendricks was

13    ever going to carry out a specific attack or do anything of

14    that nature, and because of the nature of the evidence in

13:12:31   15    this case, there's no proof of his -- of an intent to

16    retaliate against the government for, you know, in a

17    specific way as compared to sort of his general support

18    group for the ISIS ideology.

19            THE COURT:  Thank you.

13:12:47   20            Counsel for the government?

21            MR. SHEPHERD:  Yes, Your Honor.  We would dispute

22    several of the arguments made by defense counsel today, Your

23    Honor.  I believe defense counsel first is trying to impose

24    an extra burden on the government for this enhancement than

13:13:04   25    actually applies with the idea there needs to be, if I

1    understands him, some kind of specific act we can point to.

2         Where the real issue is one of intent, not of

3    whether there was a specific attack or not, attack or

4    action, because as the court noted, the enhancement can

13:13:22  5    apply to attempt crimes, can apply to conspiracies.  I think

6    the defense counsel also is asking the court to look too

7    narrowly at the conduct in the case.

8         The government's theory of the case, as we

9    expressed at trial, and I think as we've presented, this was

13:13:37  10   Mr. Hendricks' efforts to recruit a cell on behalf of ISIS,

11   to commit attacks within United States, and that his

12   intention in doing that, I don't think you can separate from

13   the goals and purposes of ISIS, number one, and then even

14   specifically if you're going to create an extension of ISIS

13:13:57  15   within the United States, if you're going to create a group

16   to train -- a facility to train, you're necessarily I think

17   implicit and that is you're acting in a manner to, if you

18   are going to expand ISIS, in which you're going to seek to

19   influence or affect the conduct of the United States

13:14:13  20   government.

21        And if you're seeking to support ISIS and extend

22   ISIS which has noted its efforts or made public its efforts

23   to retaliate against the United States for actions of the

24   United States in the Middle East for being a part of a

13:14:29  25   coalition that's attacked ISIS, I don't think you can

1    separate those.

2         We're not asking the court to find that in every

3    material support case the terrorism enhancement

4    automatically applies, but I think if you look at the facts

13:14:41  5    of this case and trying to create -- recruit a cell of

6    members in the United States to support ISIS, to expand

7    ISIS, to commit attacks on behalf of ISIS, along with that,

8    his intent is also to follow ISIS ideology and necessarily

9    that includes trying to influence the government of the

13:15:02  10   United States.

11        I think if you look specifically at just the

12   Garland attack, even in isolation, which we're not asking

13   the court to do, but even in isolation, the Garland attack

14   and his efforts afterwards to cause the posting of a

13:15:15  15   document claiming credit for it, there's an element of

16   intimidation and coercion of those who would provide

17   security for and who would host similar events.

18        I don't think you can limit that on focus of all

19   that was involved was this one attack against this one

13:15:30  20   speaker.  I think you have to look at the evidence more

21   broadly, Your Honor.  And certainly, by a preponderance of

22   the evidence, we believe that the evidence at trial that we

23   pointed to in our sentencing memorandum supports the

24   enhancement.

13:15:43  25        THE COURT:  Well, I know the precedent is -- the

Lori A. Callahan, RMR-CRR      (330) 252-6022

1  precedent is preponderance.  Is that -- I hate to ask, but

2  you think that is a sufficient standard when you're asking

3  me to apply this enhancement, which could ramp up the

4  sentence substantially?

13:16:00  5        MR. SHEPHERD:  Your Honor, I think as a matter of

6  law, it is.

7        I think as a matter of the evidence in this case,

8  we would submit we've shown more than a preponderance, that

9  both the expert testimony about ISIS, the specific

13:16:17  10  communications we pointed to in our sentencing memorandum,

11  the discussions with the informant in Baltimore, the

12  statement posted after Garland trying to take credit for the

13  Garland attack and threatening additional attacks, and all

14  of the other evidence that the court heard in the case and

13:16:35  15  that we pointed to in our sentencing memorandum, would be

16  more than a preponderance, but legally, yes, Your Honor,

17  even though it's a big enhancement, that is what the case

18  law provides.

19        THE COURT:  All right.  Thank you.

13:16:48  20        For the record, the court would note I've

21  carefully considered the matter.  We'll put up an order in

22  writing as to this particular issue, this objection and the

23  enhancement.  Of course the enhancement is fact driven, fact

24  related.

13:17:02  25        Having presided over the trial, I am aware of much

1    of the evidence in the case.  I need not recount it or set

2    forth all here this afternoon in its entirety.  But suffice

3    it to say that, at least in my view, the government has

4    established by a preponderance of the evidence, if not at a

13:17:20  5    higher standard, that the defendant intended to engage in

6    activities that would influence the government.

7         His intention, at least as part of the case, was

8    to recruit individuals in this country to form a cell of

9    ISIS or ISIL supporters, to train recruited individuals to

13:17:39 10    commit acts of violence on behalf of ISIS or ISIL as it's

11    referred to, and the other facts that we will put forth in a

12    written order, at least in my view, support the enhancement.

13         The actions of the defendant were not limited to,

14    again, the Garland, Texas, so-called Garland, Texas event,

13:17:58 15    but there is sufficient evidence to support the enhancement

16    by a preponderance of the evidence, if not a higher

17    standard, and we will detail that in writing.

18         Having said that, the court, of course, is to

19    properly calculate the advisory guidelines, we will do that,

13:18:11 20    and then we will turn to a discussion about the kinds of

21    sentence the court should impose, the reasons for the

22    court's sentence.

23         Having addressed the objection, under the statute,

24    the statutory provisions here for Count 1 is zero to 15

13:18:26 25    years.  Count 2 is zero to 15 years.  The guideline

13:18:50

13:19:10

13:19:25

13:19:34

13:19:53

1  provisions are -- 360 months is the guideline provisions

2  that would apply in this case based upon the enhancement and

3  that calculation is set forth at page 7 and page 8 according

4  to the recommendation of the probation officer.

5  Supervised release is zero to life as to Counts 1

6  and 2.  Of course probation is not an option, and $200 is

7  the supervised release.

8  Other than the objection the court has just

9  addressed, counsel for the government, do you have any

10  additional objections to the court's advisory guideline

11  calculation?

12  I believe the guideline is -- his total offense

13  level is 38 with a Criminal History Category VI, and the

14  guideline, again, at the highest end, would be 360.

15  MR. SHEPHERD:  No objection, Your Honor.

16  THE COURT:  Other than the objection that you've

17  previously raised and preserved for the record, Mr. Bryan?

18  MR. BRYAN:  No other objections, Your Honor.

19  THE COURT:  All right.  Thank you.

20  With regard to the kind of sentence the court

21  should impose, Counsel, I will call to your attention before

22  we hear from Mr. Hendricks, something that is I think

23  somewhat relevant, perhaps not directly relevant, but the

24  parties have cited in their briefing to United States versus

25  Wright, and of course there were Codefendants Baxter,

Lori A. Callahan, RMR-CRR      (330) 252-6022

1     Stevens, Hayne and Stafford, the so-called bridge bombers

2     who placed what they believed to be explosives under the

3     Route 82 bridge in Brecksville some years ago as part of the

4     Occupied Cleveland movement.

13:20:13   5         And I went back and looked at the sentencing in

6     those cases.  Mr. Wright's guideline range is 324 to 405

7     months.  He was sentenced to 138 months.

8         Mr. Baxter's guideline was 262 to 327 and he was

9     sentenced to 117 months.

13:20:28  10         Mr. Steven's guideline range was 188 to 235

11     months.  He was sentenced to 97 months.

12         Mr. Hayne was sentenced at 72 months with a

13     guideline range of 262 to 327.

14         Mr. Stafford who went to trial as part of this

13:20:46  15     case, guidelines was 324 to 405, and he received 120 months.

16         Now, comparing and contrasting that case and the

17     kind of sentence that were imposed upon individuals who

18     actively planted what they believed to be a bomb on a bridge

19     over which hundreds, if not thousands, of people travel each

13:21:08  20     and every day, how is it or why is it that the government

21     would be asking me for 30 years in this case when I compare

22     the terrorist activities of these other individuals here not

23     too many years ago?

24         And correct me if I am wrong, the government did

13:21:26  25     not appeal any of that sentences I referenced earlier.  So I

1    -- candidly, while disparity is national, but I ask myself

2    should I give Mr. Hendricks 30 years when I see these other

3    individuals with the extensive activity, at least in my

4    view, direct activity to try and bring down a bridge here in

13:21:46   5    the Northern District as against Mr. Hendricks who obviously

6    his actions were in support of a terrorist organization,

7    certainly not Occupied Cleveland, but so how is it, or why

8    is it I should not consider the sentences these other

9    defendants received without objection or without --

13:22:05  10    certainly without appeal by the government?

11            So I will just call that to your attention so you

12    can certainly be free to argue and explain to me why

13    Mr. Hendricks isn't entitled to some downward variance from

14    30 years in this case when these other individuals received

13:22:21  15    such nominal -- at least in my view, relatively nominal

16    sentences for actions that some could argue was even worse

17    than Mr. Hendricks.

18            So what is the government's position regarding

19    what type of sentence I should impose for Mr. Hendricks,

13:22:35  20    please?

21            MR. SHEPHERD:  Your Honor --

22            THE COURT:  Maybe we should -- I am sorry to

23    interrupt.  Maybe we should hear from Mr. Hendricks if he's

24    going to address the court before I hear argument.  That way

13:22:44  25    I will have a better understanding whether he wishes to --

1  whether or not he wishes to make any statement and how if

2  that statement might affect sentencing in the matter.

3       Mr. Hendricks, do you wish to make any statement

4  at all on your own behalf?

13:23:02  5       MR. BRYAN:  Your Honor, I will be able to speak on

6  behalf of Mr. Hendricks.

7       THE COURT:  Certainly, I will -- you can go either

8  way.  You can go first, or Mr. Hendricks can go first.

9  Whichever you would like.

13:23:13  10       MR. BRYAN:  Mr. Hendricks is asking me to go

11  first, Your Honor.

12       THE COURT:  All right.  You may be seated,

13  gentlemen, until -- Mr. Hendricks, until your attorney

14  completes the presentation and then -- you can be seated if

13:23:24  15  you would like since you're in custody and use the

16  microphone, sir, if you would.

17       Mr. Bryan.

18       MR. BRYAN:  So, Your Honor, at this stage, I am at

19  allocution now, and we're discussing the 18, U.S.C., 3553(a)

13:23:35  20  factors?

21       THE COURT:  Yes.  If you would like to incorporate

22  the discussion as to the sentences in Wright at all, you can

23  do that, too.

24       MR. BRYAN:  I can do that, Your Honor, and I don't

13:23:45  25  want to -- I don't want to push it too far, but there's

1    another conspiracy case.  This was a conspiracy to kill

2    American soldiers abroad that I was part of in this district

3    as well and it was in Toledo, Ohio, and there were three

4    defendants in that case and the main defendant was a

13:24:03    5    gentleman by the name of Mohammad Amawi, and I, along with

6    Timothy Ivey, were main counsel for Mohammad Amawi at trial.

7    And the secondary defendant was a gentleman by the name of

8    Marwan El-Hindi, and the third gentleman was a gentleman by

9    the name of Wassim Mazloum.

13:24:23    10              And in order, Mr. Amawi, although all of them

11    faced guidelines sentences of life in prison, because of the

12    same terrorism enhancement and other enhancements that

13    applied in that case, they were sentenced accordingly.

14              Mr. Amawi received a sentence of 240 months or 20

13:24:39    15    years.  Marwan el-Hindi received a sentence of 12 years, and

16    Wassim Mazloum received a sentence of eight years, all

17    imposed by Judge Carr in that instance.

18              There are -- in fact, there's more similarities

19    between the Amawi case and Mr. Hendricks case than there are

13:24:59    20    even between Mr. Hendricks case and the bridge bombing case.

21    And I would agree with Your Honor that the culpability of

22    the defendants in that case is reflected more strongly in

23    the fact that it wasn't all aspirational.  It was something

24    that actually was made concrete by the nature of the

13:25:15    25    government's investigation against the attempted bridge

1    bombers, and that was they gave them an opportunity, albeit

2    it was undercover opportunity, to actually go through where

3    what they had articulated and what their intent was.

4         In both the Amawi case and Mr. Hendricks case,

13:25:33  5    there were undercover law enforcement officers.  In

6    Mr. Hendricks' case, it was an FBI agent, and Mr. Amawi's

7    case, it was an informant that was being used by the FBI to

8    infiltrate the Toledo area.  Muslim community, in an

9    essence, what you have was a lot of conversation taking

13:25:52  10   place between informants and the targeted individual, and

11   based upon the conversations that were made, and that

12   happened during those investigations, conspiracy cases then

13   were later brought again the defendants.

14        In Mr. Hendricks' case, the first indictment

13:26:12  15   against him was a single count of conspiracy for conspiracy

16   to provide material support to a foreign terrorist

17   organization, which carried with it a maximum statutory

18   penalty of 15 years.

19        The government later superseded Mr. Hendricks'

13:26:28  20   case and added an attempt charge which also has a statutory

21   range of zero to 15 years, and now the government's arguing

22   that because the guideline exceeds 15 years that the court

23   can stack those sentences to arrive at the guideline range.

24        I would argue for many reasons, but one of the

13:26:51  25   reasons I would argue that that is inappropriate based upon

1    the facts of this case is that Mr. Hendricks could not have

2    committed a conspiracy to provide material support to a

3    foreign terrorist organization without attempting to do the

4    same conduct.  The offense conduct isn't even -- isn't

13:27:11  5    different between the two offenses.  It's basically the

6    same.

7         I would suggest that an attempt could be a lesser

8    included offense of conspiracy, although conspiracy would

9    never be a lesser included offense of attempt, but it's the

13:27:27  10    same offense conduct.  It's the communications that are

11    being articulated, this aspirational goal of potentially

12    creating a terrorist cell within the United States, even

13    though there's no evidence that Mr. Hendricks took any

14    material steps toward doing that other than some desire to

13:27:47  15    purchase some land out west.

16         He didn't have the ability to and never had the

17    money to -- in fact, Mr. Hendricks, there's no evidence in

18    the case, that he even had any firearms, whether they would

19    be AK47s or anything else.  He had nothing as it relates to

13:28:02  20    the things that were discussed between Mr. Hendricks and the

21    undercover agent.  None of the tools of the trade, so to

22    speak, were found with Mr. Hendricks.

23         In fact, I don't know why, but the government

24    never even sought a search warrant of Mr. Hendricks' home

13:28:21  25    that would have been served contemporaneous to his arrest

1    warrant.  They never even attempted to find these items in

2    Mr. Hendricks' possession.  In fact, they waited a year and

3    a half after Mr. Hendricks' activity with the government had

4    ceased to even arrest him, so if there's some concern that

13:28:42  5    Mr. Hendricks is a danger, was an imminent threat in the

6    community, was an imminent threat to carry out anything that

7    was even discussed, it's my belief that the government would

8    have treated his case differently than it did.

9         So what we have are two inchoate offenses.

13:29:02  10    Offenses that don't, you know, have specificity about it.

11    There wasn't a bridge bombing plot.  There wasn't even a

12    plot to target anything that was discussed with

13    Mr. Hendricks, nor the demonstration of the ability on

14    Mr. Hendricks' part to be able to carry out anything.

13:29:22  15         So as the court is required to do, to look at the

16    nature and the circumstances of the offense and the history

17    and characteristics of Mr. Hendricks, to arrive at a

18    sentence that's sufficient, but not greater than necessary,

19    to accomplish the purposes and goals of sentencing, it's our

13:29:41  20    position that the nature and circumstances of the offense

21    itself, albeit it's a material support case, that albeit

22    even has a terrorism enhancement, are ones that suggest that

23    the threat of imminent harm never existed, or the threat of

24    any real harm ever existed.

13:30:00  25         In fact, there's evidence that if Mr. Hendricks

Lori A. Callahan, RMR-CRR      (330) 252-6022

1   even had an intent to do what was discussed with the agent

2   in an undercover capacity, that he had abandoned that intent

3   to follow through on anything of that nature, because for a

4   year and a half after those conversations took place,

13:30:20  5   Mr. Hendricks went about living a law-abiding life with his

6   family and in doing everything that he could to provide for

7   his family.

8         Back in the Amawi case, one of the things I

9   mentioned to Judge Carr at the time I think is appropriate

13:30:43  10  in this case as well, I drew an analogy, and it seemed silly

11  when I first start talking about it, but I really think hits

12  home, and that is there was a movie that was I guess popular

13  some years back involving Tom Cruise by the name of Minority

14  Report.  I don't know if the court seen that movie or if

13:31:03  15  anybody else in this room had seen that movie, but it's not

16  important that you've seen the movie to get the point.

17        And that was, it was a science fiction thriller,

18  and the whole notion of the movie was that they had

19  developed a technology in the future to prevent future

13:31:19  20  crime.  So instead of waiting until a crime was committed

21  and arresting someone for committing that crime, they had a

22  system that was developed with a computer, and some people

23  who were able to tell the future events that would raise an

24  alert when something was about to happen, and when something

13:31:38  25  was about to happen, the police sprung into action and they

1    would arrest a person prior to the event actually taking

2    place and usually it was while the person was on their way

3    to commit the crime.

4         The movie is called the Minority Report because

13:31:52  5    the company that had created this system of being able to

6    predict future crime had suppressed a minority report about

7    its accuracy, that it wasn't always accurate, that it failed

8    many times to be unable to predict the future.

9         I am arguing that by analogy in Mr. Hendricks'

13:32:12  10   case, because it's very similar to these investigations,

11   these types of investigations that people like Mr. Hendricks

12   are targeted in and people like Mr. Amawi years ago were

13   targeted in, there's no way to tell if anything ever would

14   have happened, and that's good, and I guess that's sort of

13:32:35  15   the good thing behind conspiracy law.  We shouldn't have to

16   sit back and wait for something bad to happen to be able to

17   hold someone accountable for planning with others, to engage

18   in conduct with others to do it.  But the law also

19   recognizes that facts vary from case to case, and I would

13:32:56  20   argue and submit to the court that Mr. Hendricks' case is

21   that case like Mr. Amawi's that demonstrates that nothing

22   likely would or could have ever happened, albeit the

23   evidence was sufficient to convict him of conspiracy.

24         And I would argue the unlikelihood of a violent

13:33:18  25   future event or of Mr. Hendricks being involved in something

Lori A. Callahan, RMR-CRR      (330) 252-6022

1     that would have likely resulted in some type of harm is a

2     mitigating factor in and of itself, and that he should not

3     receive a 30-year sentence for something that the government

4     believes could have happened, but the evidence suggest

13:33:40  5     probably never actually would have happened.

6          And, again, I am drawing the court's attention to

7     the fact that for a year and a half after the communications

8     with the undercover, Mr. Hendricks never did anything

9     inappropriate.

13:33:55  10         That sort of segues me to just talking about Mr.

11    Hendricks, his history and characteristics.  He's a Criminal

12    History Category I, because other than these events, he has

13    lived a law-abiding life, and he's lived a good life, and

14    that good life is reflected by the familial support that he

13:34:12  15    has behind him.  His mother wrote a letter on his behalf.

16    There's another letter submitted on his behalf.

17         Also present in court today is Mr. Hendricks' wife

18    and some of his stepchildren and other friends.  But coming

19    all the way from the United Kingdom is Mr. Hendricks'

13:34:28  20    daughter, Mariam, who just waved to the court.  And Mariam

21    and Mr. Hendricks -- Mariam's mother and Mr. Hendricks met

22    quite some time ago.  Mariam is now 16 years old.  She was

23    born in the United States, and she lived in the United

24    States for the first two years of her life, and then she

13:34:49  25    moved with her mother back to the United Kingdom where her

1    mother was from, and she's been living in the United

2    Kingdom, but has since not just came to Mr. Hendricks'

3    sentencing hearing, but has came to the United States as an

4    American citizen to try to take root in the United States

13:35:06    5    and remain in the United States in large measure because of

6    her father.  That's because of the nature of the

7    relationship that he's had with his daughter, albeit it's

8    been long distance now for a long period of time.

9        I think the court itself recognized,

13:35:26    10    notwithstanding the conviction in this case, much of

11    Mr. Hendricks' good nature, by the way he's conducted

12    himself during earlier proceedings, by the way he's

13    conducted himself in not only the courtroom, but even by the

14    way that you can see that he's conducted himself over his

13:35:45    15    life.

16        And that when the government talks about

17    recidivism in terrorism cases could be higher and things

18    like that, I think what they're really doing is just trying

19    to draw on the strength of the emotion that surrounds --

13:36:01    20    well, both terrorism prosecution would suggest that the

21    person who's accused or convicted of such an offense is

22    irredeemable and they will not be able to turn their ways

23    and to rehabilitate themselves and put themselves in a

24    position where they should be able to function in society.

13:36:24    25        I believe that Mr. Hendricks -- not his criminal

Lori A. Callahan, RMR-CRR     (330) 252-6022

1    history, his lack of criminal history, but his history and

2    characteristics reflects that he does have the character,

3    notwithstanding his conviction in this case, to take

4    advantage of whatever time the court imposes upon him while

13:36:43    5    incarcerated to continue to better himself, not only for

6    himself, but for himself and for society for when he is

7    eventually released, and that it is not necessary to deprive

8    him of his liberty for the next 30 years, or even for the

9    next 15 years.

13:37:00    10    We ask the court not to grant the enhancement, the

11    terrorism enhancement, which would have placed Mr. Hendricks

12    in a guideline range of 63 to 70-month months, but we didn't

13    ask the court to impose a sentence within that guideline

14    range.

13:37:22    15    We looked at the guidelines, which suggest that

16    because of the nature of the conviction, the nature of the

17    offense, an upward variance may be appropriate if the court

18    were to find that the 12-level enhancement shouldn't have

19    applied.

13:37:39    20    And the court even said to Mr. Shepherd before,

21    just the weight of the evidence when the guideline range

22    itself can subject this person to so much more time, all you

23    have to prove that by is by the weight of the evidence and

24    the court did acknowledge that there was more evidence to

13:37:59    25    support than just the weight of the evidence to support the

1    enhancement.

2         But I think, and I don't want to be presumptuous,

3    but I think what the court is concerned about is applying

4    this 12-level enhancement willy-nilly will not arrive at a

13:38:17  5    just sentence in Mr. Hendricks' case, which the law defines

6    is a sentence that's sufficient, but not greater than

7    necessary, to accomplish the purposes and goals of

8    sentencing, which include holding Mr. Hendricks accountable,

9    rehabilitation, sentencing disparity and the like.

13:38:35  10        And so we argued for, and even conceded to a

11   sentence of 120 months by looking at the entire case, would

12   be a sentence that is sufficient, but not greater than

13   necessary, acknowledging that from our perspective,

14   Mr. Hendricks went to trial.  He has a right to appeal his

13:39:02  15   case.  He's not here to make any admissions today.  I don't

16   think that would be prudent for him to do that.

17        But just acknowledging the facts that were found

18   by the jury in this case, in looking at them objectively, we

19   believe that a sentence of that amount would be 120 months,

13:39:19  20   would be sufficient, but not greater than necessary.

21        THE COURT:  All right.  Thank you, Counsel.

22        Mr. Hendricks, what, if any, statement would you

23   like to make on your own behalf, and because you're in

24   custody, I know you're restrained, you can remain seated if

13:39:31  25   you would like.  Just use the microphone.

                Lori A. Callahan, RMR-CRR      (330) 252-6022

1            If you like to stand, you can do that as well.  It

2       might be a little bit uncomfortable.

3            THE DEFENDANT:  I will stand.

4            Sir, I've worked hard to keep my life a certain

13:39:53  5       way.  I have never got into drugs.  I never got into those

6       things that they get people in jail.  I've worked hard to

7       keep myself out of where I am today.

8            Nevertheless, I am here, on the other end of the

9       law, and always in my mind, every black man in America --

13:40:27  10      and I don't want bring up race issues -- we always have in

11      our head, "One day we're going to end up in prison."  And

12      I've actively tried not to get here where I am.

13           I've taught my daughters that, my children that,

14      society that.  I used to come to the prisons to tell them,

13:40:51  15      you know, remain positive, to never end up in this place.

16      And I understand that I'm not going to talk about my case,

17      the past.

18           I want to talk to you, sir, about my future.  I am

19      relied on by so many people, my mother, my daughter, my

13:41:22  20      children, a lot of people in the community.

21           Sir, I am not the -- I'm not the person that my

22      accusers accuse me to be.  I wish I could have said that a

23      lot during trial, but nevertheless, I do plan to pursue that

24      in the future, sir.

13:41:49  25           But I just want to talk to you about my future.  I

Lori A. Callahan, RMR-CRR     (330) 252-6022

1    have -- I am totally -- I am totally sorry for any

2    inconvenience that I caused you.

3           I am asking you, sir, I am asking the creator and

4    the merciful, the most merciful, to give me mercy, first and

13:42:13  5    foremost.  And I am asking you if there's any mercy that I

6    can have, or anything that I could get, any mercy that I can

7    get to give me another chance to get out there and prove

8    myself.  To say that I will never come here is an

9    understatement.  You would -- you will never see me again.

13:42:39  10           And I just want to ask you for mercy, anything you

11   can give me, sir.  I would appreciate that.  And I will be

12   very thankful.  I've learned a lot since being in these

13   chains.  I understand the law a lot better.  I'm a young

14   man, but I still want to see that I want future time with my

13:43:07  15   children and my wife and my mother.

16           Anything you can give me, I would appreciate it.

17   Thank you so much.

18           THE COURT:  Thank you, Mr. Hendricks.

19           Counsel for the government, what's the

13:43:21  20   government's position regarding the kind of sentence the

21   court should impose?

22           MR. SHEPHERD:  Your Honor, as we stated in our

23   sentencing memorandum, our position is requesting the

24   maximum sentence, Your Honor.

13:43:32  25           I would like to address first the reference the

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    court made to a prior case in the Wright, Stafford, Hayne,

2    Stevens and Baxter case, Your Honor.  I believe that was one

3    of the questions the court asked before, statements by the

4    defendant and defense counsel.

13:43:51    5    THE COURT:  Just so it's clear, I want to make

6    sure it's clear for the record for any reviewing court, I

7    recognize disparity is national in nature, so I want to make

8    that clear.  But this case, this Wright case involving the

9    so-called bridge bombing is a case cited to me by the

13:44:09    10   parties.  It's relevant as it relates to the guidelines, but

11   it's also relevant when we talk about proportionality and

12   fairness, at least in my view, fundamental fairness, as

13   compared and contrasted.  These are you could argue domestic

14   terrorists.

13:44:26    15   The fact that Mr. Hendricks is accused of being

16   involved with ISIL, again, is -- it is what it is, but when

17   you compare the sentences imposed on individuals who were

18   actively involved in trying to take down a bridge over which

19   thousands of people travel every day, and then I compare

13:44:46    20   that with Mr. Hendricks and his actions, I have to ask

21   myself the question, 30 years, as opposed to the sentences

22   that were imposed in the other cases I just referenced?

23   MR. SHEPHERD:  Your Honor, first, and I think as I

24   get into this, I hope to highlight what -- one point, which

13:45:06    25   is I think it's very -- I think it's very dangerous in a

1    sentencing like this, to when you compare these cases to do

2    so in a way where you don't lose sight or -- or it's very

3    difficult just comparing the raw sentences of one case with

4    the potential raw sentence in this case without really

13:45:25  5    digging into the individual factors and characteristics of

6    that particular case.

7         So, for example, Your Honor, and first I will

8    concede, I was not the prosecutor on the Wright case, so I

9    don't have all of the details on hand, but just taking a

13:45:42  10   review of the Wright decision and the Stafford decision,

11   there are some differences right there that I can point to

12   that are different in their case than from the defendant.

13        Of the four defendants -- of the five defendants

14   in the Wright case, Baxter, Stevens, Hayne and Wright, they

13:45:53  15   did all plead guilty.  I believe that is a very important

16   fact, especially in the context of a terrorism case, where

17   without a plea of guilty, without any statement of remorse,

18   when you are assessing the future dangerousness of people, I

19   think that idea that somebody has plead guilty, has

13:46:18  20   presumably in that case, although the record is not clear

21   from the decisions, expressed remorse, I think that's an

22   important distinction between a defendant who has gone to

23   trial and has made -- even today no expression of remorse

24   for his conduct.

13:46:29  25        And what you heard from the defendant was,

Lori A. Callahan, RMR-CRR     (330) 252-6022

1    although a very, very I think good statement of sort of how

2    he says he will never in the future commit this conduct

3    again, or be in trouble, actually, to be in trouble again,

4    there isn't a statement of, "Here's what my conduct was that

13:46:49  5    was wrong in this case, Your Honor."

6              THE COURT:  I wish -- Counsel, with all due

7    respect, I wish that I could have heard more from

8    Mr. Hendricks, but as I am sure you're aware, I am sure he's

9    acting in some respects with the advice of counsel.  There's

13:47:01  10    issues for appeal, and so I think he's a bit hamstrung as to

11    what he can say to me.  That's my sense.  I, like you, wish

12    I could have heard much more, but I understand why he did

13    not go any further, but in any event, go ahead.

14              MR. SHEPHERD:  Your Honor, and I agree with that.

13:47:17  15    There probably is a reason why he didn't go further today,

16    but I think it is important the idea of -- there's no

17    renunciation of ideology that I think would be important in

18    assessing the defendant in a case like this.

19              I think it's also important the specific sentence

13:47:33  20    you referenced, Mr. Hayne, according to the reported

21    decision, had testified at some point in the court

22    proceedings.  Mr. Stafford, who went to trial, there's

23    reference to his mental health issues as being a factor that

24    was described in the Stafford opinion, as well in the Court

13:47:55  25    of Appeals opinion.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1        I think -- I am sure there's other differences in

2    the weeds of their individual characteristics that are

3    important, but one thing that concerns me in the court's

4    question is this concept of because one judge previously

13:48:12  5    imposed sentences in a case, which the government did object

6    to at the time, although I concede we didn't appeal the

7    substantive reasonableness of those sentences, that it

8    should somehow bind future judges in cases that have some

9    similarities to impose a similar sentence.

13:48:28  10        THE COURT:  I'm not bound at all.  I understand

11    that.  I am sorry to interrupt you, but I'm not suggesting

12    in any way I am bound by the sentences in those cases.  I am

13    not.  I understand that completely.

14        But when I think about -- when I compare just

13:48:42  15    generally the actions of those defendants, the actions they

16    were willing to take, placing a bomb which they thought was

17    an active bomb, which thank goodness it was inert, and

18    willing to take that action, a terrorist act clearly, it

19    would have probably cost hundreds of lives, if not more, as

13:49:02  20    compared and contrasted to Mr. Hendricks as a recruiter,

21    someone who's attempting to form a cell -- and I heard the

22    trial.  I heard all the evidence against him.

23        But I would have to ask myself, but those

24    defendants, even with acceptance, we go from 324 to 405,

13:49:18  25    Mr. Wright, who was I think perhaps the most culpable, gets

1    138 months.  Mr. Baxter is 262 to 327 gets 117.  Mr. Stevens

2    is 188 to 235, I am talking about their guidelines, he gets

3    97.  And then Mr. Hayne, 262 to 327 and gets 72.

4          And I am repeating all of this, just because I

13:49:43   5    can't quite frankly get over it in some respects, and

6    Mr. Stafford goes to trial, 324 to 405, he gets 120 months,

7    and the government doesn't even appeal.  Doesn't say,

8    "Judge, wait a minute.  We think this is wrong."  There's a

9    terrorist enhancement there and there's terrorist actions.

13:49:59  10    Clear.

11          I have to ask what's fair just in general context

12    with Mr. Hendricks.

13          MR. SHEPHERD:  Your Honor, I can't -- I'm not

14    going to attempt to justify the sentences that were imposed

13:50:14  15    in the Baxter, Stevens, Hayne, Wright and Stafford case,

16    Your Honor, because -- I don't agree with those sentences if

17    you are -- as a personal matter of what I thought -- think

18    should have been imposed, and I can't speak as to why the

19    government didn't appeal those sentences.

13:50:29  20          But I don't think our failure to appeal should

21    somehow guide the sentence in this case, Your Honor.

22          I would also point to some other cases.  My

23    colleague pointed to the Amawi case, which is another

24    terrorism case out of Toledo.  Recently there was a case

13:50:49  25    sentenced in Cleveland by Judge Polster of Terrence McNeil,

1    who received a 20-year sentence, and his crimes were

2    solicitation and the posting of threats online against U.S.

3    service members.

4         He received a 20-year sentence after Judge Polster

13:51:04  5    considered all of the factors, and there's a terrorism

6    enhancement there, all of the factors and the facts in that

7    case.  Mr. Al-Ghazi we have who testified in this case

8    received a 16-year sentence.  He also had additional

9    offenses in addition to his material -- attempted material

13:51:18  10   support charge such as being a felon in possession of a

11   firearm.

12        The point I am making, Your Honor, is that in

13   looking at the individual facts of matters like the Baxter

14   case, like this case, that there are individual distinctions

13:51:36  15   that I am sure could be developed between each one, instead

16   I guess I would like to try and point the court to the

17   reasons why in this case we think the defendant is worthy of

18   the 30-year sentence, and hopefully move the court away from

19   the concern about the Wright case.

13:51:53  20        Because a couple -- I think the salient points

21   about Mr. Hendricks' conduct in this case, first

22   Mr. Hendricks' efforts to create a cell to commit attacks in

23   the United States.  Now, we don't know ultimately what

24   damage would have been done had he been fully successful on

13:52:09  25   that, but I think it is important for the court to consider

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    and this is a distinction with the local group of plotters

2    in the bridge case, that he was pulling together people from

3    different parts of the country, pulling together -- he

4    traveled to Baltimore to meet with one person.  He had been

13:52:23  5    online with Mr. Al-Ghazi here in Ohio.  He had been online

6    with the undercover who he believed was out west somewhere.

7    He had been online with Ms. Amaro who was in Louisiana, that

8    it's this active recruiting and bringing people from around

9    the country, otherwise isolated ISIS supporters is

13:52:43  10    incredibly dangerous and is a distinction between the

11    plotting that was done in the bridge case.

12          And even though, as the court pointed, that case

13    got to the point of them pushing the button on what they

14    believed was a bomb, in this case, if Mr. Hendricks had been

13:52:59  15    successful in bringing a group together to engage in

16    military training on an isolated plot of land as the

17    evidence showed and then to further commit attacks to behalf

18    of ISIS, the damage could have been just as severe or

19    greater, Your Honor.

13:53:14  20          THE COURT:  I'm sorry.  Go ahead.  Could have

21    been, but I am sorry, he never had -- at least based on

22    listening to all of the evidence, he never really had a

23    legitimate chance of doing that.  He didn't have the money.

24    He didn't have the funds.  He didn't have the resources.  He

13:53:29  25    really didn't have the wherewithal, and the most serious

1    part of this case was his activity online and perhaps, you

2    know, inspiring others to get involved in this activity.

3           Again, we're back in 2014, 2015.  Let's put this

4    in context.  So that's probably the most serious part of his

13:53:46    5    actions, but he never really had the present ability to put

6    together a training facility.  We heard all the evidence.

7    He's out traveling around trying to get land or find land,

8    live off the grid.  He never had the ability to do that

9    effectively.  He didn't have the money, the resources, or

13:54:02    10    the wherewithal to do it.  So the biggest concern was his

11    activity online.

12           Am I wrong?

13           MR. SHEPHERD:  Well, Your Honor, I think they're

14    both twin concerns.  I think what he had the greatest

13:54:15    15    capability of doing at the time were his online activities.

16    I won't dispute that there's no evidence of him being

17    incredibly wealthy or anything like that, but I think it's

18    unclear, because, in fact, he spotted surveillance in May of

19    2015.  I think that was clear.  I think it would be

13:54:36    20    speculation to say he would have been unable to follow

21    through on any of his plans.

22           THE COURT:  Was there any evidence that he was

23    able to do that?  I didn't see any evidence or hear any that

24    he was going to be able to do just what you're alleging he

13:54:50    25    could do, that is, create some cell?  I mean he has

1    discussions and some sort of pie in the sky sort of idea,

2    but I never saw any evidence that he ever had sufficient

3    money to even buy property on Ebay, as we heard testimony

4    about that action.  He didn't have the money to buy, to pay

13:55:10    5    2 or 3, 4 or 5,000 out west, did he?

6    MR. SHEPHERD:  Your Honor, I believe he had sold a

7    business in the fall of 2014.  I don't remember the exact

8    dollar value.  There was a period of which he did have some

9    money in the fall of 2014 where he had sold I believe a cell

13:55:33    10    phone business and obtained approximately -- if I may ask

11    for a minute.

12    THE COURT:  Certainly.

13    MR. SHEPHERD:  Your Honor, I don't have the exact

14    amount in front of me.  But he sold a business and did have

13:55:45    15    some money in the fall of 2015 shortly before he had the

16    discussions with the land owners about buying the land.

17    But I also would hope the court isn't discounting

18    the ability to recruit people online and ultimately bring

19    them together in person doesn't require a ton of money

13:56:06    20    either.  We saw an example of that with the online

21    recruitment of the CHS he eventually met in person in

22    Baltimore.

23    That type of online recruitment turning into an

24    in-person meeting doesn't require extensive funds.  It

13:56:20    25    doesn't require extensive funds to take that and go beyond

1    just meeting somewhere and talking online, because the cost

2    of obtaining firearms isn't necessarily prohibitive to

3    someone who's working, and I think --

4              THE COURT:  Mr. Hendricks never had any firearms,

13:56:37  5    did he?

6              THE DEFENDANT:  No, sir.

7              MR. SHEPHERD:  Not that we know of, Your Honor,

8    other than the statements that he did, which --

9              THE COURT:  But we never found any firearms or had

13:56:48 10    any evidence that he had any type of AK47 assault rifles,

11    pistols, none of that was ever discovered in his presence or

12    in his possession?

13              MR. SHEPHERD:  That's correct, Your Honor.

14              But, Your Honor, the point I was making, though,

13:57:00 15    was the ability to bring a group together and obtain arms

16    doesn't cost a prohibitive amount of funds.

17              And I think in the context of how ISIS was

18    operating in 2015, and the expert testimony about how they

19    operated online, the idea of saying that he was just an

13:57:20 20    online operative, I think is too -- discounts the danger

21    inherent in that and that that is how ISIS was creating

22    people was online, and he was certainly a part of that, and

23    the goal to -- and the goal to create a group here to extend

24    ISIS's operations in the United States in the committed

13:57:43 25    attacks is serious and it is different than other terrorism

                    Lori A. Callahan, RMR-CRR      (330) 252-6022

1    defendants.  It's different than someone who just wants to

2    himself get on an airplane and travel to Syria to fight for

3    ISIS on ISIS's perceived homeland.  It's different when you

4    are trying to get a group together to commit attacks here in

13:57:58  5    this country.

6          It's also different, Your Honor, I think in the

7    fact that it was supporting ISIS is a distinction with the

8    Baxter case, and I think the danger posed by ISIS is

9    greater -- certainly greater than any danger imposed by

13:58:11  10    affiliations with an Occupied Movement or the anarchist

11    ideology that was at play in that case.

12          And, Your Honor, I would also point the court

13    to -- the actions displayed by this defendant in this case

14    were quite sophisticated in many ways.  The lengths taken to

13:58:33  15    try and hide his online identity, the numbers of accounts

16    used, the switching of accounts from social media

17    applications to social media application, the efforts when

18    meeting with someone to avoid surveillance, the efforts to

19    avoid detection and instructions to others to avoid

13:58:50  20    detection, to vet out other potential recruits and

21    coconspirators.  You don't see that in every case, Your

22    Honor.

23          I mean, I think that shows the level of which the

24    capability this defendant has, in additions to the ideology

13:59:05  25    to support ISIS is a very dangerous combination.

1          Your Honor, I would also point out that if he was

2     just an online person, he wouldn't have gone and met someone

3     in person in Baltimore.  If he was just trying to commit

4     activities online, he wouldn't have traveled to meet

13:59:24   5     someone, which is an incredible risk if all you're trying to

6     do is hide behind your computer and be a so-called keyboard

7     warrior.  That's a step beyond.

8          It's also a step beyond when you communicate with

9     someone who at your direction goes to the scene of an event

13:59:42   10     where a terrorist attack occurs, and you are asking for

11     information.  That's a step beyond just the typical person

12     expressing their support for ISIS.

13          And then when you after the fact try to -- you

14     cause a document to be published online taking credit for

13:59:56   15     that attack and promising new attacks, you are doing more

16     than just someone who's just sitting back and trying to

17     thread an ideology through just talking online.  You're

18     getting past that, Your Honor.  And that's the danger with

19     this defendant.

14:00:14   20          And so as we look at what we believed the evidence

21     showed he did in this case and we look at his intentions,

22     what he was trying to do, what he was trying to accomplish,

23     and the fact that he didn't get to carry out everything he

24     intended because he spotted surveillance and then law

14:00:35   25     enforcement was ultimately able to sort of untangle the web

1    of tracks he laid behind to gather the evidence on him

2    shouldn't be a reason to say, "Oh, he's not deserving of a

3    lengthy sentence."

4         And in responding to Mr. Bryan's comments about,

14:00:57  5    "Well, the government left him alone for a year and a half,"

6    I mean, much easier said than done in a case where the

7    defendant has taken these efforts to conceal his activities,

8    to put a case together that is going to withstand the

9    scrutiny of a jury in a jury trial.  And to say the

14:01:15  10    government just left him alone or implied that would be

11    inaccurate, as well as from -- the defense received plenty

12    of discovery on the fact that there were surveillance being

13    done of the defendant in that time period.

14         So it wasn't as if the government just ignored

14:01:30  15    him, found out about him, forgot about him and then a year

16    came back to arrest him.  It was a case of a very active

17    investigation that was trying to pull all these pieces

18    together, and I don't believe the government should be

19    punished for that in the court considering what sentence to

14:01:45  20    impose.

21         Your Honor, for the reasons we said in our

22    sentencing memorandum, we think this defendant is a cut

23    above the usual ISIS defendant and the usual terrorism

24    defendant in that he saw himself out as a recruiter and was

14:01:59  25    trying to pull these people together to commit attacks right

1     in this country, Your Honor, and that's why we recommend

2     that the court impose that maximum sentence.

3          THE COURT:  All right.  Thank you.

4          Anyone else wish to be heard before I go further?

14:02:15   5          Mr. Bryan?

6          MR. BRYAN:  Your Honor, are you referring to

7     family members?

8          THE COURT:  If there's anyone else that wishes to

9     address the court, now is the time.  I am going to go

14:02:25   10     forward and make certain findings, as I am required to do,

11     as you're aware.

12          MR. BRYAN:  Yes, Your Honor.  The only thing I

13     would say in response to what Mr. Shepherd said was on that

14     last point.

14:02:36   15          I wasn't suggesting that the government ignored

16     Mr. Hendricks for a year and a half.  The fact is, if there

17     was any evidence of him continuing in this type of conduct

18     for the next year and a half, that's evidence that would

19     have been presented at the trial against him.  So for a year

14:02:51   20     and a half, in May of 2015 to the year and a half before he

21     was arrested, there's no evidence that he was involved in

22     the types of conduct that were being discussed in the three

23     months prior to him sort of --

24          THE COURT:  All right.

14:03:07   25          MR. BRYAN:  So, in essence, there's no evidence of

1    him doing anything for a year and a half before he was

2    arrested, even online activity.

3              THE COURT:  All right.  Thank you.

4              MS. BRYAN:  And Linda Woods is Mr. Hendricks'

14:03:21  5    mother and she did ask if she could --

6              THE COURT:  All right.  Ms. Woods, if you want to

7    step forward, please, ma'am.  You will need to use the

8    podium, if you would, and you need to state your name for

9    the court reporter.  There's a record being kept, please.

14:03:35  10             Yes, ma'am.

11             MS. WOODS:  My name is Linda Woods, and I am Erick

12   Hendricks' mother.

13             And I just wanted to give a little history.  I'm

14   not trying to argue the case or anything, but I want to talk

14:03:46  15   about Erick's character.

16             First of all, I am a registered nurse.  I've been

17   a nurse for almost 30 years.  I've worked with children with

18   disabilities.  I was in the military, and I was a medic in

19   the military where I got out and went to nursing school.

14:04:02  20             Erick -- I had four children at the time.  They

21   traveled with me to Germany.  We stayed there a while.  We

22   came back and I went to nursing school.  I've always

23   encouraged my children, my sons, especially, to do the right

24   thing, and I was one of those tough mothers.  I didn't go

14:04:21  25   for that -- anything.

1          And, Erick, he -- when he turned to the Muslim

2     faith, I was -- you know, I was surprised, but I was

3     grateful because he prayed five times a day and did the

4     right thing.  Didn't even cuss.  I cuss a whole lot more

14:04:39  5     than he do.  But he don't curse, and as I am -- I am really

6     proud of him for what he has made out of his life.

7          And the only thing I would like to say about the

8     three months that they were talking about, he was living at

9     my house.  He was living in my yard.  And I watched him.  I

14:04:59 10     have a home business, and they were staying down in the shed

11     of mine, and they were living in that shed.  I could see

12     them all day, every day.  I never seen any action.  I didn't

13     even know anything about this until he was arrested.

14          Well, he told me about it in May when he found out

14:05:16 15     about this surveillance, he called me, and let me know what

16     was going on.

17          So, but he has been -- I never saw -- Erick had an

18     injury when he was 16 years old.  He broke his neck.  You

19     can see the scar back there.  He had the same break as

14:05:36 20     Christopher Reeves, and he had two repairs on that neck.  He

21     can barely move from side to side and sit too long in one

22     place.  And I believe that he would have went to the

23     military, because I was in the military, his dad was in the

24     military, my father, uncles and great uncles were all in the

14:05:55 25     military.  And we have that background, so I never believed

1    that he would do anything against the government.

2              And I stand by that, and I stand by him and I also

3    stood -- I wanted to come -- I was here for when they

4    selected the jury.  I was here -- I think I have been here

14:06:15    5    twice, but we couldn't stay because of work, I had my sons

6    with me and my daughter, and we couldn't stay, but I wanted

7    to testify, but I was told they didn't want me to.

8              First they did, and then they said they didn't.

9              So -- but I feel like I could have brought some

14:06:32    10    clarity of those months that they were speaking about,

11    because if I had seen anything -- and he used my wifi the

12    whole time he was there.  And like I said, I wish I could

13    have been here to tell that.

14              But I am asking the judge to have mercy, the

14:06:53    15    court, to have mercy on my son.  My granddaughter, she came

16    from UK.  We didn't even know she was coming.  She came on

17    her own.

18              THE COURT:  Scotland, is that where she's at?

19              MS. WOODS:  Yes, sir.  We didn't even know she was

14:07:08    20    coming.  She just popped up and was here by Friday.  She

21    stopped in Dublin and wanted to know all about him and all

22    that stuff.  And she stayed in New York all night by

23    herself.  So she's a brave person like her father.

24              He's always been that type of person.  When he was

14:07:23    25    eight months old, he climbed up and down the stairs.  I just

1    watched him.  He's always been very observant.

2          One time he drove to New York at 17 by himself.  I

3    couldn't believe it.  A homeless guy told me he was there.

4    But just to say that he's very adventurous.  When they

14:07:39  5    saying he's going there and here, you know, that's just what

6    he is.

7          So I would like for you to have mercy on my son.

8    I am almost 65.  When he -- two weeks after he was arrested,

9    his dad died from the stress.  He -- he told me, he said, "I

14:07:59  10    just hope I can live to see him free."  But he didn't.  Two

11    weeks later, he died, which he was sick already, you know,

12    but that didn't help.

13          But I know he's been in prison, he's been

14    mentoring the young folks there, some of the young

14:08:22  15    prisoners.  They had him leading prayer, and I think he

16    intervened one of the guards being hurt.  He never was put

17    in isolation.  I think he did himself.  He asked for

18    isolation a couple of times to, you know, to concentrate on

19    what he was doing.  But he's never -- and when I was there

14:08:46  20    yesterday, they all said, you know, they liked him.

21          And I've asked three times I've been to the

22    prison, special visitation, and they all granted it, because

23    I guess because, you know, because of his actions there.

24          But I just want to say that he wouldn't -- it

14:09:05  25    wouldn't do him any good -- and when he was in the

1    community, where they talking about the cell, that three

2    months he was there, he was building a hut.  I call it a hut

3    because it was an A-line cabin.  He was building that.  He

4    never did finish it, because he got scared after he -- you

14:09:21  5    know, after this came along.  And he figured that, you know,

6    since they were all over -- helicopters and that stuff, all

7    over the place, he didn't want me to be involved, you know,

8    me to get caught up in anything like that.

9         When the FBI did come and arrest him the same day

14:09:39  10   they came to my house, all my family, and they -- I showed

11   them with he lived.  They went up in the -- I gave them

12   permission to go into -- look where the shed is I was

13   talking about, and I took them over to where the place he

14   was building and they didn't find anything.

14:09:57  15        So I stand by him and I believe in him.  And as I

16   said, in the community where he was at, he was, you know,

17   talking with the young folks.  I live in a place of 400

18   people, and there ain't nowhere you can put a cell down

19   there.  And he would talk to them and encourage them.

14:10:15  20        So that's just the way he is, and I just wanted to

21   tell you that, and I wouldn't lie to you.  All right.

22        THE COURT:  All right, ma'am.  You came quite a

23   ways.

24        Where did you come from?

14:10:26  25        MS. WOODS:  Arkansas.  Little Rock.  Home of the

```
         1    Razorbacks.
         2              THE COURT:  Okay.  Thank you.  I thought it
         3    was Little Rock, but I just wanted to confirm it.
         4              Yes, ma'am.  You want to be heard?
14:10:40 5              You came a long way.  You can step forward.
         6              MS. ABDULHAQQ:  Hello.  My name is Mariam
         7    Abdulhaqq.
         8              THE COURT:  May I ask, you are going to need to
         9    speak up a little bit louder for the court reporter.
14:11:05 10             MS. ABDULHAQQ:  Mariam Abdulhaqq.
        11             THE COURT:  You want to spell your last name,
        12    please?
        13             MS. ABDULHAQQ:  A-B-D-U-L-H-A-Q-Q.
        14             THE COURT:  Thank you.
14:11:13 15             MS. ABDULHAQQ:  I am Erick Hendricks' daughter and
        16    only daughter.  I came to the United States on Friday.  I
        17    traveled by myself.  I came for my father.  I came to
        18    support him, and I knew it was going to be a big decision,
        19    but in my heart, I always knew that -- my home is where my
14:12:00 20    heart is and my heart is going to be with my father.  I left
        21    my mother because of -- my mother has kids with my step dad,
        22    and she has four kids with my step dad and I am her only
        23    daughter, only oldest daughter.
        24             Sorry.  My mom, she didn't understand me, but she
14:12:44 25    was always there for me, but my father was -- over the
```

1    phone, he understood me.  I would say my personalty is more

2    like my father's.

3         THE COURT:  Have you had a chance to visit him

4    while you're here?  Have you had a chance to visit with your

14:13:03   5    father?

6         MS. ABDULHAQQ:  Yes, yesterday.  But I have been

7    talking to my dad over the phone while I was in the United

8    Kingdom, and over the phone, there's just a different

9    connection like -- I felt as though he was always with me,

14:13:28   10   and, you know, you could feel his love.  It was just -- he

11   could understand me, and I had a problem with my studying

12   because in the United Kingdom, I was more creative than I

13   was more academic, and I had told my dad that, and he was so

14   supportive over the phone.

14:13:51   15        And he said, "Mariam, sit down, and pretend you

16   are with me."  I said, "Okay.  Get out a piece of paper and

17   a pen and write down three things that you need to focus on

18   and you can find a solution for them," and we both did that

19   together.  And ever since then, I had always planned that I

14:14:18   20   was going to go to my dad because this is where I -- that's

21   where I always felt like I should have been.

22        And I have no intention of going back to the

23   United Kingdom.

24        THE COURT:  You intend to remain here in this

14:14:39   25   country?

                Lori A. Callahan, RMR-CRR      (330) 252-6022

1          MS. ABDULHAQQ:  Yes.

2          THE COURT:  Is there anything else you would like

3     to tell me?

4          MS. ABDULHAQQ:  I am so nervous.

14:14:56   5          THE COURT:  Don't be nervous.

6          MS. ABDULHAQQ:  My dad taught me Sabr.  In English

7     it means patience.  He always told me never to worry about

8     anything.  He said over the phone, "Mariam, don't worry

9     about me," and that was what -- he had so much faith.  He

14:15:23   10    had so much faith in his love for his family.  He would

11    always support them, and I know deep down that my father

12    would never do such a thing.

13          He has a good heart.  And I believe -- he's taught

14    me patience and patience has led me to come back home, has

14:15:57   15    led me to come back to him.

16          THE COURT:  All right.  Thank you, ma'am.  Good

17    luck to you.

18          MS. ABDULHAQQ:  Thank you.

19          THE COURT:  Anyone else?

14:16:11   20          For the record, the court, of course, is required

21    to make certain findings -- I am sorry.  Do you wish to be

22    heard, too?

23          You may step forward, please.  You need to state

24    your full name, sir, and spell your last name for the

14:16:31   25    record.

Lori A. Callahan, RMR-CRR      (330) 252-6022

```
 1              MR. BEVANY:  Noah Bevany, B-E-V-A-N-Y.

 2              THE COURT:  Yes, sir.

 3              MR. BEVANY:  I just want to say I really spend a

 4    lot of time with my dad and he's always there for me.  And

 5    he had like a back injury, and basketball is like something

 6    I like and stuff like that.  When he had time, he would come

 7    and play basketball with me.  He always took care of my

 8    mother when she needed anything.  He always took care of me

 9    if I needed a new pair of shoes, or anything, he would take

10    care of me.  And I always had him in my heart and

11    everything.  It's really hurting me because stuff that they

12    saying about him I don't believe to be true, and stuff like

13    that.

14              That's all I wanted to say.

15              THE COURT:  All right, sir.  Thank you.

16              For the record, the court, of course, is required

17    to make certain findings under 18, 3553(a).

18              We will begin with the nature and circumstances of

19    the offense.  Generally, the offense conduct is described as

20    follows:

21              Mr. Hendricks is before the court having been

22    convicted of a jury of conspiracy to provide material

23    support and resources to a foreign terrorist organization

24    and attempting to provide material support and resources to

25    a foreign terrorist organization.
```

Lori A. Callahan, RMR-CRR        (330) 252-6022

1          Between December 2014 and May of 2015,

2     Mr. Hendricks, as a U.S. citizen, conspired with others to

3     support or provide support and resources to ISIL, sometimes

4     referred to as ISIS.  Mr. Hendricks' focus in this

14:18:11  5     conspiracy was to recruit individuals in the United States

6     to form a cell of ISIL supporters, number one; number two,

7     training recruited individuals to commit acts of violence in

8     the United States on behalf of ISIL, and commit other acts

9     of violence in the United States on behalf of ISIL.

14:18:29  10          That is the general offense conduct as alleged.

11          In furtherance of the conspiracy, Mr. Hendricks

12     did the following:

13          Which I think primarily has been set forth and at

14     least been established by evidence presented in the case.

14:18:45  15          He used social media applications with various

16     user names, handles to recruit and communicate with ISIL

17     supporters.  He vetted suitable individuals to join his ISIL

18     cell.  He directed the activities of individuals, including

19     an undercover, a law enforcement agent or officer located in

14:19:01  20     the Northern District of Ohio.

21          He advised recruited individuals how to avoid law

22     enforcement detection on social media applications and how

23     to conduct counter-surveillance.  He provided recruited

24     individuals with information to read, including materials

14:19:17  25     that may have contained bomb making instructions, attempted

to purchase land to be used in providing tactical training

for ISIL members.  And he told recruits that he obtained

guidance and worked on behalf of senior brothers in ISIL,

and warned of possible future attacks in the United States

after an ISIL supported attack which occurred in Garland,

Texas.

And just as an aside, perhaps the most compelling

evidence, unfortunately, against Mr. Hendricks is the video

with the government's agent in Baltimore, and the discussion

Mr. Hendricks had with that particular individual is perhaps

the most compelling evidence, meaning it's visible, you can

see and -- you can see him and you can hear him and that is

perhaps the most compelling evidence in the case as against

Mr. Hendricks.

There's much more, but that certainly is one of

the highlights.

In terms of Mr. Hendricks' history and

characteristics, he's age 37.  He was reared by both parents

in Arkansas.  He described his childhood as being good.  As

evidenced from his mother presentation here, it's pretty

clear to me that he had a good upbringing with parents who

obviously cared about him and provided him with guidance,

and I say that just having heard his mother.  It's pretty

apparent to me that that was the case.

Mr. Hendricks apparently had some youth

1    experimenting with alcohol and marijuana, but that has

2    ended, perhaps by virtue of his religious belief.

3            He did attend college.  He did not obtain a

4    diploma.  He has some health issues as referenced by his

14:20:56   5    mother, and we are aware of the problem that he has with his

6    back.

7            Mr. Hendricks has been married twice, has two

8    children, ages 15 and 8, both of whom reside with their

9    respective mother.  Of course we heard from his daughter

14:21:11   10   here, and his daughter who lives in Scotland, and he is, at

11   least as of the date of the report, he had not seen her

12   since 2013.  The report is somewhat dated, so they may have

13   visited since that time.

14           His son lives in Pittsburgh, and he's only seen

14:21:30   15   him on a number of occasions, and, again, those are somewhat

16   dated assertions contained in the report.

17           In terms of the sentencing disparities, there may

18   be some by the court's sentence.  The most recent data that

19   we have from the probation department is that -- the most

14:21:51   20   recent publicly available data related to this offense which

21   was from 2012, according to the PSI, according to that date

22   of the national average sentence for an individual convicted

23   of providing material support to a foreign terrorist

24   organization was 111 months.

14:22:05   25           Now, that is, again, somewhat dated.  And

1   additionally, of all national defense cases, 33 percent of

2   the defendants received a nongovernment sponsored downward

3   variance of approximately 46 percent as corresponded to an

4   average 74-month reduction.  That is, again, as of 2012.  I

14:22:24  5   have attempted to obtain updated information which has not

6   been forthcoming.

7        In terms of the need for the sentence imposed, I

8   am not going to in any way minimize the defendant's conduct.

9   Obviously, I heard the trial.  I heard the evidence, and I

14:22:41  10   think the summary that I gave earlier is a fair recitation

11   of the actions of Mr. Hendricks, unfortunately.

12        He's certainly entitled to assert his innocence.

13   He's certainly not required to make any statement, and I am

14   not suggesting that I am considering that as I decide a

14:22:58  15   sentence, but it certainly would have been somewhat helpful

16   if I had had a better understanding of the how and why he

17   apparently took this path, and so it's difficult.

18        In terms of need for the sentence imposed, the

19   defendant in this case, it's a grave concern that there are

14:23:20  20   individuals who are willing to use the Internet to perhaps

21   inspire, motivate and encourage others, to engage in

22   terrorist activities, and also to create ISIS or ISIL cells

23   within this country.  It is a concern.  It's an ongoing

24   concern.

14:23:35  25        I know the government continues perhaps unseen by

1    the public, but the government, of course, continues to

2    track individuals of this sort to try to take actions and be

3    proactive in ferreting out any possible terrorist cells and

4    to protect our public, and so I note that there's a need to

14:23:57  5    promote deterrence and to discourage this type of activity.

6         That being said, I would also note, as it relates

7    to this defendant, having interacted with him on a regular

8    basis during the course of this case, he's always been

9    respectful.  He carries himself with a quiet dignity.  And,

14:24:16  10   again, there is certainly something to be said about that.

11   And I think his actions during the course of the time that

12   I've interacted with him has been just that, as I've already

13   said, not to be repetitive, but respectful and with a quiet

14   dignity.

14:24:33  15        The guidelines are 360 months.  The statutory

16   sentences for Counts 1 and 2 is zero to 15 years.

17        I am persuaded, having listened to all the

18   evidence, the facts, and obviously the sentence that I am

19   imposing is strictly limited to the information that I have

14:24:48  20   before me as it relates to Mr. Hendricks.  While there's

21   been much discussion about the so-called Wright case, that

22   is not what drives the court's sentence.

23        It is simply something, an interesting comparison

24   when we compare and contrast the actions of the two cases

14:25:04  25   and the actions of various groups that were -- that we would

1   have characterized as terrorists.  So, again, that is of

2   limited, if any, use to me, the so-called Wright case.  So

3   I'm imposing this sentence based on what I know of the case,

4   presiding over the trial and my interaction with Mr.

14:25:21  5   Hendricks and all the various statutory factors.

6          So I will do the following:

7          Pursuant to the Sentencing Reform Act of 1984, and

8   18, United States Code, 3553(a), it will be the judgment of

9   the court that Mr. Hendricks is committed to the custody of

14:25:33  10  the Bureau of Prisons for a term of 180 months.  It will be

11  concurrent and not consecutive.  180 months on Count 1; 180

12  months on Count 2, again, to be served concurrent.  It is a

13  variance.  And I've varied downward based upon all the

14  reasons I've just stated.  I will supplement my findings in

14:25:52  15  a written order, a written memoranda which will provide in

16  greater detail.

17          When the defendant is released from prison, he

18  will be placed on supervised release for a term of life,

19  which is an upward variance.  He will be supervised closely

14:26:05  20  by our probation department or others to make certain that

21  he is not in any way a risk to the public or to others.

22          Within 72 hours of being released from custody,

23  Mr. Hendricks, you will be required to report to the

24  district to which you are released.

14:26:17  25          I will waive the fine.

Lori A. Callahan, RMR-CRR    (330) 252-6022

1       A special assessment of $200 is due immediately.

2       You will be required to submit your person,

3    property, house, residence, vehicle, papers, computers as

4    defined under the federal statute, other electronic

14:26:31  5    communications or data storage devices to a search conducted

6    by your probation officer.  Failure to submit to a search

7    may be grounds for revocation of release.  And of course

8    that search must be reasonable as to time and manner and

9    based upon reasonable suspicion.

14:26:46  10       Your computer will be subject to a search for a

11    monitoring software and to insure compliance, given the

12    circumstances, the nature and the circumstances of this

13    offense.  Any access to computers must be with the approval

14    of the court or your probation officer, and they will be

14:27:05  15    permitted to conduct initial and periodic unannounced

16    searches of your computer.  The searches shall be conducted

17    for purposes of determining whether your computer contains

18    any prohibited data.  And the software will be installed and

19    all the other details I will put other put forth in the

14:27:21  20    court's order.  You will not be able to access the Internet

21    without approval by your probation officer.

22       You will be required to submit to periodic

23    polygraph testing at the discretion of the probation officer

24    as a means to insure that you're in compliance with the

14:27:33  25    requirements of your supervision.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1      And you cannot possess, view or access or

2   otherwise use material that reflects extremist or

3   terroristic views, and that is, again, a difficult

4   condition, but I believe at least based on what we know and

14:27:48  5   the evidence in this case, it is warranted.

6      And voluntary surrender, of course, the defendant

7   remains in custody.

8      I will also supplement my findings by noting that

9   I belive that a lifetime supervision, along with the

14:28:00  10   conditions I've just imposed, should allow the government to

11   continue to monitor the defendant to make certain that he's

12   no longer a risk to anyone in the community and so that is

13   why I've imposed the lifetime supervision, along with the

14   special conditions that I've imposed.

14:28:15  15      Under U.S. versus Bostic, any objections,

16   corrections, any arguments you would like to make that I

17   haven't addressed, counsel for the government, please?

18      MR. SHEPHERD:  Your Honor, just to maintain for

19   the record, we do object to the reasonableness of the

14:28:31  20   sentence consistent with our earlier request for consecutive

21   sentences, Your Honor.  Otherwise, no other objections.

22      THE COURT:  So noted.

23      Mr. Bryan?

24      MR. BRYAN:  No objections, Your Honor.  We

14:28:43  25   would -- on Mr. Hendricks behalf, he did ask me to ask the

1    court to recommend two facilities.  The first is Edgefield,

2    South Carolina and the second would be Butner, North

3    Carolina.

4              THE COURT:  Butner I am familiar with.  The other

14:28:55  5    one is -- how is it spelled, please?

6              MR. BRYAN:  He tells me Edgefield.

7              THE DEFENDANT:  Edgefield.

8              THE COURT:  We will locate whichever one it might

9    be.  We will identify it.  I will make those

14:29:07  10   recommendations.

11             Mr. Hendricks, you have a right to an appeal from

12   the court's sentence and, of course, from your conviction.

13   I will put up an order.  It may take me a little bit longer

14   than usual, my written opinion, setting forth your sentence,

14:29:17  15   the reasons for same.

16             You will have 14 days after we have issued that

17   order to file your notice of appeal and, of course,

18   Mr. Bryan, we will appoint him for the appeal and make sure

19   you have all the necessary papers, transcripts, et cetera,

14:29:30  20   for your appeal.

21             Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  All right.  That will be the court's

24   order.  Thank you very much.

14:29:35  25             MR. SHEPHERD:  Your Honor, I have one thing.

1             There was a superseding indictment in this case.

2        So we would move for I guess housekeeping purposes move to

3        dismiss the original indictment.

4             THE COURT:  All right.  Thank you.  We will grant

14:29:46  5        that request, and the superseding indictment will be the one

6        that remains.  Thank you very much.

7             Good luck to you, Mr. Hendricks.

8             THE DEFENDANT:  Thank you.

9             MR. BRYAN:  Thank you, Your Honor.

10            MR. SHEPHERD:  Thank you, Your Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7

8              s/Lori A. Callahan
               Lori Ann Callahan, RMR-CRR
9              U.S. District Court, Suite 568
               2 South Main Street
10             Akron, Ohio  44308
               (330) 252-6022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25